# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

COMCAST OF MAINE/NEW HAMPSHIRE, INC.; A&E TELEVISION NETWORKS, LLC; C-SPAN; CBS CORP.; DISCOVERY, INC.; DISNEY ENTERPRISES, INC.; FOX CABLE NETWORK SERVICES, LLC; NBCUNIVERSAL MEDIA, LLC; NEW ENGLAND SPORTS NETWORK, LP; and VIACOM INC.,

                              Plaintiffs,

          v.

JANET MILLS, in her official capacity as the Governor of Maine; AARON FREY, in his official capacity as the Attorney General of Maine; the CITY OF BATH, MAINE; the TOWN OF BERWICK, MAINE; the TOWN OF BOWDOIN, MAINE; the TOWN OF BOWDOINHAM, MAINE; the TOWN OF BRUNSWICK, MAINE; the TOWN OF DURHAM, MAINE; the TOWN OF ELIOT, MAINE; the TOWN OF FREEPORT, MAINE; the TOWN OF HARPSWELL, MAINE; the TOWN OF KITTERY, MAINE; the TOWN OF PHIPPSBURG, MAINE; the TOWN OF SOUTH BERWICK, MAINE; the TOWN OF TOPSHAM, MAINE; the TOWN OF WEST BATH, MAINE; and the TOWN OF WOOLWICH, MAINE;

                              Defendants.

Case No. _____

**DECLARATORY AND INJUNCTIVE RELIEF SOUGHT**

## COMPLAINT

Plaintiff Comcast of Maine/New Hampshire, Inc. ("Comcast Cable"), and plaintiffs A&E Television Networks, LLC ("AETN"), National Cable Satellite Corp. ("C-SPAN"), CBS Corp. ("CBS"), Discovery, Inc. ("Discovery"), Disney Enterprises, Inc. ("DEI"), Fox Cable Network Services, LLC ("Fox"), NBCUniversal Media, LLC ("NBCUniversal"), New England Sports Network, LP ("NESN"), and Viacom Inc. ("Viacom") (collectively, "Plaintiff Programmers," and together with Comcast Cable, "Plaintiffs"), bring this suit for declaratory judgment and injunctive relief against Janet Mills, in her official capacity as the Governor of Maine; Aaron Frey, in his official capacity as the Attorney General of Maine; the City of Bath, Maine; the Town of Berwick, Maine; the Town of Bowdoin, Maine; the Town of Bowdoinham, Maine; the Town of Brunswick, Maine; the Town of Durham, Maine; the Town of Eliot, Maine; the Town of Freeport, Maine; the Town of Harpswell, Maine; the Town of Kittery, Maine; the Town of Phippsburg, Maine; the Town of South Berwick, Maine; the Town of Topsham, Maine; the Town of West Bath, Maine; and the Town of Woolwich, Maine (collectively, "Defendants"), stating as follows:

### NATURE OF THE CASE

1.      This case arises from the State of Maine's attempt to regulate the provision of cable television in a manner that is squarely preempted by federal law and foreclosed by the First Amendment.  Specifically, Maine's H.P. 606 – L.D. 832, "An Act to Expand Options for Consumers of Cable Television in Purchasing Individual Channels and Programs," mandates that, "[n]otwithstanding any provision in a franchise, a cable system operator shall offer subscribers the option of purchasing access to cable channels, or programs on cable channels,

individually." 129 Pub. L. Ch. 308 (2019) ("L.D. 832"), *available at*

http://legislature.maine.gov/legis/bills/bills_129th/chapters/PUBLIC308.asp.

2.     An array of federal statutory provisions precludes Maine from dictating how cable

programming is presented to consumers. Those provisions reflect Congress's considered

judgment that consumers' interests will be best served if content developers, programming

networks, and cable operators (and other distributors) enter into market-based agreements to

determine the optimal packaging of video programming, without micromanagement by 50

different states and myriad local governments. Maine's effort to foist an "à la carte" regime on

these industry participants not only is unlawful, but would end up causing the very harms it seeks

to avoid—namely, higher costs and reduced programming choice. Indeed, as discussed further

below, the Federal Communications Commission ("FCC") and Government Accountability

Office ("GAO") have studied the implications of an à la carte mandate in depth and concluded

that forced unbundling of all cable tiers and packages would diminish carriage opportunities for

many programmers and ultimately drive many out of business, thereby curtailing choice and

diminishing diversity, while also increasing programming costs for consumers and forcing many

of them to lease new equipment.

3.     L.D. 832 is expressly preempted by several provisions of the Communications

Act of 1934, as amended (the "Communications Act" or "Act"). First, L.D. 832 runs afoul of

Section 624(f) of the Act, which prohibits state and local authorities from regulating the

"provision or content of cable services, except as expressly provided in" Title VI of the

Communications Act. 47 U.S.C. § 544(f)(1); *see Lafortune v. City of Biddeford*, 222 F.R.D. 218

(D. Me. 2004) (invalidating city ordinance regulating content of cable services in a manner that

violated Section 624(f)), *aff'd* 142 F. App'x 471 (1st Cir. 2005). Because nothing in Title VI

provides for or authorizes the à la carte mandates imposed by L.D. 832, Maine is barred from imposing such requirements.  For similar reasons, L.D. 832 is expressly preempted by Sections 624(a) and (b) of the Act, which prohibit municipalities functioning as local franchising authorities ("LFAs")—the entities principally charged with enforcing L.D. 832—from regulating "the services, facilities, and equipment provided by a cable operator except to the extent consistent with [Title VI]," or from "establish[ing] requirements for video programming," except in very limited respects not applicable here.  47 U.S.C. §§ 544(a), (b)(1).

4.      L.D. 832 is also preempted by Section 636(c), which expressly "preempt[s] and supersede[s]" any state law that "is inconsistent with [the Communications Act]."  *Id.* § 556(c).  L.D. 832 is exactly that, because it conflicts with federal law and policy objectives established by the Communications Act and FCC rules adopted pursuant to it.  For example, the Communications Act and FCC rules require that cable operators provide all subscribers with certain broadcast stations as part of a mandatory "basic tier" of service.  *Id.* §§ 534, 543(b)(7)(A).  Yet L.D. 832, by its terms, mandates the offering of such individual channels (and even individual programs on channels) *without* any need to purchase the federally mandated basic tier, making it impossible to comply with L.D. 832 without violating federal law.  More broadly, L.D. 832 effectively dismantles tiers of cable service that Congress and the FCC have repeatedly recognized as valid and, in certain cases, required.  *See, e.g.*, 47 C.F.R. § 76.920 ("Every subscriber of a cable system must subscribe to the basic tier in order to subscribe to any other tier of video programming or to purchase any other video programming."); *id.* § 76.921(a) ("A cable operator may . . . require the subscription to one or more tiers of cable programming services as a condition of access to one or more tiers of cable programming services.").  Under the Supremacy Clause of the U.S. Constitution, U.S. Const. art. VI, cl. 2, and Section 636 of the

Act, state measures that contravene validly adopted federal laws and policy determinations are preempted and have no force or effect.

5.      More fundamentally, L.D. 832 violates the First Amendment.  As the federal government recognized in declining to impose an à la carte mandate, tiers and bundling are not just a product of unilateral decision-making by cable operators or an exercise of purely contractual rights.  Tiers and bundling reflect the exercise of First Amendment rights—both by the programmers who decide how to license their programming to cable operators, and by the cable operators who decide how to provide that programming to the public.  The federal statutory and regulatory provisions, which give cable operators and programmers flexibility to package and sell programming in whatever manner they deem most appropriate (apart from the mandatory carriage requirements set forth in the Act), thus are, at their core, grounded in the First Amendment.  By taking away that flexibility, L.D. 832 imposes both content- and speaker-based restrictions, infringing the rights of programmers and cable operators.  And, to make matters worse, the statute uniquely burdens cable operators (exempting all other video distributors).  Restrictions of this type must satisfy strict scrutiny, a standard that L.D. 832 cannot possibly meet.  Indeed, this unsupported one-sentence state mandate could not satisfy even intermediate scrutiny, which would require Maine to show that L.D. 832 furthers an important or substantial governmental interest and imposes restrictions on First Amendment freedoms that are no greater than is essential to further that interest.  *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994) ("*Turner I*").  L.D. 832 does not even begin to meet that test.

6.      As a preliminary matter, the thin legislative record falls short of satisfying the State's burden of showing that L.D. 832 materially advances any purported interests in expanding programming options and saving consumers money.  Leaving aside that the statute

was passed with almost no regard for this foundational question, the State could not have met this burden even had it tried to do so: Today, consumers have an unprecedented array of competitive options for accessing video, including on an à la carte basis. L.D. 832's à la carte mandate would threaten that consumer choice. By curtailing the exercise of First Amendment rights as well as exclusive rights under the Copyright Act to license the provision of programming in ways that will best increase its viewership, L.D. 832 would imperil the survival of many programming networks, particularly those serving niche audiences, thereby detracting from programming diversity and quality. After all, if niche networks lack sufficient subscriber penetration and viewership that they often attain through carriage on program tiers, it is unlikely that they will be able to continue operating. L.D. 832 also would require substantial infrastructure modifications as well as changes to customer ordering, subscription management, and billing systems, with costs ultimately passed through to subscribers. It also would require some subscribers to lease or purchase additional technology from cable operators (or require the replacement of existing technology) to obtain à la carte programming, thereby undermining any purported cost savings from à la carte cable offerings. What is more, L.D. 832 would cause consumer prices to increase because the loss of advertising revenues programmers typically obtain via tiered carriage would instead need to be recovered by charging higher license fees to cable operators, costs that would in turn be passed along to subscribers. In short, far from promoting increased choice or saving money for consumers, as L.D 832's sponsors posited, such mandates likely would have the opposite effects, as the FCC and GAO (among other experts) have documented.

       7.     Apart from the lack of any evidence that L.D. 832 materially furthers a substantial state interest, the statute is also insufficiently tailored to survive any level of heightened scrutiny.

Not only does it impose an unnecessarily sweeping mandate on those that it *does* regulate, but L.D. 832 represents an underinclusive means of ensuring the offering of video programming on an à la carte basis, as the statute is focused solely on cable operators—and does not impose any similar requirement on any of cable's traditional or Internet-based competitors.

8.      Plaintiffs would suffer irreparable harm if L.D. 832 were permitted to take effect. Courts have long recognized that imposing unconstitutional obligations and restrictions on speech constitutes irreparable injury in and of itself.  Here, moreover, the prerogatives of cable operators and programmers to offer programming as they see fit are further protected by federal law through the Communications Act (and the Copyright Act).  The loss of the flexibility that federal law preserves is itself irreparable injury.  In addition, the practical consequences of L.D. 832's actual or threatened enforcement would cause Plaintiffs to incur an immeasurable loss of consumer and commercial goodwill and sustain significant monetary losses that likely would prove unrecoverable—e.g., due to statutory immunity protections afforded to municipalities.  *See* 47 U.S.C. § 555a(a).  For example, to begin offering all channels and programs on an à la carte basis, Plaintiff Comcast Cable and other cable operators would be required to undertake extensive modifications to their network infrastructure; ordering, subscription management, and billing systems; customer care operations; and consumer equipment.  Due to its complexity, such a transition would impose substantial costs, would harm cable operators' relationships with their subscribers, and would divert resources from other programming, service, and technology enhancements they might otherwise offer.  Moreover, by purporting to abrogate the terms of existing agreements between programming networks and cable operators—which typically require distribution of channels in their entirety and as part of tiers—L.D. 832 inevitably would

give rise to contractual disputes, thereby exposing Plaintiffs to the risk of costly litigation and potential service disruptions.

9.      The à la carte mandate also would irreparably harm Plaintiff Programmers by substantially disrupting their existing business model, which is generally oriented around distribution of programming channels on tiers of service that cable operators offer their subscribers.  In addition, L.D. 832 would put many programmers at odds with third-party copyright owners that typically supply much of their programming, to the extent the relevant agreements are predicated on (as is expressly permitted by the Copyright Act, *see* 17 U.S.C. § 106) the distribution of content as part of a tier (e.g., as is often the case for sports programming of the type distributed by Plaintiff NESN).  L.D. 832 also would undermine programmers' carriage agreements, which typically require cable operators to carry networks as part of a tier.  Programmers often negotiate license fees with cable operators based on tiered carriage, and eliminating such carriage would force programmers to charge higher license fees to cable operators, which ultimately would be passed on to subscribers.  Similarly, by restricting viewership, L.D. 832 would significantly diminish Plaintiff Programmers' advertising revenues, and those losses too would require the imposition of higher license fees (and, in turn, subscriber charges).  In fact, such losses could drive some networks off cable systems entirely.  L.D. 832 thus would harm the very consumer choice and content diversity that L.D. 832 is ostensibly intended to foster.

10.     Because such harms to Comcast Cable and Plaintiff Programmers will otherwise prove irremediable, injunctive relief is warranted.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, including the Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq.*, and 42 U.S.C. § 1983, as well as the Supremacy Clause of, and First Amendment to, the U.S. Constitution.  This Court has equitable jurisdiction to enjoin unconstitutional action.  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

12.     Because an actual controversy within the Court's jurisdiction exists, this Court may grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

13.     Venue is proper in the District of Maine, pursuant to 28 U.S.C. § 1391(b), because the events and omissions giving rise to Plaintiffs' claims occurred in Maine.  The statute was passed by the Maine Legislature, and it will be enforced by Defendants and, if not enjoined, cause injury to Plaintiffs in Maine.

## PARTIES

14.     Plaintiff Comcast Cable provides cable television services to households, businesses, and governmental entities in Maine.

15.     Plaintiff AETN is a provider of a wide array of video programming that is distributed via cable operators and satellite providers in Maine, as well as by online video providers.  AETN's programming networks include, among others, A&E, HISTORY, Lifetime, LMN (Lifetime Movies), and FYI.

16.     Plaintiff C-SPAN is a provider of public policy-focused video programming, including live gavel-to-gavel coverage of the U.S. House of Representatives and the U.S. Senate.

Its programming is distributed via cable operators and satellite providers in Maine, as well as by online video providers.

17.     Certain subsidiaries of Plaintiff CBS provide a wide array of video programming that is distributed via cable operators and satellite providers in Maine, as well as by online video providers.  That programming includes the CBS Television Network, The CW, CBS Sports Network, Pop, and the Smithsonian Channel.

18.     Plaintiff Discovery, through certain of its subsidiaries, is a provider of a wide array of video programming that is distributed via cable operators and satellite providers in Maine, as well as by online video providers.  Discovery's video programming includes Discovery Channel, HGTV, Food Network, TLC, Investigation Discovery, Travel Channel, Motortrend, Animal Planet, Science Channel, DIY Network, and Cooking Channel.

19.     Certain affiliates of Plaintiff DEI provide a wide array of video programming that is distributed via cable operators and satellite providers in Maine, as well as by online video providers.  That programming includes the ABC Television Network, ESPN, Disney Channel, Freeform, Disney XD, Disney Junior, FX, and the National Geographic Network.

20.     Certain affiliates of Plaintiff Fox provide a wide array of video programming that is distributed via cable operators and satellite providers in Maine, as well as by online video providers.  That programming includes FOX, Fox News Channel, Fox Business Network, Fox Sports 1, Fox Sports 2, Big Ten Network, and Fox Deportes.

21.     Plaintiff NBCUniversal, a subsidiary of Comcast, is a provider, both directly and through certain subsidiaries, of a wide array of video programming that is distributed via cable operators and satellite providers in Maine, as well as by online video providers.  That

programming includes the NBC Television Network, CNBC, MSNBC, USA Network, Bravo, E! Entertainment, Syfy, Universal Kids, and Oxygen.

22.     Plaintiff NESN is a provider of Boston sports-related video programming, including telecasts of live Boston Red Sox and Boston Bruins games, which is distributed via cable operators, satellite providers, and other video distributors in Maine and the other New England States, as well as by online video providers.  For almost two decades, NESN has entered into affiliation agreements with various cable operators that cover multiple states, providing for the distribution of its content as part of various cable package offerings, but not on a standalone basis.  During the legislative debate on L.D. 832, NESN was specifically targeted as a network that should be forced to have its programming offered on an à la carte basis to Maine residents. *See* Testimony of Rep. J. Evangelos at 2 (Mar. 5, 2019 Hearing), *available at* http://www.mainelegislature.org/legis/bills/getTestimonyDoc.asp?id=96832.

23.     Plaintiff Viacom is a provider of a wide array of video programming that is distributed via cable operators and satellite providers in Maine, as well as by online video providers.  Viacom's programming includes Nickelodeon, MTV, BET, Comedy Central, Paramount Network, VH1, TV Land, CMT, and Logo.

24.     Defendant Janet Mills is the Governor of Maine.  The Maine Constitution provides that the "supreme executive power of this State shall be vested in a Governor," and that the "Governor shall take care that the laws be faithfully executed."  Me. Const. art. V, §§ 1, 12. This executive power includes enforcement of L.D. 832.  Defendant Mills is sued in her official capacity only.

25.     Defendant Aaron Frey is the Attorney General of Maine.  The Attorney General represents the state in civil actions to recover money for the state, and has authority to take "civil

or criminal action . . . under common law or statute, including an action . . . to obtain injunctive relief or a combination of injunctive relief and other remedies available under common law or statute." 5 M.R.S. §§ 192, 194-J(2). Additionally, guidance promulgated by the Attorney General states that "the legislature has enacted specific rights and protections for users of cable television systems . . . . The Attorney General's Office is authorized to receive consumer complaints concerning matters other than channel selection and rates." Maine Attorney General, *Consumer Law Guide* § 29.24 (2012) (emphasis removed), *available at* https://www.maine.gov/ag/consumer/law_guide_article.shtml?id=27950. Defendant Frey is sued in his official capacity only.

26. Defendant the City of Bath is a municipality located in the State of Maine. "Pursuant to 30-A M.R.S.A. § 3008 municipalities may enact ordinances governing the franchising and regulation of cable television systems." *Id.* § 29.24. Maine law confers on municipalities the right to seek "injunctive relief in addition to any other remedies available by law to protect any rights conferred upon the municipality by [section 3008] or any ordinances enacted under [section 3008] or section 3010," 30-A M.R.S. § 3008(3)(E). L.D. 832 will be codified in section 3008 of title 30-A of the Maine Revised Statutes, thereby giving Bath and the other municipal defendants the authority to enforce its requirements. Comcast Cable provides cable television services in Bath, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Bath.

27. Defendant the Town of Berwick is a municipality located in the State of Maine. As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants Berwick the authority to enforce its requirements. Comcast Cable provides cable television services in

Berwick, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Berwick.

28.     Defendant the Town of Bowdoin is a municipality located in the State of Maine. As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants Bowdoin the authority to enforce its requirements.  Comcast Cable provides cable television services in Bowdoin, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Bowdoin.

29.     Defendant the Town of Bowdoinham is a municipality located in the State of Maine.  As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants Bowdoinham the authority to enforce its requirements.  Comcast Cable provides cable television services in Bowdoinham, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Bowdoinham.

30.     Defendant the Town of Brunswick is a municipality located in the State of Maine. As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants Brunswick the authority to enforce its requirements.  Comcast Cable provides cable television services in Brunswick, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Brunswick.

31.     Defendant the Town of Durham is a municipality located in the State of Maine. As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants Durham the authority to enforce its requirements.  Comcast Cable provides cable television services in Durham, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Durham.

32.     Defendant the Town of Eliot is a municipality located in the State of Maine.  As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants Eliot the authority to enforce its requirements.  Comcast Cable provides cable television services in Eliot, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Eliot.

33.     Defendant the Town of Freeport is a municipality located in the State of Maine.  As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants Freeport the authority to enforce its requirements.  Comcast Cable provides cable television services in Freeport, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Freeport.

34.     Defendant the Town of Harpswell is a municipality located in the State of Maine.  As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants Harpswell the authority to enforce its requirements.  Comcast Cable provides cable television services in Harpswell, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Harpswell.

35.     Defendant the Town of Kittery is a municipality located in the State of Maine.  As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants Kittery the authority to enforce its requirements.  Comcast Cable provides cable television services in Kittery, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Kittery.

36.     Defendant the Town of Phippsburg is a municipality located in the State of Maine.  As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants Phippsburg the authority to enforce its requirements.  Comcast Cable provides cable television

services in Phippsburg, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Phippsburg.

37.    Defendant the Town of South Berwick is a municipality located in the State of Maine.  As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants South Berwick the authority to enforce its requirements.  Comcast Cable provides cable television services in South Berwick, and Plaintiff Programmers develop and license programming that is distributed by cable operators in South Berwick.

38.    Defendant the Town of Topsham is a municipality located in the State of Maine. As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants Topsham the authority to enforce its requirements.  Comcast Cable provides cable television services in Topsham, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Topsham.

39.    Defendant the Town of West Bath is a municipality located in the State of Maine. As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants West Bath the authority to enforce its requirements.  Comcast Cable provides cable television services in West Bath, and Plaintiff Programmers develop and license programming that is distributed by cable operators in West Bath.

40.    Defendant the Town of Woolwich is a municipality located in the State of Maine. As detailed above, section 3008 of title 30-A of the Maine Revised Statutes grants Woolwich the authority to enforce its requirements.  Comcast Cable provides cable television services in Woolwich, and Plaintiff Programmers develop and license programming that is distributed by cable operators in Woolwich.

## FACTUAL AND LEGAL BACKGROUND

### *Cable Operators & Programmers*

41.     Comcast Cable is a provider of cable television services in Maine.  In Maine, as elsewhere, cable operators distribute 24/7 channels of video content provided by companies such as Plaintiff Programmers (e.g., A&E, C-SPAN, CBS, Discovery Channel, ABC, FOX, NBC, NESN, and Nickelodeon), as well as individual programming assets.  Cable operators package such channels (also called "networks") into "tiers" designed by the cable operator, and also offer certain channels and individual programs on an à la carte basis that cable subscribers may purchase separately.  A cable operator's distribution of a programmer's content is governed by a contract—known as an "affiliation agreement" or, in the case of many broadcast station programmers, a "retransmission consent agreement"—between the two parties.  The carriage of some broadcast stations is instead governed by the Communications Act's "must-carry" provisions and the FCC's implementing rules, which require distribution of their content as a matter of law without any contract between the broadcast stations and cable operators.

42.     Although affiliation agreements' terms vary, they typically grant a cable operator rights to distribute a programmer's networks as part of a certain "tier" of channels.  *See* U.S. Gen. Accounting Office, GAO-04-8, *Telecommunications: Issues Related to Competition and Subscriber Rates in the Cable Television Industry* 33-34 (2003) ("*GAO Report*") (explaining, based on GAO's review of contracts and other research, that programming agreements generally specify tiering requirements).  Such terms are grounded in the exercise of First Amendment and exclusive copyright rights to decide how to license creative works, and many programmers negotiate for them because they (and the content creators whose works they are licensed to provide) want their content to be available to wide audiences in order to attract dedicated and

even casual viewers.  *See id.* at 34.  A network's placement on a tier enables greater viewership of the network, which generally increases the advertising revenue that a programmer may obtain and gives the programmer the ability to charge a lower license fee to cable operators, thereby lowering subscription prices.  *Id.*  As a result, affiliation agreements are negotiated to contain various "carriage," "packaging," and "penetration" provisions—that is, how a programmer's networks may be distributed to a cable operator's subscribers.  For example, an affiliation agreement's terms may provide that a network be distributed on the same tier or in the same package as one or more competing networks.  Or a programmer may prohibit a distributor from including a particular type of programming (such as a network focusing on children's interests) on a tier that would be incompatible (such as a tier with content for more mature audiences).  And programmers and operators often negotiate volume discounts for various packages of programming, just as in any market.  Moreover, to prevent interference with the editorial discretion that programmers exercise over the inclusion and organization of content on their networks, affiliation agreements generally prohibit cable operators from disassembling a network's "linear" programming stream—e.g., to distribute content on a program-by-program basis—unless the cable operator specifically negotiates for this right.

43.    Cable operators also rely on tiers of service to provide value to their subscribers, typically offering tiers referred to as "basic" (i.e., the federally mandated tier noted above, and described further below), "expanded basic," and other optional tiers (such as sports tiers or other specialty tiers).  Cable operators also offer various à la carte options—again pursuant to licenses they have negotiated in affiliation agreements (in this case with a different economic model)— including premium channels such as HBO, pay-per-view sporting events, and a wealth of video-on-demand offerings such as movies and individual episodes of popular TV shows.  This

approach is unique neither to Maine nor to the cable industry.  Indeed, multichannel video programming distributors ("MVPDs") across the country—including large and small cable operators and direct broadcast satellite ("DBS") providers (DIRECTV and DISH Network)—assemble and deliver programming in a similar manner, relying principally on tiers of service that offer programming packages curated by the provider and programmers.  "Virtual" (i.e., online) MVPDs such as AT&T TV NOW (formerly DirecTV NOW), Hulu + Live TV, Sling TV, YouTube TV, and others do the same.

### *Federal Law Governing Cable Service*

44.     Congress has long been heavily involved in regulating the provision of cable services, in an avowed effort to bring uniformity to an area that it found was suffering from patchwork regulation at inception.  Accordingly, when companies create, aggregate, and distribute video programming for distribution over cable systems, each participant's decisions regarding how to assemble such programming into collections of episodes, packages, and tiers are subject to exclusive federal authority.  Content developers and networks have broad, federally protected interests under the Copyright Act in controlling the dissemination of their video programming,[1] and cable operators' distribution of such programming is governed by Title VI of the Communications Act, which strictly limits the role of state and local governments to the responsibilities expressly set forth therein, which do not include the power to mandate the sale of programming on an à la carte basis.  Congress authorized state and local governments to enter into franchise agreements with cable operators to regulate the use of public rights-of-way,

---

[1] *See, e.g.*, 17 U.S.C. § 106 (enumerating a copyright owner's "exclusive rights to do and to authorize" various acts, including the right to "perform the copyrighted work publicly" and to "distribute copies . . . of the copyrighted work"); *id.* § 301 (establishing that all legal and equitable rights within the scope of copyright are governed exclusively by the federal Copyright Act).

but expressly barred them from regulating programming content or the manner in which it is distributed.  That approach is grounded both in the First Amendment, which protects the editorial discretion of content creators, programming networks, and cable operators, and in Congress's recognition that a uniform federal framework (rather than myriad state and local laws) will best promote competition, programming diversity, consumer choice, the protection of exclusive rights under the Copyright Act, and other public interests.

45.    Indeed, from the first major cable law (enacted in 1984) onward, the presentation of cable programming in tiers has been repeatedly recognized and affirmed by Congress.  And Congress has not simply permitted tiers to exist—Congress has built its regulation of the cable industry upon the premise that cable service is delivered in tiers.  These tiers represent one way in which cable operators exercise their First Amendment rights, using editorial discretion to design tiers and decide how to package the channels offered to their customers.  The only exception is a minimum set of federally required channels (e.g., certain local broadcast stations) that all cable operators must offer collectively as a basic tier.  Because cable tiers have served as a core component of the federal cable regulatory framework, any interference with them by a state or local government would seriously disrupt the carefully calibrated system of rules put into place by Congress.

46.    In 1984, Congress enacted the Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2779 (the "1984 Act"), which added Title VI to the Communications Act to regulate cable television service.  Congress had determined that the "overlapping authority of the FCC and the municipalities" over cable television services had resulted in an "ill[-]defined . . . state of regulatory uncertainty."  *All. for Cmty. Media v.* FCC, 529 F.3d 763, 767-68 (6th Cir. 2008) (citation and quotation marks omitted).  It therefore concluded that "national standards"

were necessary to "clarify the authority of Federal, State and local government[s] to regulate cable through the franchise process." H.R. Rep. No. 98-934, at 23 (1984). Indeed, Congress declared that the purpose of the new Title VI was, among other things, to "establish a national policy concerning cable communications," and to "minimize unnecessary regulation that would impose an undue economic burden on cable systems." 47 U.S.C. §§ 521(1), (6).

47.     The 1984 Act reflected and ratified the practice of organizing cable packages via levels of carriage called tiers by, among other things, introducing defined terms such as "basic cable service" (defined as "any service tier which includes the retransmission of local television broadcast signals") and "service tier" (defined as "a category of cable service or other services provided by a cable operator and for which a separate rate is charged by the cable operator"). *Id.* §§ 522(3), (17).

48.     In 1992, Congress enacted the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 (the "1992 Act"), which imposed certain mandatory carriage obligations on cable operators in order to preserve local broadcast stations. In particular, the 1992 Act requires these broadcast stations to be carried on the federally mandated basic tier of programming. 47 U.S.C. §§ 534, 535, 543(b)(7). But the 1992 Act does not otherwise disturb the flexibility of cable operators and programmers to structure tiers of service as they see fit.

49.     As noted, Congress made clear throughout the 1984 Act and the 1992 Act that the services provided by cable operators, and the programming they carry, are governed primarily by federal law and the FCC. Congress established a carefully circumscribed regulatory framework, under which federal law exclusively prescribes certain programming requirements (including must-carry for certain broadcast stations, *id.*, and the program carriage and program access

provisions set forth in Sections 616 and 628, *id.* §§ 536, 548).  And Section 623 of the Act establishes a default requirement under which cable operators must provide a basic tier with federally prescribed minimum contents:  "Each cable operator of a cable system *shall* provide its subscribers a separately available basic service tier *to which subscription is required* for access to any other tier of service."  *Id.* § 543(b)(7)(A) (emphases added).

50.     In contrast, while local and state franchising authorities are authorized to enter into agreements with cable operators to determine how facilities will be deployed within public rights-of-way, *id.* § 541 (describing general franchise requirements and limitations on provisions that may be included in franchise agreements), and to impose customer service requirements, *id.* § 552, they are prohibited from imposing any programming-related requirements on cable operators unless such requirements are expressly provided in or authorized by Title VI.  Pursuant to Section 624(f), "[a]ny Federal agency, State, or franchising authority may not impose requirements regarding the provision or content of cable services, *except as expressly provided in this subchapter*"—i.e., by Title VI of the Act.  *Id.* § 544(f)(1) (emphasis added).

51.     Additionally, Sections 624(a) and (b) respectively prohibit franchising authorities from regulating "the *services*, facilities, and equipment provided by a cable operator except to the extent consistent with this subchapter," and provide that a franchising authority, "in its request for proposals for a franchise . . . may establish requirements for facilities and equipment, but may not [subject to an exception not relevant here] *establish requirements for video programming* or other information services."  *Id.* §§ 544(a), (b)(1) (emphases added).  Section 636 further confirms the primacy of federal law, as it expressly "preempt[s] and supersede[s] . . . any provision of law of any State . . . or franchising authority . . . which is inconsistent with [the Communications Act]."  *Id.* § 556(c).

52.     The FCC has repeatedly confirmed the preemptive effects of these statutory provisions, *see, e.g.*, *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, Third Report and Order, MB Docket No. 05-311, FCC 19-80, ¶ 80 (2019) ("expressly preempt[ing] any state or local requirement, whether or not imposed by a franchising authority, that would impose obligations on franchised cable operators beyond what Title VI allows"), as have the courts, *see infra* ¶¶ 59-66.

53.     At the federal level, policymakers have considered whether an à la carte mandate would benefit consumers by expanding choice and enabling some cable subscribers to lower their monthly charges.  For example, a bill proposed in the U.S. Senate in 2013 would have introduced an à la carte requirement into the federal regulatory framework.  *See* Television Consumer Freedom Act of 2013, S. 912, 113th Cong. (2013).  But ample evidence compiled by the FCC and the GAO, among other sources, indicated that forcing programmers and cable operators to offer all video content on an à la carte basis would threaten to drive niche programmers out of business, curtail consumer choice, and impose a variety of new costs on consumers and other harms.  *See, e.g.*, FCC, Media Bureau, *Report on the Packaging and Sale of Video Programming Services to the Public* 56 (2004) ("*FCC Report*") ("A la carte would likely have a significant negative impact on consumer choice."), *available at* https://docs.fcc.gov/public/attachments/DOC-254432A1.pdf; *id.* at 45 ("[A]n a la carte regime would undermine the ability of program networks to garner the advertising revenue needed to remain viable."); *id.* at 6 ("[N]etworks serving small niche interests, such as religious programming, programming aimed at minority interests, arts programming and independently owned networks" might be unable to gain carriage and survive if an à la carte mandate were

imposed.); *GAO Report* at 34-37 ("If cable subscribers were allowed to choose networks on an à la carte basis, the economics of the cable network industry could be altered, and, if this were to occur, it is possible that cable rates could actually increase for some consumers."); *id.* at 32-33 (describing additional costs that cable operators and their customers would bear if programming were required to be sold à la carte); *State of Video: Hearing Before the Subcomm. on Commc'ns, Tech. & the Internet of the S. Comm. on Commerce, Sci. & Transp.*, 113th Cong. 32-33, 39 (2013) (testimony of Michael K. Powell, President & Chief Executive Officer, National Cable & Telecommunications Association, explaining various harms that would result from an à la carte mandate). Not surprisingly, given these harms, Congress has never enacted any such requirement. Accordingly, pursuant to Sections 624(f), 636, and other provisions of the Act, neither the FCC nor any state or local government is permitted to subject cable operators and programmers to such an à la carte mandate.

### The Maine Statute

54.     On June 3, 2019, the Maine Legislature passed L.D. 832, "An Act to Expand Options for Consumers of Cable Television in Purchasing Individual Channels and Programs." This statute was enacted when the Governor permitted it to become law without signature on June 15, 2019.

55.     L.D. 832 provides: "Notwithstanding any provision in a franchise, a cable operator shall offer subscribers the option of purchasing access to cable channels, or programs on cable channels, individually." No video providers other than "cable operators"—such as DBS operators or other traditional MVPDs, or online video providers—are covered.

56.     Although, on its face, L.D. 832 is directed to cable operators, it directly impacts producers of video programming and licensors of television networks in various ways, including

by compelling downstream à la carte distribution of their channels and individual programs (such as discrete episodes of a television series) in a manner that upends programmers' bargained-for (and First Amendment- and Copyright Act-protected) carriage arrangements with cable operators.

57.     Limited testimony was offered in support of L.D. 832.  The sponsors of L.D. 832 stated that its purposes are to expand programming options and to save cable consumers money. *See, e.g.*, J. Evangelos Testimony at 1 ("For far too long, consumers have been forced to purchase cable TV packages which include dozens of channels the consumer has no interest in watching.").

58.     Most other stakeholders, even those supportive of these objectives, offered testimony pointing out that the bill was clearly preempted by federal law.  *See, e.g.*, Testimony of B. Hobbins, Office of the Public Advocate (Mar. 5, 2019 Hearing) ("But, a serious impediment to legislation that involves cable companies is that to the extent cable is regulated, it is at the federal level."), *available at* http://www.mainelegislature.org/legis/bills/getTestimonyDoc.asp?id=96835; Testimony of M. Kinney, Charter Communications (Mar. 5, 2019 Hearing) ("[B]ased on the federal law preemption and the fact that the way consumers get their video content has dramatically changed with more options now than ever before, introducing a bill that targets one provider in a very competitive marketplace places an unfair disadvantage to an industry that invests heavily in Maine."), *available at* http://www.mainelegislature.org/legis/bills/getTestimonyDoc.asp?id=96834; Testimony of C. Hodgdon, Comcast Cable (Mar. 5, 2019 Hearing) ("Efforts like LD 832 to regulate providers' service offerings are preempted by federal law and therefore illegal."), *available at*

http://www.mainelegislature.org/legis/bills/getTestimonyDoc.asp?id=96833.[2]  L.D. 832 is

scheduled to take effect on September 19, 2019.  The law is set to be codified as subsection (F)

of Section 3008 in Title 30-A of the Maine Revised Statutes.

## L.D. 832 IS PREEMPTED BY FEDERAL LAW

59.     As the Maine Legislature was clearly informed, L.D. 832 is preempted under both

express preemption and conflict preemption principles.  Express preemption applies where

Congress, "in enacting a federal statute, has expressed a clear intent to pre-empt state law."

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698-99 (1984).  Conflict preemption applies

where either (1) "compliance with both state and federal law is impossible" or (2) the "state law

'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress.'"  *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  Regulations

promulgated by the FCC, acting pursuant to authority granted to it by Congress through the

Communications Act, *see, e.g.*, 47 U.S.C. § 543(b), preempt state laws to the same degree as

federal statutes.  *See, e.g.*, *City of New York v. FCC*, 486 U.S. 57, 64 (1988) ("The statutorily

authorized regulations of an agency will pre-empt any state or local law that conflicts with such

regulations or frustrates the purposes thereof."); *Crisp*, 467 U.S. at 699 ("Federal regulations

have no less preemptive effect than federal statutes.").

60.     ***Express preemption.***  L.D. 832 violates and is expressly preempted by

Section 624(f)(1) of the Communications Act.  As noted, that provision states that "[a]ny Federal

agency, State, or franchising authority may not impose requirements regarding the provision or

---

[2] In the wake of this testimony, the Office of the Public Advocate, on behalf of the Maine
Legislature's Joint Standing Committee on Energy Utilities and Technology, sent a letter to the
FCC's Consumer and Government Affairs Bureau inquiring whether L.D. 832 was preempted by
federal law.  The FCC staff responded that no FCC ruling specifically addressed the issue and
did not express an opinion on whether L.D. 832 was preempted by the Communications Act.

content of cable services, *except as expressly provided in this subchapter*"—i.e., by Title VI of the Act.  47 U.S.C. § 544(f)(1) (emphasis added).  Nothing in Title VI permits Maine to impose the programming mandates in L.D. 832.  No provision of Title VI remotely requires—much less does so "expressly"—the offering of channels on an à la carte basis or authorizes any state or LFA—or even the FCC—to impose such requirements.  As noted, there was an (ultimately unsuccessful) effort in Congress to introduce a bill requiring cable operators to offer programming services à la carte—precisely because such offerings were *not* otherwise required under the Act.  *See* Television Consumer Freedom Act of 2013, S. 912, 113th Cong. (2013).  To the contrary, as explained further below, the Communications Act and FCC regulations explicitly contemplate—and to some extent mandate—the presentation of programming *via tiers*—i.e., a mandatory basic tier and optional upper-level tiers.  This regulatory framework preserves the editorial discretion of cable operators and programmers to choose the manner in which they provide content to customers—discretion that is grounded in copyright law and the First Amendment.  *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 214 (1997) ("*Turner II*") (explaining that "provisions [that] restrain cable operators' editorial discretion in creating programming packages" or "render it more difficult for cable programmers to compete for carriage" implicate the First Amendment (internal quotation marks omitted)); *see also United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000).

61.    L.D. 832 requires that cable operators "offer subscribers the option of purchasing access to cable channels, or programs on cable channels, individually."  This state measure plainly "impose[s] requirements regarding the provision or content of cable services" beyond those mandated by Title VI.  47 U.S.C. § 544(f)(1).

62.     First, it regulates the *provision* of cable services, both by affirmatively requiring cable operators to present video programming to customers on an à la carte basis and by prohibiting operators from exercising their editorial discretion to present such programming only as part of a tier.  There can be no question that a state law that supplants cable programmers and operators' editorial judgments regarding whether and how to assemble programming into packages and tiers—and instead sets forth an absolute requirement to offer all channels and individual programs on an à la carte basis—dictates the manner in which cable services are *provided*.

63.     Second, L.D. 832 imposes requirements regarding the *content* of cable services. By singling out programming carried by cable operators for the à la carte mandate, while exempting programming carried by other distributors and all forms of online video programming, L.D. 832 uniquely burdens—and thus imposes a requirement "regarding"—a specific category of content.  *Cf. Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) ("[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter.").  Moreover, by mandating that cable operators offer all channels and programs on a standalone basis—disassembled from the remainder of the programming tiers established by the cable operator, or (in the case of individual programs) stripped from the series or other compilation assembled by the cable programmer—L.D. 832 alters the content preferences of the programmer and distributor, and thus is a "requirement regarding the . . . content of cable services" in that additional respect. Indeed, to the extent that a programmer refuses to allow a programming service or individual program to be shown in such a disassembled, à la carte form, and thus chooses to withhold its content from distribution over cable systems in Maine, L.D. 832 will have the effect of

preventing the cable operator from carrying that programming altogether.  In addition to the constitutional problems that raises, *see infra* ¶¶ 73 *et seq.*, it underscores that the à la carte mandate is content-based within the meaning of Section 624(f).

64.  Because, as noted above, Title VI neither expressly provides for nor authorizes states to impose such obligations or restrictions, L.D. 832 violates and is expressly preempted by Section 624(f)(1) of the Communications Act.  Unsurprisingly, then, courts have consistently held in analogous situations that state and local laws were preempted when they imposed requirements pertaining to the video programming offered by cable operators beyond those expressly provided in Title VI of the Act.  Notably, in *Lafortune v. City of Biddeford*, this Court affirmed a magistrate judge's holding that a city's requirement of a written release before a cable operator could air programs on a public access channel "'impose[d] requirements regarding the . . . content of cable services[]' in violation of" Section 624(f)(1).  222 F.R.D. 218 (D. Me. 2004); *Lafortune v. City of Biddeford*, No. 01-250-P-H, 2002 WL 823678, at *8 (D. Me. Apr. 30, 2002).  The First Circuit affirmed.  *See Lafortune v. City of Biddeford*, 142 F. App'x 471 (1st Cir. 2005).  Here, it is even more readily apparent that L.D. 832 impermissibly imposes requirements regarding the provision and content of cable services, as the à la carte mandate goes to the heart of how cable programming is presented to subscribers.

65.  Other courts likewise have found state and local requirements preempted pursuant to Section 624(f) in a wide variety of circumstances.  For example, when the Town of East Hampton, New York, threatened to revoke a cable operator's franchise for restructuring its tiers to comply with federal law in a manner inconsistent with the terms of its franchise agreement, the Eastern District of New York held that the operative franchise provisions were preempted by the 1992 Cable Act.  *See Cablevision Sys. Corp. v. Town of E. Hampton*, 862 F. Supp. 875, 883

(E.D.N.Y. 1994), *aff'd*, 57 F.3d 1062 (2d Cir. 1995).  There, the agreement required the cable operator to carry at least 23 channels on its lowest priced tier and prohibited it from "abandon[ing] any service or portion thereof without the written consent of the municipality." *Id.* at 881, 885.  The court concluded, however, that the town could not "usurp the cable operator's power to determine the details and particulars of the provision of cable service" and that, by "attempting to prevent the elimination of" a tier, the town was "impermissibly seeking to control the particulars of the provision of cable service" in violation of the Act.  *Id.* at 886.

66.     Similarly, where an LFA exceeded its jurisdiction over PEG channels by requiring a cable operator to make a particular programming decision, a court found this action prohibited by Section 624(f) because it infringed on the cable operator's editorial autonomy. *Time Warner Cable of N.Y.C. v. City of New York*, 943 F. Supp. 1357, 1391 (S.D.N.Y. 1996) (finding that New York City's unilateral action placing cable news networks on PEG channels "violates Time Warner's editorial autonomy under" Section 624(f)), *aff'd sub nom. Time Warner Cable of N.Y.C. v. Bloomberg L.P.*, 118 F.3d 917 (2d Cir. 1997).  The court held that while the Act does "give a franchising authority the power to require an operator to provide PEG channels," *id.* at 1367, New York City could not use this power to make its own programming decisions, in light of Section 624(f).  *Id.* at 1391; *see also MediaOne Grp., Inc. v. Cty. of Henrico*, 97 F. Supp. 2d 712, 716 (E.D. Va. 2000), *aff'd*, 257 F.3d 356 (4th Cir. 2001) (finding that a county ordinance conditioning permission to provide service on the agreement of an ISP to transmit the content of other ISPs violated Section 624(f) and other provisions of Title VI of the Communications Act).

67.     Moreover, given the Maine Legislature's delegation of enforcement authority to LFAs (through codification of L.D. 832 in section 3008 of title 30-A of the Maine Revised

Statutes), the statute is further preempted by Sections 624(a) and (b)(1) of the Act. Section 3008 states that it is the "policy of this State, with respect to cable television systems," to "affirm the importance of municipal control of franchising and regulation," 30-A M.R.S. § 3008(1), grants municipalities the authority to "enact any ordinances, not contrary to this chapter, governing franchising and regulation of cable television systems using public ways," *id.* § 3008(2), and confers on municipalities the right to seek "injunctive relief in addition to any other remedies available by law to protect any rights conferred upon the municipality by this section or any ordinances enacted under this section or section 3010," *id.* § 3008(3)(E). This conferral of authority on municipalities to require cable operators to comply with L.D. 832's à la carte mandate triggers preemption under Sections 624(a) and (b)(1) of the Communications Act. Those statutory sections provide, respectively, that "any franchising authority may not regulate the *services*, facilities, and equipment provided by a cable operator except to the extent consistent with this subchapter"—i.e., Title VI—and that a franchising authority "in its request for proposals for a franchise . . . may establish requirements for facilities and equipment, but may not, except as provided in subsection (h), *establish requirements for video programming* or other information services." 47 U.S.C. §§ 544(a), (b)(1) (emphases added). Just as L.D. 832 imposes requirements regarding the provision and content of cable services in violation of Section 624(f), imposing an à la carte obligation on cable operators unquestionably constitutes regulation of both the "services" provided by a cable operator and "requirements for video programming."

68. ***Conflict preemption.*** L.D. 832 also is preempted because it impermissibly conflicts with federal law, by making compliance with both federal law and L.D. 832 impossible and by imposing an obstacle to the accomplishment of objectives advanced by federal law. L.D. 832 thus is preempted pursuant to basic conflict preemption principles. Notably, the express

preemption in Section 636 of the Communications Act codifies these basic conflict preemption principles.  47 U.S.C. § 556(c) ("preempt[ing] and supersed[ing]" any state law that "is inconsistent with [the Communications Act]").

69.     To begin with, compliance with both L.D. 832 and federal law is impossible because a cable operator's à la carte offering of broadcast signals would directly conflict with the requirement that cable operators provide the signals of all stations that elect "must carry" status pursuant to Section 614 of the Communications Act on a mandatory basic tier.[3]  In particular, although certain *other* requirements relating to the basic service tier (including rate regulation) sunset in areas where the FCC has found that effective competition is present, 47 U.S.C. § 543(a)(2), the FCC has construed Section 614 to require cable operators to ensure that their subscribers *receive* all must-carry stations irrespective of the presence of such competition.  *See Carriage of Digital Television Broadcast Signals: Amendment to Part 76 of the Commission's Rules*, Fifth Report and Order, 27 FCC Rcd. 6529 ¶ 9 (2012) (stating that Section 614 of the Act "requires that every class of subscriber must receive all must carry signals," and that "[c]able operators have complied with this requirement through the use of a basic service tier, *i.e.*, a level of service to which subscription is required in order to be eligible for access to any other tier of service at additional charge"); *Carriage of Digital Television Broadcast Signals: Amendment to Part 76 of the Commission's Rules,* Third Report and Order and Third Further Notice of Proposed Rulemaking, 22 FCC Rcd. 21064 ¶ 29 n.94 (2007) ("Congress intended that all cable

---

[3] The Communications Act gives broadcast stations the option to elect "must carry" status—in which case cable operators are compelled to transmit their programming on the basic tier—or to negotiate "retransmission consent" agreements under which they may obtain compensation for carriage by cable and satellite systems and agree to alternative distribution arrangements.  *See* 47 U.S.C. §§ 614, 615 (imposing must-carry obligations); *id.* § 325(b) (setting forth retransmission consent regime).

subscribers be able to see must-carry signals, regardless of whether their cable operator faced effective competition.").  As the FCC has recognized, this obligation to ensure that all cable subscribers receive all must-carry signals precludes the offering of such channels on an optional, á la carte basis.  *See FCC Report* at 122 ("A cable operator generally cannot offer all local broadcast stations on an a la carte basis because the Act requires that broadcast stations be sold together on the basic service tier and provided to every subscriber of the cable system.").

70.     Relatedly, the FCC regulation governing signal carriage obligations for must-carry stations requires that they be "provided to *every subscriber* of a cable system."  47 C.F.R. § 76.56(d)(1) (emphasis added).  That regulation also mandates that qualifying non-commercial stations "shall be available to every subscriber as part of the cable system's lowest priced service tier that includes the retransmission of local commercial television broadcast signals."  *Id.* § 76.56(d)(2).  There is no way for a cable operator to adhere to these federal requirements while also complying with L.D. 832.  L.D. 832 would prohibit cable operators from requiring subscribers to purchase these broadcast channels as part of the basic tier, notwithstanding that federal law mandates that cable operators provide *all* such channels to all subscribers.

71.     Even if it were possible to comply with both L.D. 832 and federal law, L.D. 832 still would be preempted because it impedes the accomplishment of federal objectives set forth in the Communications Act and FCC rules.  As noted above, a state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law, *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or otherwise "frustrates the full effectiveness of federal law," *Perez v. Campbell*, 402 U.S. 637, 652 (1971), is preempted under the conflict preemption doctrine, pursuant to the Supremacy Clause of the U.S. Constitution.  And here, Congress made its intent to preserve the ordinary operation of those principles plain, as Section 636 of the Act

expressly commands that "any provision of law of any State . . . or franchising authority . . . which is inconsistent with [the Communications Act] shall be deemed to be preempted and superseded."  47 U.S.C. § 556(c).

72.     In accordance with the Communications Act, the FCC has established a regulatory framework founded on the provision of cable service through tiers and packages over which, notwithstanding certain minimum carriage requirements (such as the must-carry requirement for certain broadcast stations), cable providers retain broad editorial discretion. Congress has made clear that its goals are to establish and maintain "a national policy concerning cable communications" that "minimize[s] unnecessary regulation that would impose an undue economic burden on cable systems."  47 U.S.C. §§ 521(1), (6).  And Congress and the FCC have chosen to accomplish that objective in large part by regulating the provision of certain service tiers—i.e., categories "of cable service or other services provided by a cable operator."  *Id.* § 522(17); *see also id.* §§ 543(b)(7)(A) (prescribing the minimum contents of the basic tier for areas subject to rate regulation and requiring all cable subscribers to purchase the basic tier as a prerequisite to buying "any other tier of service").  Because L.D. 832 plainly stands as an obstacle to the achievement of important federal policy objectives—including the policies requiring cable operators to provide a basic tier including all must-carry broadcast stations and giving operators discretion to offer other programming services as part of additional tiers—it is invalid under conflict preemption principles as well.

## L.D. 832 VIOLATES THE FIRST AMENDMENT

73.     L.D. 832 violates the First Amendment to the United States Constitution, which provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press."

U.S. Const. amend. I.  The Fourteenth Amendment to the United States Constitution made this proscription applicable to the States and their political subdivisions.  *See id*. amend. XIV, § 1.

74.      "Cable programmers and cable operators engage in and transmit speech, and . . . are entitled to the protection of the speech and press provisions of the First Amendment." *Turner I*, 512 U.S. at 636.  Whether "[t]hrough original programming or by exercising editorial discretion over which stations or programs to include in [their] repertoire," such entities "see[k] to communicate messages on a wide variety of topics and in a wide variety of formats."  *Id.* (internal quotation marks omitted).  In particular, when cable programmers and distributors decide how to present programming services to consumers—including whether to offer such services à la carte or as part of a tier of service—they are engaging in protected speech.  *See Playboy Entm't Grp., Inc.*, 529 U.S. at 812 (holding that a statute violated the First Amendment where it imposed overbroad requirements on cable programmers); *Turner II*, 520 U.S. at 214 (finding that "cable operators' editorial discretion in creating programming packages" constitutes protected speech); *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 154 (2d Cir. 2013) ("[T]here [is no] dispute that" laws imposing carriage requirements "regulate[] MVPDs' protected speech by restraining their editorial discretion over which programming networks to carry and *on what terms*." (emphasis added)).

75.      The Supreme Court also has long been "deeply skeptical of laws that 'distinguis[h] among different speakers.'"  *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (citation omitted); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content."); *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 638 (5th Cir. 2012) ("Laws singling out a small number of speakers for onerous treatment

are inherently suspect."). Accordingly, "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Reed*, 135 S. Ct. at 2230; *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("In the realm of private speech or expression, government regulation may not favor one speaker over another."); *Newton v. LePage*, 849 F. Supp. 2d 82, 118 (D. Me. 2012) (same).

76.    L.D. 832 infringes on both of these First Amendment protections. First, the law precludes particular kinds of speech (i.e., cable operators may not offer content ("cable channels" and "programs" carried on cable channels)) solely in a tier of service that reflects the exercise of editorial discretion, nor may programmers that supply content to cable operators require that their programming be distributed to subscribers in the manner that the programmers prefer. Second, the law uniquely burdens certain speakers (i.e., cable operators and programmers that supply content to cable operators). Indeed, the legislative history reveals an explicit effort to target one of the Plaintiff Programmers, NESN, so that it would be forced to have its live sports telecasts carried by cable operators on an à la carte basis. *See* J. Evangelos Testimony at 2. Other MVPDs, including the two national DBS providers, DIRECTV and DISH Network, which are the second and fourth largest MVPDs nationwide,[4] as well as all forms of Internet-based video programming providers (such as Netflix, Hulu, Amazon Prime, Apple iTunes, and a wide array of "virtual" MVPD services, including Sling TV, AT&T TV NOW, Hulu + Live TV, YouTube TV, and PlayStation Vue),[5] are not covered by this statute, even though such other distributors typically offer packages and tiers of video programming just as cable operators do. L.D. 832 thus is subject to strict scrutiny twice over, because it amounts to a content-based

---

[4] *See Communications Marketplace Report*, Report, 33 FCC Rcd. 12558 ¶ 53 (2018) ("*FCC Communications Marketplace Report*").

[5] *Id.* ¶ 82.

regulation of speech (by prohibiting content from being distributed solely on tiers), and also constitutes, on its face, a speaker-based regulation of speech.

77.    L.D. 832 does not come close to satisfying strict scrutiny, which requires that the State identify a compelling governmental interest and that the statute employ the least restrictive means of advancing that interest.  *See, e.g.*, *Reed*, 135 S. Ct. at 2231; *Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016) ("Narrow tailoring in the strict scrutiny context requires the statute to be 'the least restrictive means among available, effective alternatives.'" (quoting *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004)).

78.    Indeed, that L.D. 832 could not even satisfy intermediate scrutiny, which would apply if the statute were neither content-based nor speaker-based, necessarily demonstrates that the statute fails strict scrutiny.  Under intermediate scrutiny, Maine would bear the burden of showing that the statute "furthers an important or substantial governmental interest" that is "unrelated to the suppression of free expression" and imposes restrictions on First Amendment freedoms that are "no greater than is essential to the furtherance of that interest." *Id.* (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).  Maine cannot carry that burden, for several reasons.

**L.D. 832 Does Not Advance Any Important or Substantial Government Interest**

79.    Maine has not shown that L.D. 832 furthers an important or substantial government interest (much less a compelling interest).  As a preliminary matter, Maine's asserted interest in expanding video programming options for cable subscribers cannot be a legitimate state interest justifying a speech restriction at all, because federal law bars states from imposing such requirements regarding the provision or content of cable services.  *See supra* ¶¶ 44-53. Even the Maine Office of the Public Advocate recognized "a serious impediment to

legislation" due to federal preemption concerns. *See, e.g.*, B. Hobbins Testimony at 1-2. Such

preemption undermines any claim of a substantial governmental interest in an à la carte mandate,

as the State of Maine cannot legitimately pursue a requirement that Congress has expressly

foreclosed through federal legislation.

80.     But even if the State's aims were legitimate, and indeed substantial (or even

compelling) *in the abstract*, the state must show that its speech restriction "will in fact advance

those interests." *Turner I*, 512 U.S. at 664. Maine's burden in this respect is considerable:

Before overriding programming providers' and cable operators' decisions regarding how to offer

content to their subscribers, the State was required to identify substantial evidence demonstrating

"that the harms it recites are real and that its restriction will in fact alleviate them to a material

degree," rather than relying on "speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761,

770-71 (1993); *see also Asociación de Educación Privada de P.R., Inc. v. García-Padilla*, 490

F.3d 1, 18 (1st Cir. 2007) (holding that the government is required to show "that the regulation

will . . . alleviate [the identified] harms in a direct and material way" (internal quotation marks

omitted)); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 26 (D.C. Cir. 2014) (en banc)

(requiring "evidence of a measure's effectiveness").

81.     Maine did not carry this heavy burden. Although the proponents of L.D. 832

asserted that the à la carte mandate is necessary to remedy a supposed "lack of consumer choice"

for video programming and to reduce prices,[6] the State failed to provide any *evidence* that there

is in fact a lack of choice, that the à la carte mandate would directly and materially expand

consumers' programming options, or that the mandate would lower costs for consumers. The

---

[6] B. Hobbins Testimony at 1; *see also* J. Evangelos Testimony at 1 (stating that "consumers have been forced to purchase cable TV packages").

Legislature did not identify a single study, adduce any expert testimony, or even address the various published reports describing the likely impacts of an à la carte mandate.  In such circumstances, whether applying strict or intermediate scrutiny, courts have not hesitated to strike down speech restrictions as unconstitutional.  *See, e.g.*, *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 801 & n.8 (2011) (striking down regulation of violent video games based on insufficient evidence that the state's aims were directly and materially advanced, even where there were studies submitted in support of restriction); *Edenfield*, 507 U.S. at 770-73 (striking down prohibition against in-person solicitations by accountants because purported evidence of harms failed to justify restriction on speech); *El Día, Inc. v. P.R. Dep't of Consumer Affairs*, 413 F.3d 110, 115 (1st Cir. 2005) (holding that statute did not satisfy intermediate scrutiny where the record failed to document asserted harms or efficacy of speech restriction in remedying such harms).  Any post-hoc justifications now proffered by the state would come too late, as the Legislature was required to identify an evidentiary basis sufficient to justify speech restrictions *before* supplanting cable programmers' and operators' editorial discretion.  *See, e.g.*, *Edenfield*, 507 U.S. at 772 (emphasizing need for evidence relied on by governmental entity and rejecting resort to speculation and conjecture); *Klein v. City of San Clemente*, 584 F.3d 1196, 1204 (9th Cir. 2009) (cautioning that resorts to "common sense . . . can all-too-easily be used to mask unsupported conjecture, which is, of course, verboten in the First Amendment context").

82.     Leaving aside the Maine Legislature's failure to satisfy its burden of developing a record to support restricting the speech of programming providers and cable operators, it could not have justified L.D. 832, given that ample evidence—consisting of government reports and other evidence of which the Court can take judicial notice—affirmatively *undermines* the

argument that the à la carte mandate is necessary to promote choice or would result in cost savings for consumers.

83.     *First*, the assertion that consumers in Maine lack choice in accessing video programming is untrue, given the myriad options available in today's burgeoning video entertainment marketplace.  Congress imposed discrete programming mandates in the Communications Act (such as the must-carry obligation described above) based on the concern that cable operators in the 1980s and early 1990s possessed monopoly power.  But today, as courts have recognized, "[c]able operators . . . no longer have the bottleneck power over programming that concerned the Congress in 1992."  *See Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009).  Whereas cable operators' market share exceeded 95 percent in 1992, cable television subscribers accounted for only slightly more than 55 percent of all MVPD subscribers as of 2017.  *See FCC Communications Marketplace Report* ¶ 54; *see also Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Third Annual Report, 12 FCC Rcd. 4358, 4495 (App. F) (1997).  Not only can consumers choose among traditional video providers, including cable and DBS providers, but they can access an extraordinary number of video programming services over the Internet.  For instance, Amazon Prime is reported to have more than 100 million members in the United States, and Netflix has more than 60 million paid subscribers in the United States.  *See* Consumer Intelligence Research Partners, LLC, *Amazon Exceeds 100 Million US Prime Members* (Jan. 17, 2019), *available at* https://files.constantcontact.com/150f9af2201/a37a79a7-0eff-4a38-b05a-ce3c459addc2.pdf; Statista, *Number of Netflix Paying Streaming Subscribers Worldwide* (Aug. 9, 2019), available at https://www.statista.com/statistics/250934/quarterly-number-of-netflix-streaming-subscribers-worldwide/.  Moreover, these online video services, as well as many legacy providers, allow

customers to pick and choose from "skinny" tiers of programming and to purchase or rent

individual movies or shows.  *See, e.g.*, *FCC Communications Marketplace Report* ¶¶ 76-82

(describing diverse array of online video distribution models and options).  And an increasing

number of programmers are making their individual networks available directly to consumers,

*see id.*, thereby promoting the à la carte objective animating L.D. 832 without any impermissible

regulatory intervention.  Especially in light of these marketplace realities, which the FCC has

amply documented, there is no justification for L.D. 832's unique burdens on cable provider

offerings.

84.     *Second*, numerous studies (all of which the Maine Legislature appears to have

ignored) have demonstrated that a mandatory à la carte regime very likely would undercut, rather

than advance, the State's asserted interests in expanding programming options and driving down

prices.  If all individual networks were forced to persuade customers to subscribe on a standalone

basis, many niche programmers would be dropped from cable lineups and potentially driven out

of business, resulting in less choice and less programming diversity.  *See, e.g.*, *FCC Report* at 56

("A la carte would likely have a significant negative impact on consumer choice.").  By the same

token, because cable packages and tiers allow for programming costs to be distributed over a

broader number of subscribers, such packages are generally more economically efficient (and

less costly) than most à la carte programming options.  *See GAO Report* at 34-37 ("If cable

subscribers were allowed to choose networks on an à la carte basis, the economics of the cable

network industry could be altered, and, if this were to occur, it is possible that cable rates could

actually increase for some consumers."); Michael L. Katz, *Slicing and Dicing: A Realistic

Examination of Regulating Cable Programming Tier Structures* 17 (2004) ("*Katz Report*") ("For

variety of reasons, mandatory unbundling can be expected to increase prices."), *available at* https://ecfsapi.fcc.gov/file/6516284144.pdf.[7]

85.      Moreover, the technology required to implement a retail à la carte requirement would require an "addressable" set-top box on each connected television set—i.e., a box that can be controlled by the cable operator so that it will receive a customized programming lineup.  *See Katz Report* at 9 ("Purchasing programming on an *a la carte* basis would require consumers to have addressable set-top boxes, which would entail considerable additional expenses."). Implementing an à la carte mandate therefore would require customers to lease or purchase addressable boxes for each connected television set, thereby further increasing the costs associated with purchasing cable services, given that many consumers do not lease such equipment for all such TV sets today.

**L.D. 832 Is Not Appropriately Tailored**

86.      Even if Maine could show that L.D. 832 furthered an important or substantial government interest, which it cannot do, the statute still would fail to pass constitutional muster because it is not sufficiently tailored to advance that interest.  Narrow tailoring "demand[s] a close fit" between the means of implementation and the asserted government interest.  *McCullen v. Coakley*, 573 U.S. 464, 486 (2014); *Rideout*, 838 F.3d 65 at 72 (holding a statute is not narrowly tailored where there is "a substantial mismatch" between the statute's objective and means asserted to achieve it).  "[T]he means chosen [must] not 'burden substantially more

---

[7] As noted above, cable operators today offer a variety of services on an à la carte basis, and they have collaborated with programmers to expand consumer choice by introducing increased flexibility in tiering structures.  But while programmers and distributors have worked to deliver these benefits without sacrificing programming diversity or increasing costs, a rigid governmental mandate applied to all channels and programs would be overbroad and counterproductive, even apart from its constitutional defects and ultra vires status.

speech than is necessary to further the government's legitimate interests.'"  *Turner I*, 512 U.S. at 662 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1968)).  In addition, an ordinance that fails to bar *other* speech presenting the same supposed harms as the prohibited speech demonstrates that the asserted governmental interest is not genuinely compelling or important, or that the government may not "in fact [be] pursuing the interest it invokes."  *Brown*, 564 U.S. at 802.

87.     L.D. 832 fails both aspects of the narrow tailoring analysis.  As noted above, *supra* ¶¶ 81-85, and discussed further below, *infra* ¶¶ 90-102, the statute is overly burdensome.  There is no evidence that an à la carte mandate would be economical for consumers, or increase consumer choice in the long run.  Yet the mandate imposes severe First Amendment burdens, completely depriving both cable operators and programmers of their rights to decide how to package and present content.  And on top of that severe constitutional injury, the law would impose the increased costs of distributing new addressable cable boxes, implementing billing system changes, and disrupting existing contractual relationships between video programmers and distributors—all of which is, once again, far more likely to harm than to expand consumer choice.

88.     In addition, L.D. 832 epitomizes a fatally underinclusive ordinance.  Despite the professed interest in promoting increased choice and cost savings for consumers, the Maine Legislature imposed an à la carte mandate only on cable operators, leaving every other provider of video programming free to continue presenting only tiered/packaged service offerings.  As a result, even the smallest cable operators in Maine (serving only several hundred or a few thousand subscribers) are subject to the mandate, while DIRECTV and DISH Network are not, despite serving far more customers in Maine.  Similarly, the statute exempts all online video

distributors without attempting to offer any justification for doing so.  The Supreme Court has repeatedly recognized that "a law cannot be regarded as protecting an interest 'of the highest order,'" let alone doing so in an appropriately tailored manner, "when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (quoting *Fla. Star v. B.J.F.*, 491 U.S. 524, 541-42 (1989) (Scalia, J., concurring)).  Accordingly, the Supreme Court has consistently invalidated such underinclusive measures, both under strict and intermediate scrutiny.  *See, e.g.*, *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 190 (1999) (holding under intermediate scrutiny that a regulation that restricted "advertising about privately operated commercial casino gambling" but not "advertisements for tribal casino gambling" was "so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it"); *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 488-89 (1995) (holding that an act prohibiting beer labels from displaying alcohol content did not survive intermediate scrutiny because it "bans the disclosure of alcohol content on beer labels," but "allows the exact opposite in the case of wines and spirits"); *Cincinnati v. Discovery Network*, 507 U.S. 410, 424 (1993) (striking down ordinance prohibiting commercial newsracks on sidewalks under intermediate scrutiny where exemption of non-commercial newsracks undermined claim that the law promoted asserted interests in safety and aesthetics).

89.     The Maine Legislature has not shown, and cannot show, that cable operators pose some unique threat to consumer choice, given the ready availability of competing MVPD services and the staggering array of online video options, which, as noted above, the FCC as the expert agency has repeatedly documented.  This too is fatal to any defense of L.D. 832.  *See, e.g.*, *Reed*, 135 S. Ct. at 2232 (concluding that there was no evidence to support town's assertion that

restricted signs posed "a greater threat to safety" than signs treated preferentially); *Discovery Network*, 507 U.S. at 424 (holding that distinctions drawn by city bore "no relationship whatsoever" to the particular interests the city has asserted).  Ultimately, as shown above, L.D. 832 could not be justified under the First Amendment even if it applied evenhandedly to all video distributors, but the fact that it discriminates against cable operators makes the constitutional defects even more evident.

## IRREPARABLE HARM TO PLAINTIFFS

90.     Together, Plaintiffs develop, produce, offer, distribute, and deliver video content to a substantial segment of Maine's residents.  At present, cable systems do not and, indeed, cannot offer all content they distribute on an à la carte basis as L.D. 832 purports to require.  If the unconstitutional statute were permitted to take effect, Plaintiffs would suffer irreparable injury that could not be adequately redressed by a recovery of damages.

91.     L.D. 832 imposes obligations and restrictions that violate Plaintiffs' First Amendment rights.  That alone suffices to establish sufficient irreparable injury to warrant injunctive relief, for "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10-11 (1st Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Moreover, Plaintiffs would suffer an immeasurable loss of commercial and consumer goodwill and incur significant and largely unrecoverable monetary losses if L.D. 832 were to take effect. And where, as here, monetary losses may prove impossible to recover, injunctive relief is the only appropriate remedy.

92.     Transitioning to an à la carte model would be extraordinarily complex and resource-intensive.  For example, cable operators would be required to modify their network

infrastructure, which is currently designed to deliver a discrete set of programming tiers and limited à la carte options to customers, to accommodate the increased complexity associated with delivering countless combinations of à la carte channels and programs to subscribers.  And, as the FCC has found, "to implement a la carte, most, if not all, cable operators would . . . need to make substantial changes, at considerable expense, in their ordering and billing systems." *FCC Report* at 41.  In addition, "[c]able operators likely would have to add additional customer service and technical staff to deal with the increased number of transactions that would occur under an à la carte regime." *GAO Report* at 33.  Today, cable operators' customer support personnel are readily familiar with the discrete set of tiers and packages available to subscribers and thus can process customer orders expeditiously.  But under L.D. 832's à la carte mandate, the number of possible programming combinations would grow exponentially to virtually unlimited individualized permutations, and training customer service personnel to handle this increased complexity effectively would be time-consuming and expensive.  And even with such training, the ordering process—and, as a result, service calls—would take additional time, and the volume of such calls likely would increase as well, as the availability of substantially more combinations likely would lead subscribers to modify their subscriptions more frequently.  Comcast Cable and other cable operators likely would incur substantial and largely unrecoverable costs in hiring and training personnel to manage this increased call volume.

93.     Cable operators also would be required to ensure that each of their subscribers has the appropriate equipment to receive content on an à la carte basis.  Currently, subscribers who purchase only the basic tier from Comcast Cable or other operators may not have an addressable set-top box for every television set to receive the channels included in their subscriptions.  Moreover, some subscribers rely on legacy set-top boxes or simple digital television adapters

that lack the functionality necessary to receive content on an à la carte basis. Therefore, to ensure that such subscribers can receive à la carte programming on each of their televisions, cable operators in Maine could be required to purchase and distribute thousands of more advanced addressable set-top boxes, at substantial expense. *See id.* at 9 ("Purchasing programming on an *a la carte* basis would require consumers to have addressable set-top boxes, which would entail considerable additional expenses."); *see also GAO Report* at 32. Although cable operators could recover such costs through rental fees over the long term, they would nevertheless sustain the inevitable and irremediable reputational harm and loss of goodwill associated with the inconvenience of replacing equipment and imposing or increasing such fees.

94.    Furthermore, subscribers' bills would become increasingly lengthy and complex, thereby causing additional harm to goodwill and rendering compliance with the Commission's truth-in-billing rules, which require bills to be "clear, concise, and understandable," more difficult and expensive. *See* 47 C.F.R. § 76.1619(a); *see also FCC Report* at 41-42. Today, cable bills are designed to provide pricing information for a discrete number of tiers and packages and thus are relatively streamlined. To provide the same level of detail about the hundreds, if not thousands, of "channel" and "program" permutations created by L.D. 832's à la carte mandate, the format of subscribers' bills would have to be substantially transformed and bills themselves could run to dozens and dozens of pages. Moreover, frequent modifications to a subscriber's à la carte programming selections would further complicate the billing process. Not only would such changes require cable operators to incur substantial additional expense (e.g., due to increased printing and postage costs)—potentially unrecoverable—but such complexity would undoubtedly confuse consumers and lead to an increase in billing inquiries and disputes, causing considerable reputational harm. *See Katz Report* at 9-10.

95.     In addition, L.D. 832's requirement that cable operators offer content on an à la carte basis is at odds with preexisting contractual obligations contained in their affiliation agreements with various programmers, which may themselves reflect the exercise of rights grounded in the First Amendment and the Copyright Act.  *See GAO Report* at 33 ("Even if cable operators desired to offer customers . . . à la carte service, most contracts negotiated between cable networks and cable operators prohibit these alternatives."); *see also supra* ¶¶ 41-43.  In fact, in light of the terms of their current affiliation agreements, regardless of how cable operators choose to proceed, they would suffer a substantial loss of commercial and consumer goodwill as well as potentially unrecoverable monetary losses.  On the one hand, were cable operators to honor the terms of their affiliation agreements and refuse to offer content on an à la carte basis, they would expose themselves to enforcement actions, which would entail monetary losses and reputational harm.  On the other hand, violating, or otherwise forcing renegotiation of, their affiliation agreements so as to comply with L.D. 832 would damage cable operators' relationships with programmers and invite costly litigation and carriage disputes that, in turn, would strain their relationships with consumers.

96.     Of course, Plaintiff Programmers would suffer similar harms to their reputations and commercial goodwill from such disputes.  Even more fundamentally, a requirement to distribute individual programs on an à la carte basis would override Plaintiff Programmers' exercise of First Amendment-protected editorial discretion in assembling linear channels of video programming as they see fit.  And displacing contractual arrangements that require distribution of programming as part of a tier would put many programming networks at odds with their contractual obligations to underlying copyright owners, just as it might abrogate affiliation agreements between programmers and cable operators.  For example, Plaintiff

NESN's business model is dependent on distributing its network programming to all subscribers on a tier with broad reach.  Forcing the distribution of the network and all individual "programs" on an à la carte basis would be at odds with the broad mandate from the professional sports teams that NESN carries to obtain the widest possible distribution and reach Red Sox and Bruins fans over all corners of Maine.  The à la carte mandate also would place NESN at a competitive disadvantage vis-à-vis broadcast stations with must-carry rights that continue to guarantee them placement on the basic tier, among other competing distributors.  Finally, a sudden and seismic shift towards pricing content on a channel-by-channel or program-by-program basis would effectively prevent timely renegotiation of affiliation agreements and, in some instances, underlying agreements between programmers and copyright owners, to comport with L.D. 832's à la carte mandate.

97.     Plaintiffs also would suffer a decline in advertising revenue if cable operators were forced to offer programmers' content on an à la carte basis.  The FCC has recognized that "an a la carte regime would undermine the ability of program networks to garner the advertising revenue needed to remain viable" in part because it would "reduce viewership of nearly all program networks." *FCC Report* at 45, 118.  The problem would be particularly acute for niche networks, which may attract fewer viewers if they are not carried on tiers with higher penetration rates and therefore more easily discoverable by consumers.  Cable operators, which derive significant revenue from the sale of local advertising inserts on these networks, would face similar shortfalls.  *See id.* at 92-93.  In addition, mandated á la carte would inhibit programmers from negotiating package or volume discounts for their programming with operators, which is a common practice in this and other markets.  To offset the loss of advertising revenues and ensure that they can continue to make high quality programming available to consumers, Plaintiff

Programmers would have to charge, and cable operators would have to pay, increased license fees, which would be passed on to subscribers, inviting complaints and customer defections. *See id.* Cable operators' own advertising-related losses also would be passed on to subscribers, only compounding such damage.

98.     Diminished advertising revenues may put some programmers out of business, thereby threatening broad content diversity and making cable operators' offerings less attractive. Today, tiering/packaging of channels ensures that "networks serving small niche interests, such as religious programming, programming aimed at minority interests, arts programming and independently owned networks" attract and retain the viewers—and thus advertisers—necessary to survive and thrive. *See FCC Report* at 6; *Katz Report* at 19-21; *see also supra* ¶ 42. In an à la carte system, on the other hand, such content would not be given that opportunity, thereby stifling innovation and limiting consumer choice.

99.     L.D. 832's invalid distinction between cable operators and other MVPDs (as well as online video distributors) would only exacerbate these injuries. As explained above, if the statute were permitted to take effect, cable operators would be subject to various restrictions and obligations and, as a result, would suffer substantial reputational and monetary harm. DBS and Internet-based video programming providers, on the other hand, would not be similarly burdened and therefore would not sustain similar injuries. This disparity would place cable operators at a constitutionally impermissible and ultimately irremediable competitive disadvantage vis-à-vis otherwise similarly situated MVPDs and online providers.

100.     Moreover, if required to devote the substantial amount of capital and number of personnel to comply with L.D. 832's à la carte mandate, cable operators would have to divert resources away from developing programming, service, and technology enhancements that they

might otherwise have been able to offer, placing them at an even greater competitive

disadvantage.

101.    Finally, absent injunctive relief to prevent these harms from happening, if and

when this Court ultimately finds L.D. 832 preempted, cable operators would be forced to incur

additional monetary losses to revert their systems, operations, and equipment to present

functionality.  Such operational oscillations would undoubtedly confuse and frustrate

subscribers, contributing to additional loss of consumer goodwill and further consumer

defections.

102.    For all of these reasons, Plaintiffs would suffer an immeasurable loss of consumer

and commercial goodwill, as well as potentially unrecoverable monetary losses, if L.D. 832 were

allowed to go into effect.

**FIRST CLAIM FOR RELIEF**

***L.D. 832 Is Preempted by Federal Law***

103.    The allegations of paragraphs 1 through 102 above are incorporated as though

fully set forth herein.

104.    L.D. 832 is expressly preempted by Sections 624(a), 624 (b)(1), 624(f), and

Section 636(c) of the Communications Act, 47 U.S.C §§ 544(a), 544(b)(1), 544(f), and 556(c).

105.    L.D. 832 is preempted, first, because it purports to exercise authority that federal

law expressly denies.  *See* 47 U.S.C §§ 544(a), 544(b)(1), & 544(f).

106.    L.D. 832 is preempted, second, because compliance by cable operators with both

L.D. 832 and federal law, including Section 614 of the Communications Act, 47 U.S.C. § 534,

and Section 76.56(d)(1) of the FCC's rules, 47 C.F.R. § 76.56(d)(1), is impossible, given their

conflicting obligations on cable operators.

107.     L.D. 832 is preempted, third, because the requirement of à la carte cable service by a state conflicts with the federal policy of preventing States from imposing requirements on cable operators beyond those provided in Title VI of the Act.  L.D. 832 also imposes an obstacle to the federal policies requiring a mandatory basic tier and permitting additional tiers composed of channels selected by cable operators and programmers.

## SECOND CLAIM FOR RELIEF

### *L.D. 832 Violates the First Amendment to the U.S. Constitution*

108.     The allegations of paragraphs 1 through 102 above are incorporated as though fully set forth herein.

109.     L.D. 832 violates the First Amendment of the United States Constitution because the provision constitutes an impermissible content- and speaker-based restriction on Plaintiffs' speech that cannot survive heightened scrutiny.

110.     First, L.D. 832 does not materially further an important, substantial, or compelling governmental interest.

111.     Second, even if Maine could show that L.D. 832 materially furthered its interests, the statute is not sufficiently tailored to survive strict or intermediate scrutiny.  L.D. 832's imposition of unique and overly burdensome obligations on cable operators, while exempting all other video providers, renders the statute both overbroad and fatally underinclusive.

112.     Maine's enforcement of L.D. 832 will deprive Plaintiffs of their rights under the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

1.  A declaration and judgment pursuant to 28 U.S.C. § 2201 that L.D. 832 is preempted by federal law.

2.  A declaration and judgment pursuant to 28 U.S.C. § 2201 that L.D. 832 violates the First Amendment of the U.S. Constitution.

3.  An order preliminarily and permanently enjoining Defendants from enforcing or giving effect to L.D. 832.

4.  An award of reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

5.  Such further relief as the Court deems just and equitable.

Dated: September 6, 2019

Respectfully submitted,

/s/ *Joshua A. Tardy*
Joshua A. Tardy
Joshua A. Randlett
RUDMAN WINCHELL
84 Harlow Street
P.O. Box 1401
Bangor, ME 1401
jrandlett@rudmanwinchell.com
jtardy@rudmanwinchell.com

*Attorneys for Plaintiffs*

Matthew A. Brill*
Matthew T. Murchison*
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
matthew.brill@lw.com
matthew.murchison@lw.com

*Attorneys for Plaintiffs*

David P. Murray*
Michael D. Hurwitz*
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006-1238
MHurwitz@willkie.com
DMurray@willkie.com

*Attorneys for Plaintiffs Comcast of Maine/New Hampshire, Inc. and NBCUniversal Media, LLC*

* Pro hac vice certification pending

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the foregoing document entitled

*Plaintiffs' Complaint for Declaratory and Injunctive Relief* via the Court's CM/ECF system, which

will serve a copy of same upon all counsel of record.

DATED: September 6, 2019

/s/ *Joshua A. Randlett*
Joshua A. Randlett, Esq.
