**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

COMCAST OF MAINE/NEW HAMPSHIRE,
INC.; A&E TELEVISION NETWORKS,
LLC; C-SPAN; CBS CORP.; DISCOVERY,
INC.; DISNEY ENTERPRISES, INC.; FOX
CABLE NETWORK SERVICES, LLC;
NBCUNIVERSAL MEDIA, LLC; NEW
ENGLAND SPORTS NETWORK, LP; and
VIACOM INC.,

                     Plaintiffs,

      v.

JANET MILLS, in her official capacity as the
Governor of Maine; AARON FREY, in his
official capacity as the Attorney General of
Maine; the CITY OF BATH, MAINE; the
TOWN OF BERWICK, MAINE; the TOWN
OF BOWDOIN, MAINE; the TOWN OF
BOWDOINHAM, MAINE; the TOWN OF
BRUNSWICK, MAINE; the TOWN OF
DURHAM, MAINE; the TOWN OF ELIOT,
MAINE; the TOWN OF FREEPORT,
MAINE; the TOWN OF HARPSWELL,
MAINE; the TOWN OF KITTERY, MAINE;
the TOWN OF PHIPPSBURG, MAINE; the
TOWN OF SOUTH BERWICK, MAINE; the
TOWN OF TOPSHAM, MAINE; the TOWN
OF WEST BATH, MAINE; and the TOWN
OF WOOLWICH, MAINE;

                     Defendants.

Case No. 1:19-cv-00410-NT

**INJUNCTIVE RELIEF SOUGHT**

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
WITH INCORPORATED MEMORANDUM OF LAW**

NOW COME Plaintiffs, through their undersigned attorneys, and pursuant to Fed. R. Civ. P. 65, who hereby respectfully move for a preliminary injunction enjoining the enforcement of H.P. 606-L.D. 832, "An Act to Expand Options for Consumers of Cable Television in Purchasing Individual Channels and Programs" ("L.D. 832"). In support thereof, Plaintiffs state as follows.

Plaintiffs are a cable operator in the State of Maine and providers of video programming that is distributed over cable systems throughout the state ("Plaintiff Programmers"). L.D. 832 became law on June 15, 2019, and is scheduled to take effect on September 19, 2019. It requires cable operators to make individual channels and programs available for purchase to consumers on an "à la carte" basis. No other state in the country has tried to mandate the offering of channels and programs on an à la carte basis—likely because, as even proponents of L.D. 832 recognized, that mandate is squarely preempted by federal law. Making matters worse, it violates the First Amendment by infringing the editorial discretion of both cable operators and programmers. Allowing L.D. 832 to take effect thus not only would fundamentally disrupt decades of settled practice that has grown around long-established federal regulations, but would irreparably harm Plaintiffs by infringing their constitutional rights. Plaintiffs also would suffer unrecoverable monetary losses, loss of goodwill, and reputational injury in attempting to implement L.D. 832. Plaintiffs accordingly ask this Court to enter a preliminary injunction preserving the status quo pending resolution of this case. Such relief will not unduly burden Defendants, and it will serve the public interest by preventing violations of constitutional and federal law. Indeed, it will serve the public far better than allowing L.D. 832 to go into effect, since Maine's novel à la carte mandate is bound to result in increased cable costs, reduced programming choice, consumer dissatisfaction, and the diversion of resources from enhanced

cable offerings.  Accordingly, the requested preliminary injunction is justified and should be granted.

## BACKGROUND

*Cable Service Tiers.*  To provide cable service to consumers, cable operators such as Plaintiff Comcast of Maine/New Hampshire, Inc. ("Comcast Cable") distribute channels of video content assembled and provided by entities such as Plaintiff Programmers.  For decades, most channels have been packaged into "tiers" designed by the cable operator.  The manner in which a cable operator distributes a programmer's content is governed by a private contract called an "affiliation agreement" or, in the case of some broadcast stations, a "retransmission consent agreement."  Other broadcast stations are distributed by cable operators pursuant to "must-carry" provisions in the Communications Act and FCC rules, without a contract.[1]

Affiliation agreements are negotiated to contain various "carriage," "packaging," and/or "penetration" provisions that govern how a programmer's content is distributed to a cable operator's subscribers.  *See, e.g.*, U.S. Gen. Accounting Office, GAO-04-8, *Telecommunications: Issues Related to Competition and Subscriber Rates in the Cable Television Industry* 33-34 (2003) ("*GAO Report*") (describing GAO's review of industry programming agreements with tiering requirements).  For example, the agreement may provide for distribution to a minimum percentage of subscribers and/or on a particular tier of service.  *Id.*  Such terms are grounded in the exercise of First Amendment rights and exclusive rights under the Copyright Act to decide how to license creative works.  Programmers seek wide distribution of their content to attract as

---

[1] The Communications Act gives broadcast stations the option to elect "must carry" status—in which case cable operators are compelled to transmit their programming on the basic tier—or to negotiate "retransmission consent agreements" under which they may obtain compensation for carriage by cable and satellite systems and agree to alternative distribution arrangements.  *See* 47 U.S.C. §§ 534, 535 (imposing must-carry obligations); *id.* § 325(b) (implementing retransmission consent regime).

many viewers as possible, which generates more advertising revenue and, for programmers with popular content, per-subscriber license fees.  *See id.* at 42.  In some cases, broader distribution also is needed to fulfill programmers' contractual obligations to third-party copyright owners that supply content.  Complaint ¶ 9.  To preserve editorial discretion over the inclusion and organization of their content, affiliation agreements also generally prohibit cable operators from disassembling a channel's "linear" programming stream or offering content on a program-by-program basis—unless the cable operator specifically negotiates for this right (which many have not done).  *Id.* ¶ 42.

Cable operators package programmers' channels in various service tiers, often referred to as "basic" (which includes certain local broadcast channels specified by federal law), "expanded basic," and other optional tiers (such as sports tiers or other specialty tiers).  *Id.* ¶ 43.  These tiers offer an array of programming options at different price points that provide the greatest choice and value to consumers.  Where consistent with their affiliation agreements and regulatory obligations, cable operators also offer certain à la carte options to consumers, such as premium channels (e.g., HBO) and extensive video-on-demand and pay-per-view services.  *Id.*

These offerings are not unique to the cable industry or to Maine.  Other video providers across the country follow the same general practices.  These include other multichannel video programming distributors ("MVPDs") like direct broadcast satellite ("DBS") providers DIRECTV and DISH Network, as well as "virtual" (i.e., online) MVPDs like AT&T TV NOW, Sling TV, Hulu+ Live TV, and YouTube TV.  Each MVPD delivers programming principally in tiers of service with different packages of content curated by the provider and programmers.

***Federal Regulation of Cable Service.***  Cable television service has been subject to federal regulation for decades.  This regulation is premised in large part on cable operators'

longstanding practice of offering programming in tiers. Congress established a federal regulatory framework for cable television in the Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2779 ("1984 Act"), which added Title VI to the Communications Act. Congress determined that the "overlapping authority of the FCC and the municipalities" over cable television services had resulted in an "ill[-]defined . . . state of regulatory uncertainty." *All. for Cmty. Media v. FCC*, 529 F.3d 763, 767-68 (6th Cir. 2008) (citation and internal quotations omitted). It therefore concluded that "national standards" were necessary to "clarify the authority of Federal, State and local government[s] to regulate cable through the franchise process." H.R. Rep. No. 98-934, at 23 (1984), 1984 U.S.C.C.A.N. 4655, 4660. Title VI thus "establish[es] a national policy concerning cable communications," which includes "minimiz[ing] unnecessary regulation that would impose an undue economic burden on cable systems." 47 U.S.C. § 521(1), (6). The 1984 Act endorsed the cable industry's tiering practices, codifying defined terms such as "basic cable service" (defined as "any service tier which includes the retransmission of local television broadcast signals") and "service tier" (defined as "a category of cable service or other services provided by a cable operator and for which a separate rate is charged by the cable operator"). *Id.* § 522(3), (17). Congress later enacted the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460, which imposed certain carriage obligations, e.g., "must carry" provisions applicable to certain local broadcast stations.[2]

Together, this legislation established a calibrated regulatory framework that preserves the editorial discretion of cable operators and programmers in choosing how to package the channels

---

[2] Content developers and programmers also have broad, federally protected interests under the Copyright Act in controlling the dissemination of their video programming. *See, e.g.*, 17 U.S.C. § 106 (enumerating a copyright owner's "exclusive rights," which includes the right to "distribute . . . the copyrighted work"); *id.* § 301 (establishing that all legal and equitable rights within the scope of copyright are governed exclusively by the federal Copyright Act).

and content offered to customers.  Consistent with First Amendment principles, this editorial

discretion is subject only to certain circumscribed limitations, including the broadcast must-carry

rules, *id.* §§ 534, 535, minimum basic tier specifications for areas not subject to effective

competition, *id.* § 543, and the program carriage and program access provisions in Sections 616

and 628, *id.* §§ 536, 548.[3]  And Congress expressly precluded state or local governments from

altering or supplementing those minimal federal restraints.

In particular, local and state franchising authorities are authorized to enter into "franchise

agreements" with cable operators to regulate the use of public rights-of-way, *id.* § 541

(describing general franchise requirements and limitations on provisions that may be included in

franchise agreements), and to impose customer service requirements, *id.* § 552.  But Section

624(f)(1) of the Communications Act expressly directs that "[a]ny Federal agency, State, or

franchising authority may not impose requirements regarding the provision or content of cable

services, *except as expressly provided in this subchapter*"—i.e., by Title VI.  *Id.* § 544(f)(1)

(emphasis added).  Further, Sections 624(a) and (b) prohibit state or local franchising authorities

from regulating "the *services* . . . provided by a cable operator except to the extent consistent

with this subchapter," and provide that a franchising authority, "in its request for proposals for a

franchise . . . may establish requirements for facilities and equipment, but *may not* [subject to an

exception not relevant here] *establish requirements for video programming* or other information

services."  *Id.* § 544(a), (b)(1) (emphases added).  And, in addition to prohibiting franchising

authorities from imposing such requirements, the Communications Act, in Section 636(c),

---

[3] These requirements were enacted at a time when cable operators were often the only video providers in a local community besides broadcast stations.  The dramatic growth in video competition has made these requirements increasingly suspect.  *See, e.g.*, *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009) ("Cable operators . . . no longer have the bottleneck power over programming that concerned the Congress in 1992."); *Agape Church, Inc. v. FCC*, 738 F.3d 397, 413-14 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (describing dramatic changes in the video marketplace that make it unlikely that mandatory carriage requirements would survive scrutiny today).

expressly preempts any state or local law that conflicts with it.  *See id.* § 556(c).  Together, these provisions reflect Congress's intent to prevent state and local governments from regulating programming content and its decision that a uniform federal framework (rather than myriad state and local laws) will best promote competition, programming diversity, consumer choice, copyright protection, and other public interests.

***The Maine Statute.***  L.D. 832 is a single sentence law that was enacted without the governor's signature.  It provides:  "Notwithstanding any provision in a franchise, a cable system operator shall offer subscribers the option of purchasing access to cable channels, or programs on cable channels, individually."  129 Pub. L. Ch. 308, § 1 (2019) (to be codified at 30-A M.R.S. § 3008(3)(F)).  It is purportedly intended to increase consumer choice and lower cable costs.[4]  By its terms, L.D. 832 mandates that cable operators offer all channels and individual programs on an à la carte basis to consumers.  No other video programming distributors are subject to the law.

## ARGUMENT

In requesting a preliminary injunction from this Court, movants must show that (1) they are likely to succeed on the merits of their claims; (2) they will suffer irreparable harm during the pendency of litigation in the absence of any injunction; (3) the injunction would burden the State less than denying the injunction would burden the movants; and (4) granting the injunction is in the public interest.  *See, e.g.*, *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012).  Plaintiffs satisfy each of these requirements.

---

[4] *See* Rep. J. Evangelos Testimony in Support of LD 832, at 1 (Mar. 5, 2019), http://www.mainelegislature.org/legis/bills/getTestimonyDoc.asp?id=96832 ("For far too long, consumers have been forced to purchase cable TV packages which include dozens of channels that the consumer has no interest in watching.").

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

As shown below, L.D. 832 is clearly preempted by federal law and therefore invalid.  Its content mandates also infringe on Plaintiffs' protected speech in violation of the First Amendment.  Plaintiffs therefore are likely to succeed on the merits of their claims.

### A.  L.D. 832 Is Preempted by Federal Law

*Express Preemption.*  L.D. 832 is expressly preempted by Section 624(f)(1) of the Communications Act, which prohibits the State from imposing any "requirements regarding the provision or content of cable services" except as expressly provided in Title VI.  47 U.S.C. § 544(f)(1).  No provision of Title VI requires the offering of channels or programs on an à la carte basis, much less authorizes any state or local franchising authority—or even the FCC—to impose such requirements.  Rather, federal law preserves the editorial discretion of cable operators and programmers to choose the manner in which they provide content to customers, subject only to specified carriage mandates.

L.D. 832 imposes requirements regarding *both* the provision *and* the content of cable services.  It regulates the provision of cable services by requiring cable operators to provide "cable channels" and individual "programs" on an à la carte basis and by prohibiting operators and programmers from exercising their editorial discretion to present such programming only as part of a tier.  L.D. 832 likewise regulates the content of cable services by dictating that all channels and programs must be offered on an individualized basis.  By singling out programming distributed by cable operators for the à la carte mandate, while exempting all programming carried by other distributors, L.D. 832 uniquely burdens a specific category of content.  In addition, the law effectively requires, for example, that a cable operator offer the telecast of a single Red Sox game on NESN to a Maine consumer, notwithstanding that neither

NESN nor the cable operator sells that content in that manner. By mandating such programming disaggregation, the law infringes on the very editorial rights of the cable operator and programmer that Congress expressly shielded from such interference in Section 624(f)(1).

Decisions in this Court and others have invalidated similar state and local laws that imposed content-related requirements on cable services as expressly preempted under Section 624(f)(1). *See Lafortune v. City of Biddeford*, No. 01-250-P-H, 2002 WL 823678, at *8 (D. Me. Apr. 30, 2002), *aff'd*, 142 F. App'x 471 (1st Cir. 2005) (affirming magistrate judge's holding that a city's requirement of a written release before a cable operator could air programs on a public access channel "'impose[d] requirements regarding the . . . content of cable services,' in violation of" Section 624(f)(1)); *Cablevision Sys. Corp. v. Town of E. Hampton*, 862 F. Supp. 875, 886 (E.D.N.Y. 1994) (holding that town could not "usurp the cable operator's power to determine the details and particulars of the provision of cable service" and "ha[d] no authority to regulate . . . the manner in which [c]able service is packaged for the [c]onsumer"), *aff'd*, 57 F.3d 1062 (2d Cir. 1995); *Time Warner Cable of N.Y.C. v. City of New York*, 943 F. Supp. 1357, 1391 (S.D.N.Y. 1996) (holding that city's unilateral placement of cable news networks on certain channels "violates Time Warner's editorial autonomy" and was preempted by Section 624(f)), *aff'd sub nom. Time Warner Cable of N.Y.C. v. Bloomberg L.P.*, 118 F.3d 917 (2d Cir. 1997).

By authorizing municipalities, as local franchising authorities, to enforce the law through its codification in Section 3008,[5] L.D. 832 also is expressly preempted by Sections 624(a) and (b)(1) of the Communications Act. These sections prohibit "[a]ny franchising authority" from

---

[5] Section 3008 grants municipalities the authority to "enact any ordinances, not contrary to this chapter, governing franchising and regulation of cable television systems using public ways," 30-A M.R.S. § 3008(2), and confers on municipalities the right to seek "injunctive relief in addition to any other remedies available by law to protect any rights conferred upon the municipality by this section or any ordinances enacted under this section or section 3010," *id.* § 3008(3)(E).

regulating the "services" or establishing any requirements for "video programming" offered by cable operators. 47 U.S.C. § 544(a), (b)(1). The à la carte mandates in L.D. 832 violate both prohibitions by directly regulating cable operators' "services" and imposing "requirements for video programming." The law is thus invalid on this additional ground, as well.

**Conflict Preemption.** L.D. 832 also is preempted because it impermissibly conflicts with federal law, by making compliance with both federal law and L.D. 832 impossible and by imposing an obstacle to the accomplishment of federal objectives. *See Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698-99 (1984); *see also City of New York v. FCC*, 486 U.S. 57, 64 (1988) ("The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof."). L.D. 832 thus is preempted pursuant to basic conflict preemption principles, which are codified expressly in Section 636(c) of the Communications Act. 47 U.S.C. § 556(c) ("preempt[ing] and supersed[ing]" any state law that "is inconsistent with [the Communications Act]"); *see also Liberty Cablevision of P.R., Inc. v. Municipality of Caguas,* 417 F.3d 216, 221 (1st Cir. 2005) (finding that "Congress has made it 'unmistakably clear' [in Section 636(c)] that the Cable Act will preempt any inconsistent state or local law") (citations omitted).

As noted above, cable operators are required to provide the signals of all stations that elect "must-carry" status pursuant to Section 614 of the Communications Act on a mandatory basic tier.[6] The FCC's rules further direct that must-carry stations be "provided to every

---

[6] Although certain other requirements relating to the basic service tier (including rate regulation) sunset in areas where the FCC has found that effective competition is present, 47 U.S.C. § 543(a)(2), the FCC has construed Section 614 to require cable operators to ensure that their subscribers *receive* all must-carry stations irrespective of the presence of such competition. *See Carriage of Digital Television Broadcast Signals*, Fifth Report and Order, 27 FCC Rcd. 6529 ¶ 9 (2012) (stating that Section 614 of the Act "requires that every class of subscriber must receive all must carry signals," and that "[c]able operators have complied with this requirement through the use of a basic service tier, *i.e.*, a level of service to which subscription is required in order to be eligible for access to any other tier of service at additional charge"); *Carriage of Digital Television Broadcast Signals,* Third Report and Order, 22 FCC

subscriber of a cable system." 47 C.F.R. § 76.56(d)(1). Cable operators cannot comply with both this federal must-carry requirement and the à la carte mandate of L.D. 832, which effectively prohibits cable operators from requiring Maine subscribers to purchase must-carry stations as part of the basic tier. Indeed, the FCC recognized this exact conflict over a decade ago, finding that "[a] cable operator generally cannot offer all local broadcast stations on an à la carte basis because the Act requires that broadcast stations be sold together on the basic service tier and provided to every subscriber of the cable system." FCC, Media Bureau, *Report on the Packaging and Sale of Video Programming Services to the Public* 122 (2004) ("*FCC Report*").

L.D. 832 also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" set forth in the Communications Act and FCC rules, *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), and otherwise "frustrates the full effectiveness of federal law," *Perez v. Campbell*, 402 U.S. 637, 652 (1971). As noted, Congress and the FCC sought to ensure delivery of must-carry broadcast stations to all subscribers, and more broadly, Congress made clear that its goals for regulating cable service were to establish and maintain "a national policy concerning cable communications" that "minimize[s] unnecessary regulation that would impose an undue economic burden on cable systems." 47 U.S.C. § 521(1), (6); *see also id.* § 556(c) (confirming that conflicting state and local laws are "deemed to be preempted and superseded"). Congress and the FCC have chosen to achieve this objective through a federal regulatory regime that grants local and state franchising authorities limited regulatory oversight governing public rights-of-way and prohibits them from imposing any regulations regarding the provision or content of cable services. As shown, this regulatory framework preserves the

Rcd. 21064 ¶ 29 n.94 (2007) ("Congress intended that all cable subscribers be able to see must-carry signals, regardless of whether their cable operator faced effective competition.").

editorial discretion of cable operators and programmers to choose the manner in which they provide content to customers, whether that be solely in tiers of programming, à la carte, or both. L.D. 832 plainly frustrates these federal statutory and policy objectives.

### B. L.D. 832 Violates the First Amendment

Further, L.D. 832 imposes content- and speaker-based restrictions on cable operators' and programmers' protected speech in violation of the First Amendment. *See* U.S. Const., amend. I. The Supreme Court has made clear that both "[c]able programmers and cable operators engage in and transmit speech, and . . . are entitled to the protection of the speech and press provisions of the First Amendment." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994). Thus, when cable operators and programmers decide how to present programming to consumers—whether on an à la carte basis or as part of a tier of service—they are engaging in protected speech. *See id.* ("Through original programming or by exercising editorial discretion over which stations or programs to include in its repertoire, cable programmers and operators see[k] to communicate messages on a wide variety of topics and in a wide variety of formats.") (internal quotations omitted); *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 214 (1997) (confirming that "cable operators' editorial discretion in creating programming packages" constitutes protected speech); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000) (holding that a statute violated the First Amendment where it imposed overbroad requirements on cable programmers).

L.D. 832 eviscerates this protected editorial discretion, as it eliminates the ability of cable operators and programmers to decide not to offer programming on an à la carte basis. It targets certain content (i.e., "cable channels" and "programs" carried on cable channels) and uniquely burdens certain speakers (i.e., cable operators and programmers that supply content to cable operators). Remarkably, no other types of MVPDs, including DBS video providers such as

DIRECTV and DISH Network, "virtual" MVPD services like Sling TV, YouTube TV, and AT&T TV NOW, nor the programming any of those services distributes, are covered by the law even though they distribute their services via video packages and tiers just as cable operators do today.

Such content- and speaker-based laws are subject to strict scrutiny and must be narrowly tailored to serve a compelling governmental interest using the least restrictive means. *See, e.g.*, *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226, 2230-31 (2015) ("[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference," and "[c]ontent-based . . . laws are presumptively unconstitutional."); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995) ("In the realm of private speech or expression, government regulation may not favor one speaker over another."). Even laws that do not include content- or speaker-based distinctions must pass intermediate scrutiny, which requires a state to prove that the law "furthers an important or substantial governmental interest," is "unrelated to the suppression of free expression," and imposes restrictions on First Amendment rights that are "no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968); *see also March v. Mills*, 867 F.3d 46, 66 (1st Cir. 2017). L.D. 832 fails under either level of scrutiny.

Maine plainly did not satisfy its burden to show that the law advances an important or substantial, much less compelling, governmental interest to increase consumer choices and lower costs. It failed to develop the type of legislative record containing the evidence necessary to satisfy any level of First Amendment scrutiny. *See Edenfield v. Fane*, 507 U.S. 761, 768 (1993) (holding that the government must proffer evidence showing how the speech restriction advances the interests at stake, rather than relying on speculation); *El Día, Inc. v. P.R. Dep't of Consumer*

*Affairs*, 413 F.3d 110, 115 (1st Cir. 2005) (holding that a statute did not pass intermediate scrutiny where the record lacked evidence both as to the asserted harms that the speech restriction was intended to remedy, and as to the efficiency of the restriction in remedying those harms). The absence of any record evidence showing a need for the government to override Plaintiffs' editorial discretion is not surprising: The reality is that consumers in Maine and elsewhere have myriad options for obtaining video content, whether from traditional MVPD services or through the vast array of online options.[7] Consumers also can pick and choose from "skinny" tiers of programming and purchase or rent individual movies or shows. Many programmers also are making their individual channels available directly to consumers. *See, e.g.*, *FCC Communications Marketplace Report* ¶¶ 76-82 (describing these rapidly growing competitive video options). Given the abundance of choice in the video marketplace, including à la carte options, Maine has no basis to claim that L.D. 832 is necessary to expand video options for consumers. *See Asociación de Educación Privada de P.R., Inc. v. García-Padilla*, 490 F.3d 1, 18 (1st Cir. 2007) ("We cannot conclude that [the state agency] has a legitimate state interest in fixing a problem it has not shown to exist."). Rather, L.D. 832's à la carte mandate would threaten that consumer choice by curtailing the licensing (and stymying the viewership) of programming in ways that jeopardize the survival of many programming networks, particularly

---

[7] While cable operators' market share exceeded 95 percent in 1992, cable television subscribers accounted for only slightly more than 55 percent of all MVPD subscribers as of 2017, without even considering the many online video options that are now available to consumers. *Compare Communications Marketplace Report*, Report, 33 FCC Rcd. 12558 ¶ 54 (2018), ("*FCC Communications Marketplace Report*"), *with Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Third Annual Report, 12 FCC Rcd. 4358, 4495 (App. F) (1997). For example, Amazon Prime reportedly has more than 100 million members in the United States, and Netflix has more than 60 million paid U.S. subscribers. *See* Press Release, Consumer Intelligence Research Partners, LLC, *Amazon Exceeds 100 Million US Prime Members* (Jan. 17, 2019), https://files.constantcontact.com/150f9af2201/a37a79a7-0eff-4a38-b05a-ce3c459addc2.pdf; Statista, *Number of Netflix Paying Streaming Subscribers Worldwide from 3rd Quarter 2011 to 2nd Quarter 2019 (in Millions)* (Aug. 9, 2019), https://www.statista.com/statistics/250934/quarterly-number-of-netflix-streaming-subscribers-worldwide/.

for programming serving niche audiences. *See FCC Report* at 56 ("À la carte would likely have a significant negative impact on consumer choice.").

Nor is there any evidence that L.D. 832 would lower costs for consumers. To the contrary, numerous studies have demonstrated that a mandatory à la carte regime likely would result in *higher* prices for consumers. *See, e.g.*, *GAO Report* at 34-37 ("If cable subscribers were allowed to choose networks on an à la carte basis, the economics of the cable network industry could be altered, and, if this were to occur, it is possible that cable rates could actually increase for some consumers."); *see also* Declaration of Peter Plaehn ¶¶ 13-14 ("Plaehn Decl."); Declaration of Rick Rioboli ¶¶ 17-19 ("Rioboli Decl.").

L.D. 832 likewise is not narrowly tailored to advance the State's putative interests "in a direct and material way." *García-Padilla*, 490 F.3d at 18. "Narrow tailoring in the strict scrutiny context requires the statute to be 'the least restrictive means among available, effective alternatives.'" *Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016) (quoting *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)). Even under intermediate scrutiny, the requisite tailoring "demand[s] a close fit" between the means of implementation and the asserted government interest. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). And when a law is underinclusive and permits other speech that presents "the very harm that the state claims it is trying to address, there may be reason to doubt the seriousness of that harm . . . and 'whether the government is in fact pursuing the interests it invokes.'" *March*, 867 F.3d at 65 (quoting *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1668 (2015)).

L.D. 832 is both overinclusive and underinclusive. There is no evidence of unfulfilled consumer video demand that could possibly justify mandating à la carte options for *every*

channel and individual program offered by a cable operator.  Yet, the law leaves no cable programming unburdened from its scope, making it overbroad.  *See McCullen*, 573 U.S. at 486.

At the same time, L.D. 832 is fatally underinclusive because it only applies to cable operators and their program offerings.  If increased choice and cost savings are its objectives, Maine has no valid justification for exempting all other video providers from the law—including DIRECTV and DISH Network, which are among the largest MVPDs in the country,[8] as well as "virtual" MVPDs like Sling TV, Hulu+ Live TV, and YouTube TV with growing numbers of subscribers.[9]  All of these competing distributors remain free to continue offering programming only in tiers, while L.D. 832 irrationally compels even the smallest cable operators in Maine to offer all channels and programs à la carte.  The Supreme Court has consistently invalidated such underinclusive laws under both strict and intermediate scrutiny.  *See, e.g.*, *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 190 (1999) (holding under intermediate scrutiny that a law restricting "advertising about privately operated commercial casino gambling" but not "for tribal casino gambling" was "so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it"); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("[A] law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (internal quotes omitted); Complaint ¶ 88 (citing other authorities).

For all these reasons, Plaintiffs are likely to succeed in their challenges to L.D. 832.

---

[8] *See FCC Communications Marketplace Report* ¶ 53.

[9] *See id.* ¶ 124 & fig. B-6.

## II.     L.D. 832 WILL IRREPARABLY HARM PLAINTIFFS

Plaintiffs will suffer irreparable harm if Defendants seek to enforce L.D. 832, which upends decades-old cable practices, while this litigation is pending.  That the law infringes on their First Amendment rights alone satisfies irreparable injury for purposes of granting injunctive relief:  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *cf.* Plaehn Decl. ¶ 17.  Decisions in this Court have likewise recognized that "[a] party may be irreparably injured in the face of the threatened enforcement of a preempted law." *Arcadian Health Plan, Inc. v. Korfman*, No. 1:10-CV-322-GZS, 2010 WL 5173624, at *8 (D. Me. Dec. 14, 2010) (Rep. & Rec.) (internal quotations omitted).

Plaintiffs also would suffer a substantial and unrecoverable loss of commercial and consumer goodwill.  L.D. 832's à la carte mandates conflict with standard licensing practices in the industry that generally preclude such offerings, and are at odds with Plaintiff Programmers' agreements with content suppliers.  *See* Plaehn Decl. ¶¶ 11-12; *see also GAO Report* at 33-34. This would result in disagreements and even litigation between cable operators and programmers, and between some programmers and their suppliers.  *See* Rioboli Decl. ¶ 18.  If cable operators were to honor the terms of their affiliation agreements, they would expose themselves to enforcement actions, which would entail monetary losses and reputational harm. *Id.*  Yet violating or otherwise forcing renegotiation of their affiliation agreements so as to comply with L.D. 832 would damage cable operators' relationships with programmers and invite costly litigation and carriage disputes that, in turn, would strain cable operators' relationships with consumers.  *Id.*

In addition, L.D. 832 would require cable operators and programmers to develop new pricing models for individual channels and programs, in order to offset the loss in subscriber fees and advertising revenues cable operators and programmers currently receive and ensure that they can continue to make high quality programming available to consumers. *See* Plaehn Decl. ¶¶ 13-14; Rioboli Decl. ¶¶ 18-19. Developing such models would be complex, as it would require assigning a monetary value to programming in as little as half-hour increments. And programming priced in this manner would likely be more expensive, frustrating consumer expectations and leading to potential customer defections. Plaehn Decl. ¶ 13; Rioboli Decl. ¶¶ 19-20. Such losses of customers and goodwill are quintessential irremediable injuries justifying injunctive relief. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages."); *Waldron v. George Weston Bakeries, Inc.*, 575 F. Supp. 2d 271, 277-78 (1st Cir. 2008) (granting preliminary injunction and finding that the loss of customer goodwill constituted irreparable harm) (citing *Dominion Video Satellite, Inc. vs. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156-57 (10th Cir. 2001) (upholding grant of injunction and finding of irreparable injury based on video provider's loss of reputation, goodwill, and the inability to meet contractual obligations with programmers and subscribers)).

Implementing an à la carte model in Maine would also impose substantial costs by forcing cable operators to redesign many aspects of their operating systems. These damages could not be recovered from the State or local franchising authorities, which are immune from such claims. *See* 47 U.S.C. § 555(a); *Kentucky v. United States ex rel. Hagel*, 759 F.3d 588, 599 (6th Cir. 2014); *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013). Compliance with L.D. 832 would require fundamental changes to cable

operators' ordering, customer subscription management, and billing systems—all of which currently are designed to deliver a discrete set of programming tiers and only limited à la carte options to customers. These efforts would be exacerbated by the sheer complexity of attempting to deliver the countless individual channel and program options that L.D. 832 mandates. *See* Rioboli Decl. ¶¶ 8-16; *see also FCC Report* at 41. Substantial resources also would be required to train customer service personnel to process these complex orders, handle increased customer call volumes, and troubleshoot any problems. *See* Rioboli Decl. ¶ 15. For example, Plaintiff Comcast Cable's ordering and billing systems and customer service representatives are currently equipped to handle a discrete number of tiers and packages and associated billing and offer codes. Under L.D. 832, Comcast Cable would have to create hundreds of new per-channel billing codes and hundreds of thousands of new per-program offer codes. The dramatic increase in number and combinations of these individual codes would overwhelm cable operators' systems and customer services representatives. *See id.* ¶¶ 11, 15-16.

Compliance with L.D. 832's à la carte mandate likewise would require significant network infrastructure and equipment modifications. Cable operators' existing network configuration and infrastructure in Maine cannot support the à la carte delivery of all channels and programs as required by L.D. 832. *Id.* ¶ 12. And many cable customers have legacy devices that are not capable of receiving content on an à la carte basis. Cable operators would have to purchase and distribute thousands of more advanced "addressable" set-top boxes to these customers at substantial expense. *Id.* ¶ 14. This would create inconveniences for customers and increase equipment fees, compounding the loss of goodwill. *Id.*

Further, L.D. 832 will result in less advertising revenues for Plaintiffs. Plaehn Decl. ¶¶ 13, 15. As the FCC has found, "an a la carte regime would undermine the ability of program

networks to garner the advertising revenue to remain viable" in part because it would "reduce viewership of nearly all program networks." *FCC Report* at 45, 118. Cable operators, which derive significant revenue from the sale of local advertising inserts, would face similar shortfalls. *See id.* at 92-93; Rioboli Decl. ¶ 19. To offset these advertising losses, Plaintiff Programmers would have to charge, and Plaintiff Comcast Cable would have to pay, increased license fees, which would be passed on to subscribers in the form of higher prices—compounding consumer complaints and defections. *See FCC Report* at 93; Plaehn Decl. ¶ 13; Rioboli Decl. ¶¶ 19-20. Diminished advertising revenues will also harm content diversity. The tiers and packages offered by cable operators enable niche networks, "such as religious programming, programming aimed at minority interests, arts programming and independently owned networks," to attract and retain the viewers—and thus advertisers—necessary to remain viable. *See, e.g.*, *FCC Report* at 6; *see also* Plaehn Decl. ¶ 15. Under the à la carte system imposed by Maine, such content would not be given that opportunity, stifling innovation and limiting the consumer choice that L.D. 832 is ostensibly intended to foster.

Finally, L.D. 832 would create serious imbalances in the competitive marketplace. By singling out cable services for its mandates, the law would fundamentally disrupt decades of existing cable practices and impose substantial costs on this segment of the video marketplace. DBS and Internet-based video providers will not be similarly burdened or harmed, placing cable operators at an unfair and irreparable competitive disadvantage. Rioboli Decl. ¶ 20.

## III.    GRANTING THE INJUNCTION WILL NOT BURDEN THE DEFENDANTS

The balance of hardships also weighs in favor of granting a preliminary injunction. L.D. 832 has not yet taken effect, so enjoining the law would simply "preserve the status quo, freezing an existing situation . . . and prevent[ing] further injury." *CMM Cable Rep., Inc. v. Ocean Coast*

*Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). Nor can the State claim harm from its inability to enforce a likely unconstitutional law. *Odebrecht Constr.*, 715 F.3d at 1289-90 (finding that the injunction did not harm the state because the only harm was the "more nebulous, not easily quantified harm of being prevented from enforcing one of its laws," and noting that there is "no harm from the state's nonenforcement of invalid legislation") (internal citations omitted).

## IV.    THE INJUNCTION SERVES THE PUBLIC INTEREST

Granting a preliminary injunction will serve the public interest by protecting Plaintiffs' First Amendment rights and ensuring adherence to federal law. "When a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." *Magriz v. Union de Tronquistas de P.R., Local 901*, 765 F. Supp. 2d 143, 157 (D.P.R. 2011) (internal cites and quotes omitted). Likewise, as this Court has explained, "[w]here Congress has expressly preempted the state law at issue, Congress has already determined that it is the preempting federal law that serves the public interest." *Arcadian Health Plan, Inc.*, 2010 WL 5173624, at *9; *see also CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008) ("[T]he public has an interest in the enforcement of federal statutes.").

The substantial costs of implementing L.D. 832 will divert resources from enhanced cable offerings and technologies for consumers. Such implementation also will result in increased prices for consumers, not cost savings, and reduced content diversity. The requested injunctive relief thus will serve the public interest by avoiding these harms as well.

## <u>CONCLUSION</u>

For all of these reasons, Plaintiffs' motion for a preliminary injunction enjoining enforcement of L.D. 832 pending the resolution of this action should be granted.

Respectfully submitted,

/s/ Joshua A. Tardy
Joshua A. Tardy
Joshua A. Randlett
RUDMAN WINCHELL
84 Harlow Street
P.O. Box 1401
Bangor, ME 04401
jtardy@rudmanwinchell.com
jrandlett@rudmanwinchell.com

*Attorneys for Plaintiffs*

Matthew A. Brill*
Matthew T. Murchison*
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
matthew.brill@lw.com
matthew.murchison@lw.com

*Attorneys for Plaintiffs*

David P. Murray*
Michael D. Hurwitz*
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006-1238
dmurray@willkie.com
mhurwitz@willkie.com

*Attorneys for Plaintiffs Comcast of Maine/New Hampshire, Inc. and NBCUniversal Media, LLC*

Dated: September 11, 2019                    * pro hac vice certification pending

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document entitled

*Plaintiffs' Motion for Preliminary Injunction with Incorporated Memorandum of Law* via the

Court's CM/ECF system, which will serve a copy of same upon all counsel of record.

DATED: September 11, 2019

/s/ Joshua A. Randlett
Joshua A. Randlett, Esq.