IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| COMCAST OF MAINE/NEW HAMPSHIRE, INC.; A&E TELEVISION NETWORKS, LLC; C-SPAN; CBS CORP.; DISCOVERY, INC.; DISNEY ENTERPRISES, INC.; FOX CABLE NETWORK SERVICES, LLC; NBCUNIVERSAL MEDIA, LLC; NEW ENGLAND SPORTS NETWORK, LP; and VIACOM INC.,<br><br>                Plaintiffs,<br><br>    v.<br><br>JANET MILLS, in her official capacity as the Governor of Maine; AARON FREY, in his official capacity as the Attorney General of Maine; the CITY OF BATH, MAINE; the TOWN OF BERWICK, MAINE; the TOWN OF BOWDOIN, MAINE; the TOWN OF BOWDOINHAM, MAINE; the TOWN OF BRUNSWICK, MAINE; the TOWN OF DURHAM, MAINE; the TOWN OF ELIOT, MAINE; the TOWN OF FREEPORT, MAINE; the TOWN OF HARPSWELL, MAINE; the TOWN OF KITTERY, MAINE; the TOWN OF PHIPPSBURG, MAINE; the TOWN OF SOUTH BERWICK, MAINE; the TOWN OF TOPSHAM, MAINE; the TOWN OF WEST BATH, MAINE; and the TOWN OF WOOLWICH, MAINE;<br><br>                Defendants. | Case No. 1:19-cv-00410-NT |

**DECLARATION OF PETER PLAEHN IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Peter Plaehn, declare as follows:

1.    My name is Peter Plaehn. I am Vice President, Affiliate Relations for New England Sports Network Limited Partnership ("NESN"). In this role, I am responsible for NESN

distribution through affiliation agreements with cable, satellite, telco and "virtual" online multichannel television providers. I have worked for NESN since 1986 in advertising, public relations, marketing and distribution roles.

2. I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

**Background on Affiliation Agreements and Distribution Requirements**

3. One of the nation's first regional sports networks, NESN provides daily programming on its primary and secondary channels throughout the year. First and foremost, NESN is the home of the Boston Red Sox and Boston Bruins, and the network licenses the rights to broadcast regular season Red Sox and Bruins games and some Bruins playoff games in Maine and the other New England states. NESN produces a variety of additional sports programming, including pregame and postgame shows for the Red Sox and Bruins and other short-form and feature content. NESN also licenses the rights to broadcast college basketball, football and hockey games. In determining what content to include in its schedules over the course of the year, NESN pursues a deliberate programming strategy designed to secure rights to the most appealing kinds of content, round out a diverse programming schedule, maintain its brand as the region's premiere sports network, and create substantial value for viewers and for affiliates that distribute NESN throughout New England.

4. NESN's business generally relies on license fees paid by cable companies, satellite and telco providers, and "virtual" online video providers and from advertising revenue from the sale of ads broadcast on NESN. NESN has affiliation agreements with video providers, which are complex, detailed, highly confidential contracts establishing the fees that the provider pays to NESN and various other programming requirements and measures. Video providers for residential customers provide NESN's primary and secondary channels as part of packages along

with other channels—known as service tiers—offered to subscribers; such providers do not provide NESN to these customers on an individual à la carte basis.

5. NESN seeks the broadest distribution possible of its content. Expanded distribution improves NESN's business in general, including from an advertising standpoint. In addition, the professional sports teams—Red Sox and Bruins—want NESN to obtain very broad distribution to reach their fans throughout New England and to do so via distribution as part of a tier, not as an à la carte offering.

6. NESN's affiliation agreements typically require video providers to distribute NESN at minimum penetration levels to a certain percentage of the distributor's subscribers. The affiliation agreements may also specify that the distributor carry NESN on a particular "tier" or in a particular "package" (e.g., expanded basic), or that NESN be distributed on the same tier or in the same package as one or more competing channels.

7. To maintain the composition of NESN's programming, NESN's affiliation agreements generally prohibit cable operators and other providers from disassembling NESN's "linear" programming stream and distributing content on a program-by-program basis.

8. The distribution of NESN as part of a service tier packaged with other channels, along with the minimum penetration and other distribution terms in these affiliation agreements, are critical to NESN's business objective of ensuring that its channels are available to a wide audience in order to attract both dedicated and casual viewers.

9. NESN's ability to generate advertising and license fee revenues based on its broad distribution in turn affects NESN's ability to obtain and produce compelling high-quality content for our viewers.

## Harms Caused by L.D. 832's À La Carte Mandate

10. I understand that L.D. 832 would require cable operators in Maine to "offer subscribers the option of purchasing access to cable channels, or programs on cable channels, individually." The law mandates that cable operators make a programmer's channel—and even individual programs on the channel—available for consumers to purchase on an à la carte basis. If L.D. 832's à la carte mandate goes into effect, it will irreparably harm NESN.

*Affiliation and Rights Agreements*

11. The à la carte mandates in L.D. 832 are inconsistent with the terms of NESN's affiliation agreements with cable operators as such agreements do not provide for à la carte distribution to residential subscribers. These affiliation agreements do not include any pricing or other economics for à la carte viewing of NESN's content, because inclusion in tiered packages is the manner in which NESN intends to deliver its programming, as supported by federal law.

12. In addition, L.D. 832's requirements are at odds with the mandate of the pro sports teams (Red Sox and Bruins) that NESN achieve broad distribution through distribution as part of tiers, not à la carte offerings. Notably, the legislative history of L.D. 832 reflects a particular effort to target NESN's content and mandate that cable consumers be able to view Red Sox games without subscribing to a tiered cable package, or even subscribing to NESN itself.

*Pricing of À La Carte Content*

13. As explained above, NESN wants to distribute its programming as part of a tier and not on a stand-alone à la carte basis—a decision that is protected by federal law. Accordingly, NESN has not determined the rates that it would charge for à la carte service. However, given the importance of broad distribution of NESN's content under existing affiliation and rights agreements, both for viewership ratings and advertising and license fee

revenues, the pricing of our content for à la carte distribution would have to account for and offset the potential loss of such revenues, which I believe would be substantial given the possibility of significantly lower subscriber figures. As a result, in many cases, the prices charged for NESN on a standalone basis or for its individual programs likely would be very expensive and certainly significantly higher than the fees most subscribers currently pay to receive the same content as part of a package or tier of cable service.

14. Implementing all of these pricing and distribution changes only for Maine will also be very complex for NESN and our local cable distributors. Such efforts would impose very significant costs for NESN in terms of time spent by our employees and hard costs incurred in making fundamental changes to our business model that we do not want to make.

*Loss of Viewers and Related Unknown Risks*

15. Because L.D. 832's à la carte mandates threatens to reduce NESN's viewership, it will impede NESN's ability to attract potential viewers and advertisers, which are critical to our business model. The risks and uncertainties created by the law will also chill investment in new programming and channels that might otherwise be offered to consumers in Maine. For these reasons, Maine's à la carte mandates will jeopardize content quality as well as content diversity in the video marketplace.

16. Moreover, L.D. 832 would disadvantage NESN vis-à-vis competing sellers of video programming that are less dependent on distributing programming as part of a package or tier.

*Interference with NESN's Editorial Discretion*

17. NESN is a recognized speaker under the First Amendment both as to the content and programming we provide and the manner in which we provide it (as part of a fully integrated

channel to be included as part of a tier of similar cable programming services). L.D. 832's requirement that individual *programs* on a channel be disaggregated and made available for purchase on an à la carte basis also would upend the strategic and editorial decisions that NESN makes when curating the programs that comprise its primary and secondary channels. NESN invests substantial time and resources in building its channels' line-up of content and resulting brand identity. L.D. 832 will unravel all of these efforts and investments. Rather than allowing NESN to decide how best to package and license their content, Maine is now dictating those choices by law. No other state has imposed such programming decisions on NESN.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on Sept 9, 2019

*[signature]*

Peter Plaehn