## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MAINE

|  |  |
|---|---|
| COMCAST OF MAINE/NEW HAMPSHIRE, INC., *et al.*,<br><br>    Plaintiffs,<br><br>      v.<br><br>JANET MILLS, in Her Official Capacity as the Governor of the State of Maine, *et al.*,<br><br>    Defendants. | CIVIL ACTION NO.: 1:19-cv-00410-NT |

## STATE DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Recognizing that Maine consumers are being forced to purchase expensive packages of dozens of cable television channels just to get the handful of channels they actually want to watch, and in light of the financial hardship this poses for many consumers, Maine's Legislature enacted P.L. 2019, ch. 308 ("Chapter 308"), which requires cable operators to offer subscribers the option of individually purchasing cable channels and programs.

No provision of federal law preempts Chapter 308. The provision plaintiffs principally rely upon has been authoritatively construed by a federal court of appeals, a federal district court, and a state appellate court as preempting only those state laws that regulate the content of programming. Chapter 308 does not regulate content – cable operators and program providers have complete discretion to select the channels and programs they will make available to subscribers. Chapter 308 simply requires that once a particular channel or program is selected, it must be made available individually. To the extent plaintiffs have not waived their claims with respect to two other provisions of federal law (by not presenting any developed argument), the

claims fail because the provisions do not apply to States. Finally, there is no "conflict preemption" because cable operators can easily comply with both Chapter 308 and the applicable provisions of federal law, and Chapter 308 does not stand as an obstacle to accomplishing the objectives of federal law.

Plaintiffs argue that Chapter 308 violates their First Amendment rights because it interferes with their "editorial discretion" to refuse to offer channels and programs individually. In other words, plaintiffs are claiming that they have a First Amendment right to require customers to buy HGTV and Animal Planet in order to watch Discovery and to require customers to buy "NCIS" and "Big Brother" in order to watch "60 Minutes." There is no First Amendment right to engage in this bundling, and, unsurprisingly, plaintiffs cite no authority supporting such a proposition. If, though, the First Amendment were somehow implicated here, intermediate scrutiny applies, and Chapter 308 passes because it advances the important State interest of consumer protection and it is sufficiently tailored to further that interest. Because plaintiffs are thus not likely to succeed on the merits, and because the other relevant criteria are not met, their motion for a preliminary injunction should be denied.

### Cable Television and the Federal 1984 Cable Act's Preservation of State Authority

In 1984, Congress enacted the Cable Communications Policy Act of 1984 ("1984 Cable Act" or the "Act") and added Title VI to the Communications Act of 1934. Pub. L. 98-549, 98 Stat. 2779. The House Report recognized that previously, cable television was regulated primarily "at the local government level through the franchise process," by which a local government entity "specified the nature of the cable system to be constructed, the service to be provided, and the rate which may be charged for those services." H.R. Rep. No. 98-934, 1984 U.S.C.C.A.N. 4655, 4656 ("House Report"). The House Report also noted that "some States

have laws regulating the terms of what may be included in such a franchise." *Id.* Congress intended that the 1984 Cable Act would establish a "national policy" that would "continue[] reliance on the local franchising process as the primary means of cable television regulation, while defining and limiting the authority that a franchising authority may exercise through the franchise process." *Id.* One expressed purpose of the 1984 Cable Act is to "assure that cable systems are responsive to the needs and interests of the local community." 47 U.S.C. § 521(2).

The Act "grants local governments substantial authority to enforce franchise agreements," House Report, at 4657, and several provisions in the Act make clear that States would continue to exercise broad authority over the provision of cable television services. Most importantly, one provision states: "Nothing in this subchapter shall be construed to prohibit any State or any franchising authority from enacting or enforcing any consumer protection law, to the extent not specifically preempted by this subchapter." 47 U.S.C. § 552(d)(1). Another provision states: "Nothing in this subchapter shall be construed to restrict a State from exercising jurisdiction with regard to cable services consistent with this subchapter." 47 U.S.C. § 556(b).[1] In sum, the 1984 Cable Act retains States' historic authority to regulate cable television and protect consumers so long as such regulation is consistent with, and not preempted by, the Act.

## **Chapter 308**

During its last session, Maine's Legislature considered L.D. 832, "An Act to Expand Options for Consumers of Cable Television in Purchasing Individual Channels and Programs." The bill sought to amend 30-A M.R.S. § 3008(3), which imposes certain requirements on cable television systems, by adding the following provision: "Notwithstanding any provision in a

---

[1] A third provision states: "Nothing in this subchapter shall be construed to affect any authority of any State, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare, to the extent consistent with the express provisions of this subchapter." 47 U.S.C. § 556(a).

franchise, a cable system operator shall offer subscribers the option of purchasing access to cable channels, or programs on cable channels, individually."  L.D. 832 (129th Legis., Feb. 14, 2019). This is commonly referred to as the "à la carte" option.

Representative Jeffrey Evangelos, one of sponsors of the bill, explained the basis for it: "I submitted this bill on behalf of Maine's hundreds of thousands of cable television subscribers. For far too long, consumers have been forced to purchase cable TV packages which include dozens of channels the consumer has no interest in watching."  *See* Testimony of Rep. Jeffrey Evangelos, attached hereto as Exhibit A, at 1.  Representative Evangelos referenced an FCC survey "finding that the cost of expanded basic cable has effectively risen from about $25 a month in 1995 to over $54, greatly exceeding inflation."  *Id.*  He also referenced an FCC report finding "that the average consumer would save 13 percent on cable bills if he or she could subscribe only to those channels actually watched."  *Id.*, at 2.[2]  Representative Evangelos noted that cable operators are already offering some à la carte options.  *Id.*  Finally, he referenced the "plight of a senior citizen on fixed income, who would like to watch sports or classic movies."  *Id.*  The appropriate cable package costs approximately $100 per month, which, for a senior living on $800 per month in Social Security benefits, "amounts to almost 12.5% of that senior citizen's income, effectively pricing them out of the market."  *Id.*  On the other hand, "[a]n à la

[2] The report, entitled "Further Report on the Packaging and Sale of Video Programming Services to the Public," dated February 9, 2006 ("Further Report"), is available at https://www.fcc.gov/document/further-report-packaging-and-sale-video-programming-services, and an FCC press release and "fact sheet" regarding the Further Report is attached hereto as Exhibit B.  An earlier FCC report (which plaintiffs and amicus Motion Picture Association cite to) had found that à la carte requirements would increase prices and reduce programming diversity.  The Further Report (which plaintiffs and amicus Motion Picture Association do not mention) concluded that the earlier report made calculation mistakes and "relied on problematic assumptions and presented incorrect and biased analysis." Further Report, at 3.  The Further Report found that correcting for the earlier report's mistake, "a consumer purchasing 11 cable channels would face a change in his bill ranging from a 13% decrease to a 4% increase, with a decrease in 3 out of 4 cases."  *Id.*, at 4 (emphasis in original).  An average cable household watches 17 channels, and under à la carte, and assuming six broadcast stations, consumers could receive as many as 20 channels without seeing an increase in their bills.  *Id.*  The Further Report concluded that an à la carte regime "could give consumers the opportunity to lower their cable bills by purchasing fewer channels or smaller packages" and that "many consumers could be better off under an à la carte model.  *Id.*, at 5.

carte option would allow this person to select a few favorite channels and enjoy programming that fits [her or her] budget." *Id*.

The Office of the Public Advocate ("OPA") testified that

It is the experience of the OPA that a great deal of consumers experience a high level of frustration with their cable providers. They feel that they lack choices and being able to select the channels they want and not have to pay for channels they do not watch and do not want would be highly favorable. . . . The OPA supports consumer choice and appreciates customers' frustration with not being able to choose and pay only for certain channels they actually watch. LD 832 would go a long way in an attempt to remedy the lack of consumer choice in the cable marketplace in Maine.

*See* Testimony of the OPA, attached hereto as Exhibit C, at 1. The OPA testified neither for nor against the bill, however, apparently because of a concern the bill could be preempted. *Id*., at 1-2. Subsequently, however, the OPA sent a letter to the FCC asking whether LD 832 would be preempted by federal law. *See* Letter dated March 27, 2019, attached hereto as Exhibit D. On May 7, 2019, the Chief of the FCC's Consumer and Governmental Affairs Bureau responded: "This poses a question of first impression and we could not locate any specific Commission ruling that addresses your exact issue. Thus, we are not in a position to express an opinion on the question you raise." *See* FCC Letter, attached hereto as Exhibit E. So, while the plaintiffs claim that Chapter 308 is "clearly preempted by federal law," PI Motion, at 7, the FCC is not so sure.

The House and Senate passed LD 832, and it became law on June 15, 2019 as Chapter 308 of the Public Laws of 2019.

### Argument

## I. The Plaintiffs are Not Likely to Succeed on the Merits.

Plaintiffs correctly identify the four factors to be considered when deciding whether to issue a preliminary injunction. PI Motion, at 6. It should be added, though, that "[t]he sine qua

non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Here, plaintiffs are not likely to succeed on their preemption or First Amendment claims.

### A. Chapter 308 is Not Preempted by the 1984 Cable Act.

1. There is a Presumption Against Preemption and Express
   <u>Preemption Provisions Must be Narrowly Construed.</u>

The Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that "interfere with, or are contrary to," federal law. *Gibbons v. Ogden,* 22 U.S. 1, 211 (1824). "Preemption is strong medicine, not casually to be dispensed." *Grant's Dairy--Maine, LLC v. Commissioner of Maine Dept. of Agriculture, Food & Rural Resources*, 232 F.3d 8, 18 (1st Cir. 2000). "Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Federal law may supersede state law in three different ways: 1) Congress can include language in the law that expressly preempts certain state laws; 2) the law can create a scheme of regulation that is so comprehensive that it essentially "occupies the field" and leaves no room for state regulation; or 3) the state law actually conflicts with federal law. *See, e.g., Hillsborough County, Florida. v. Automated Medical Laboratories, Inc*., 471 U.S. 707, 713 (1985). The plaintiffs argue only that express and conflict preemption apply here.

"Express preemption occurs when Congress states in the text of legislation that it intends to preempt state legislation in the area." *EEOC v. Massachusetts*, 987 F.2d 64, 67-68 (1st Cir. 1993); *see also Grant's Dairy--Maine,* 232 F.3d at 15 ("Express preemption occurs only when a

federal statute explicitly confirms Congress's intention to preempt state law and defines the extent of that preclusion.").

> Two presumptions inform the process of determining the scope of an express preemption clause. First, the familiar assumption that preemption will not lie absent evidence of a clear and manifest congressional purpose must be applied not only when answering the threshold question of whether Congress intended <u>any</u> preemption to occur, but also when measuring the reach of an explicit preemption clause. Second, while the scope determination must be anchored in the text of the express preemption clause, congressional intent is not to be derived solely from that language but from context as well.

*Massachusetts Ass'n of Health Maint. Organizations v. Ruthardt*, 194 F.3d 176, 179 (1st Cir. 1999) (emphasis in original, citation omitted). Because of the presumption against preemption, express preemption provisions must be narrowly construed. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 496 (9th Cir. 2005) ("This presumption against preemption leads us to the principle that express preemption statutory provisions should be given a narrow interpretation.").

Under "conflict preemption," "state law is preempted to the extent that it actually conflicts with federal law*." Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Development Com'n*, 461 U.S. 190, 204 (1983). "Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)). The presumption against preemption applies to conflict preemption just as it does to express preemption. *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009).

## 2. Chapter 308 Is Not Expressly Preempted By 47 U.S.C. § 544(f)(1).

Plaintiffs first argue that Chapter 308 is expressly preempted by a provision in the 1984 Cable Act stating: "Any Federal agency, State, or franchising authority may not impose requirements regarding the provision or content of cable services, except as expressly provided in this subchapter." 47 U.S.C. § 544(f)(1). Plaintiffs argue that because no provision of Title VI authorizes States to impose à la carte requirements, Section 544(f)(1) preempts Chapter 308. PI Motion, at 7-9. The flaw in this argument is that Section 544(f)(1) is not nearly as broad as plaintiffs claim. Rather, as the D.C. Circuit Court of Appeals, a federal district court, and a state appellate court have all held, this provision applies only to regulations of the <u>content</u> of programming.

At issue in *United Video, Inc. v. FCC*, 890 F.2d 1173 (D.C. Cir. 1989) were rules issued by the FCC relating to syndicated television programs. Suppliers of such programs grant licenses to local television stations to show the programs in their local broadcast areas. *Id.*, at 1176. Cable television operators, however, had the ability to receive the broadcasts from local stations and then retransmit the broadcasts to their customers in other areas. *Id.* The FCC's rules (called the "syndex rules") permitted local broadcasters to forbid cable operators from retransmitting syndicated programs into their local broadcast areas. *Id.*

The cable operators challenged the syndex rule on several grounds, including that the FCC was precluded by Section 544(f) from issuing them. *Id.*, at 1187. Finding that Section 544(f) was ambiguous, the Court referred to the legislative history. *Id.*, at 1188. The court noted that the House report "explains the context in which Congress adopted Section 544(f)." *Id.*, at 1188.

> It had been the practice of local franchising authorities, in granting cable franchises, to specify in great detail the type of facilities that the operator must

construct, and also to specify "the services that the operator must provide (e.g., Cable News Network, HBO, The Health Channel)." H.R.Rep. No. 934, 98th Cong., 2d Sess. 26, reprinted in 1984 U.S.Code Cong. & Admin.News 4655, 4663. Congress determined that local governments should have the power to require particular cable facilities, but "the Committee does not believe it is appropriate for government officials to dictate the specific programming to be provided over a cable system." *Id*. This historical context supports the Commission's belief that when Congress forbade "requirements regarding the provision or content of cable services," its concern was with rules requiring cable companies to carry particular programming.

*Id.*. The court stated:

> [T]he examples given in the House report suggest that the key is whether a regulation is content-based or content-neutral. Section 544(f), one must note, does not simply forbid "requirements"; it forbids "requirements regarding the <u>provision</u> or <u>content</u> of cable services" (emphasis added). The House report suggests that Congress thought a cable company's owners, not government officials, should decide what sorts of programming the company would provide. But it does not suggest a concern with regulations of cable that are not based on the content of cable programming, and do not require that particular programs or types of programs be provided. Such regulations are not requirements "regarding the provision or content" of cable services.

*Id*., at 1189. The court held that while the syndex rules "will certainly affect the content of cable programming, it is content-neutral" and is thus "clearly different from a requirement or prohibition of the carriage of a particular program or channel." *Id*.[3] Thus, Section 544(f) did not prohibit the FCC from issuing the syndex rule. *Id*., at 1189-90.[4]

In *Storer Cable Commc'ns v. City of Montgomery, Ala*., 806 F. Supp. 1518 (M.D. Ala. 1992), a city enacted two ordinances, including one which essentially prohibited program suppliers and cable operators from entering into exclusive agreements with respect to

---

[3] As a hypothetical of a requirement that would not be preempted, the court posited a local franchising authority requiring that a cable operator provide service seven days of week, despite that the company might prefer to provide service on fewer days. *Id*., at 1189. The court said that such a result would not dictate specific programming and would not implicate Section 544(f). *Id*.

[4] The FCC had not argued that Section 544(f) applies only to content-based regulations but instead had argued that it applies only to regulations that impose affirmative requirements on cable operators and not on ones that impose prohibitions. *Id*., at 1187-88. The court rejected this "affirmative/negative distinction" but upheld the FCC's rules on the alternate ground, discussed above, that Section 544(f) does not apply to regulations that are not based on programming content. *Id*., at 1187-90.

programming content. *Id.*, at 1527. A cable operator and program suppliers argued, among other things, that the ordinance was preempted by Section 544(f). The court noted that "[a]lthough the language of subsection (f) is susceptible to a broad reading," the D.C. Circuit's decision in *United Video* gave the provision "quite a narrow scope." *Id.*, at 1545. The court was "persuaded by the [D.C. Circuit's] analysis of the legislative history and by the court's conclusion that § 544(f)'s concern is with 'content-based rules' which require or forbid cable providers from carrying particular programming." *Id.*, at 1544. The court stated:

> The ordinance does not require or forbid anyone, Storer Cable or Montgomery Cablevision, to carry certain programming. To the extent that it might require the plaintiffs to license programming, it would do so on basis of the market effects of the targeted licenses, not on the content of programming. The ordinance would not, even under these conditions, interfere with the editorial decisions of the plaintiffs by telling them what programming they can or cannot provide to the public. The plaintiffs have never suggested, here or within the context of their first amendment challenge to this ordinance, that the purpose or effect of Ordinance 48–90 is to suppress a particular message or viewpoint. For these reasons, Ordinance 48–90 is not preempted by subsection (f) of § 544.

*Id.*, at 1546.[5]

In *Morrison v. Viacom, Inc.*, 61 Cal. Rptr.2d 544 (Cal. Ct. App. 1997), plaintiffs alleged that a cable provider was restraining trade in violation of state law by tying the purchase of channels – the provider required customers to purchase broadcast channels in order to purchase satellite cable channels and required customers to purchase both broadcast channels and satellite cable channels to purchase premium channels. *Id.*, at 547. The cable provider argued that plaintiffs' cause of action was preempted by, among other things, Section 544(f). *Id.*, at 555.

---

[5] In so holding, the court rejected the plaintiffs' argument that the analysis in *United Video* applies only to FCC regulations and not local ordinances. *Id.*, at 154 n.24. The court found the argument "meritless," noting that Section 544(f) applies equally to federal agencies, states, and franchising authorities and that the relevant issue in *United Video* was whether the regulation at issue there was "a requirement regarding the provision or content of cable services." *Id.* It is impossible to see how this analysis would differ depending on the identity of the regulatory authority.

The court found that *United Video* and *Storer Cable* "support the conclusion that section 544(f)

targets regulation of the content of cable services." *Id.*, at 556. The court held that because the

"anti-tying" provisions of the state law at issue "do not seek to regulate the content of cable

services, they are not preempted by section 544(f)." *Id.*, at 556.[6]

Just like the regulations at issue in *United Video*, *Storer*, and *Morrison*, Chapter 308 does

not regulate the content of cable services. In fact, it is similar to the "anti-tying" provisions at

issue in *Morrison*. Cable companies are free to provide (or not provider) whatever channels and

programs they choose. All Chapter 308 requires is that once a cable operator elects to provide a

particular channel or program, it must allow subscribers the option of purchasing that channel or

program individually. Just like the syndex rules at issue in *United Video*, Chapter 308 "does not

require carriage of any particular program or type of program, nor does it prevent a cable

company from acquiring the right to present, and presenting, any program." 890 F.2d at 1189.

The cases cited by plaintiffs are inapposite. At issue in *Lafortune v. City of Biddeford*,

No. 01-250-P-H, 2002 WL 823678 (D. Me. Apr. 30, 2002), was a franchising authority's policy

that arguably required show producers to obtain written releases from any individual (other than

public officials) mentioned in the show. *Id.*, at *8. The court held that such a requirement would

confer on the individuals "veto power over some of the content of that program." *Id.* Again,

though, Chapter 308 does not regulate content.

In *Cablevision Sys. Corp. v. Town of East Hampton*, 862 F. Supp. 875 (E.D.N.Y. 1994), a

town sought to revoke a cable operator's franchise because, among other things, it had

---

[6] It is important to note that while the three cases discussed above expressly rejected arguments that Section 544(f) goes beyond preempting the regulation of the content of cable services, two cases have suggested that Section 544(f) is limited to content regulation. *See Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002) (citing Section 544(f) for the proposition that "Congress has imposed limitations on regulations implicating program content"); *Fox News Network, L.L.C. v. Time Warner Inc.*, 962 F. Supp. 339, 342 (E.D.N.Y. 1997) (citing Section 544(f) for the proposition that "the Cable Act explicitly protects the programming decisions of cable operators").

eliminated a tier of channels it previously offered to subscribers. The court held that 47 U.S.C. § 544(a) preempted the town's attempt to prevent elimination of a tier of channels. Id., at 886. The court did not so much as mention Section 544(f), so it is not clear why plaintiffs contend this case supports their argument.[7]

In *Time Warner Cable of New York City v. City of New York*, 943 F. Supp. 1357 (S.D.N.Y. 1996), New York City placed Bloomberg Information Services on one of its public, educational and governmental use ("PEG") channels and was preparing to put Fox News on another PEG channel. Pursuant to the 1984 Cable Act, "[a] franchising authority may establish requirements in a franchise with respect to the designation or use of channel capacity for public, educational, or governmental use only to the extent provided in this section." 47 U.S.C. § 531(a). The court rejected New York's argument that "governmental use" meant any use whatsoever by a government and instead held that it meant programming intended to show the public the workings of local government. *Id*., at 1386-89. The court held that the City thus violated Section 531(a) by placing commercial programming on its PEG channels. *Id*., at 1389. The court also held that the City violated the cable operator's First Amendment right "to be free from government interference with its programming decisions." *Id*., at 1399. The court found that the City "acted to compel [the cable operator] to add Fox News to its system of commercial channels and that these actions have had a direct, immediate, and chilling effect on Time Warner's exercise of its constitutionally-protected editorial discretion." *Id*.

The court also held that the City violated Section 544(f) and stated that its analysis of the issue "is substantially the same as for a violation of the First Amendment;" so for the same

---

[7] In *Morrison v. Viacom*, the plaintiffs similarly argued that *Town of East Hampton* supported their argument that Section 544(f) preempted the "anti-tying" requirement. 61 Cal. Rptr.2d at 556. The *Morrison* court held that "*Town of East Hampton* does not advance respondent's argument that this case is preempted by section 544(f) for several reasons. First and foremost, *Town of East Hampton* did not discuss or even refer to section 544(f)." *Id*..

reasons that the City violated the First Amendment, it violated Section 544(f)(1).  *Id*., at 1391.  If

anything, then, this case demonstrates Section 544(f)'s narrow scope of preventing governmental

entities from interfering with the content of cable programming by, for example, forcing a cable

operator to carry particular content.  Again, though, Chapter 308 does not interfere with cable

content – it simply requires cable operators to offer individually those channels and programs

they choose to carry.

3.  Plaintiffs Have Waived Their Argument Regarding 47 U.S.C. §§ 544(a) and 544(b)(1),
    But, In Any Event, These Provisions Do Not Expressly Preempt Chapter 308.

Section 544(a) prohibits franchising authorities from regulating the "services" of a cable

operator and Section 544(b)(1) prohibits them from "establish[ing] requirements for video

programming."  Plaintiffs offer no support for their claim that an à la carte mandate is a

regulation of "cable services" or a requirement for "video programming."  PI Motion, at 8-9.  In

fact, plaintiffs' entire discussion of Sections 544(a) and 544(b)(1) are contained in just four

sentences of their twenty-page brief.  Any argument about these two provisions should be

deemed waived.  *See Int'l Ass'n of Machinists & Aerospace Workers v. Verso Corp*., 121 F.

Supp. 3d 201, 229 (D. Me. 2015) ("Lack of developed arguments are commonly deemed

waived."); *see also United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (referring to

appellate rule that "issues adverted to in a perfunctory manner, unaccompanied by some effort at

developed argumentation, are deemed waived").

Regardless, Sections 544(a) and 544(b)(1) do not expressly preempt Chapter 308.

Assuming for the sake of argument that the à la carte requirement regulates "cable services" or

"video programming," both provisions apply only to <u>franchising authorities</u>.  They do not apply

to States.  In contrast, other provisions in Section 544 do clearly apply to States.  47 U.S.C. §§

544(e) (prohibiting States from regulating subscriber equipment and transmission technology);

544(f)(1) (prohibiting States from imposing "requirements regarding the provision or content of cable services"). Congress clearly understood how to make a preemptive provision applicable to States, and it did not do so with respect to Sections 544(a) and 544(b)(1).[8]

4. Chapter 308 Is Not in Conflict With Any Provision of the 1984 Cable Act.

Plaintiffs argue that Chapter 308 is also preempted because "it impermissibly conflicts with federal law, by making compliance with both federal law and [Chapter 308] impossible and by imposing an obstacle to the accomplishment of federal objectives." PI Motion, at 9. Specifically, plaintiffs note that the 1984 Cable Act requires them to provide the signals of certain "must-carry" stations, and that FCC rules "further direct that must-carry stations be 'provided to every subscriber of a cable system.'" *Id.*, at 9-10 (quoting 47 C.F.R. § 76.56(d)(1); *see also* 47 U.S.C. § 543(b)(7) ("Each cable operator of a cable system shall provide its subscribers a separately available basic service tier to which subscription is required for access to any other tier of service" and "[s]uch basic service tier, shall, at a minimum," include local broadcast and PEG stations). Plaintiffs argue that "[c]able operators cannot comply with both this federal must-carry requirement and the à la carte mandate of [Chapter 308], which effectively prohibits cable operators from requiring Maine subscribers to purchase must-carry stations as part of the basic tier." *Id.*, at 10.

The Attorney General, though, does not interpret Chapter 308 as allowing consumers to purchase à la carte channels and programs without first subscribing to the mandatory basic tier.[9]

---

[8] Plaintiffs argue that these provisions are preempted because franchising authorities can enforce Chapter 308. PI Motion, at 8 & n.5 (citing 30-A M.R.S. § 3008(3)(E)). But Section 544(a) and 544(b)(1) apply only when a franchising authority regulates or establishes requirements. Nothing suggests that they would also apply if a franchising authority simply enforces a regulation or requirement established by a State. And even if they did apply, that would mean, at <u>most</u>, that franchising authorities might be prevented from enforcing Chapter 308. Section 544(a) and 544(b)(1) do not stop the State from enacting and enforcing the law.

[9] "In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982); *see also Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 66 (1st Cir. 2011)

The law requires cable operators to "offer <u>subscribers</u> the option of purchasing access to cable channels, or programs on cable channels, individually." Chapter 308, § 1 (emphasis added). So, one first must become a subscriber (and receive all of the stations that cable operators are required to provide to subscribers) before one can then purchase additional channels and programs individually. There is, then, no risk that complying with Chapter 308 will make it impossible for cable operators to comply with the 1984 Cable Act. [10]

   5. <u>Chapter 308 Is Not an Obstacle to the Accomplishing the Objectives of the 1984 Cable Act</u>.

      Plaintiffs' argument that Chapter 308 is an obstacle to the purposes and objectives of the 1984 Cable Act is not entirely clear. To the extent plaintiffs are arguing that the law would interfere with Congress's goal of ensuring delivery to subscribers of must-carry stations, the argument fails because, as discussed above, Chapter 308 does not interfere with the must-carry provisions. To the extent plaintiffs argue that Chapter 308 interferes with Congress's goal of a "national policy concerning cable communications," PI Motion, at 10, plaintiffs ignore that Congress expressly reserved to States the power to regulate in this area, including, in particular, with respect to consumer protection laws, unless "specifically preempted" by the 1984 Cable Act. 47 U.S.C. § 552(d)(1). For the reasons discussed above, no provision of the Act specifically preempts Chapter 308.

      Plaintiffs vaguely argue that the "regulatory framework" of the 1984 Cable Act preserves their "editorial discretion" to choose whether to deliver content "in tiers of programming, à la carte, or both," PI Motion, at 10-11. Again, though, no specific provision preserves that

---

[10] Because of the manner in which Chapter 308 operates, there is no reason for amici National Association of Broadcasters and Maine Association of Broadcasters to worry. Amici – who include operators of broadcast television stations in Maine – are concerned that their viewership will drop if cable operators are no longer required to carry their signals as part of the federally-mandated basic service tier. Amici Brief, at 2. For the reason discussed above, Chapter 308 does not impact this basic tier. Again, before a person may request individual channels and programs, one must first become a subscriber. And becoming a subscriber necessarily means obtaining the federally-required basic tier of service, including local broadcast stations and PEG channels.

authority, nor is there anything to suggest that Congress intended such a result. Rather, Congress preserved cable operators' discretion to decide what programming they will, and will not, provide. *See* 47 U.S.C. § 544(f)(1). And, as discussed above, Chapter 308 does not limit that discretion.

### B. Chapter 308 Does Not Violate Plaintiffs' First Amendment Rights.

The plaintiffs claim that they have a right under the First Amendment to "decide not to offer programming on an à la carte basis." PI Motion, at 11. The First Amendment affords no such right. The "essential right" of free expression conferred by the First Amendment is contravened by "Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) ("*Turner I*"). Chapter 308 neither stifles nor requires speech. Programming providers remain free to decide what programs they supply to cable operators, and cable operators remain free to decide what stations and programs they will carry on their systems. All that Chapter 308 requires is that once a cable operator decides to carry a particular station or program, it must make that station or program available individually.

Plaintiffs cite no case supporting the notion that they have a First Amendment right to bundle channels and programs. The closest they come is *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ("*Turner I*") and *Turner Broadcasting Sys., Inc. v. FCC*. 520 U.S. 180 (1997) ("*Turner II*"). At issue in those cases was whether provisions of federal law requiring cable operators to carry local broadcast stations (referred to as "must-carry provisions") violated the First Amendment rights of cable operators and program providers. Considering first whether protected conduct was at issue, the Court in *Turner I* that "[t]hrough original programming or by exercising editorial discretion over which stations or programs to include in its repertoire, cable

programmers and operators see[k] to communicate messages on a wide variety of topics and in a wide variety of formats."  512 U.S. at 636 (citation and internal quotations omitted).  In *Turner II*, the Court stated that the must-carry provisions implicate the First Amendment because they "restrain cable operators' editorial discretion in creating programming packages by reducing the number of channels over which they exercise unfettered control."  520 U.S. at 214 (citation, internal quotations, and brackets omitted).  In other words, the Court was simply saying that cable operators, who are not the actual creators of the "speech" (i.e., the individual programs) nevertheless engage in First Amendment conduct by deciding, through their selection of channels and programs, what speech they will present to their customers.  *See United States Telecom Ass'n v. FCC*, 855 F.3d 381, 391 (D.C. Cir. 2017) ("a cable operator draws the protections of the First Amendment when it exercises editorial discretion about which programming to carry") (per curiam decision on petition for hearing en banc).  Regulations that limit the ability of cable operators to make such decisions thus implicate the First Amendment.  In neither *Turner I* nor *Turner II* did the Court suggest that cable operators not only have a First Amendment right to decide what programs and channels to show, but also the right to condition the purchase of some programs and channels on the purchase of others.  Nor does either case suggest that program providers have a protected First Amendment right to bundle programs.

Because Chapter 308, by simply requiring the unbundling of channels and programs, does not implicate the First Amendment, the Court need go no further.  If, though, the Court were to engage in a First Amendment analysis, it is intermediate, not strict, scrutiny that applies. Strict scrutiny applies to a content-based speech restriction.  *See, e.g., United States v. Playboy Entm't Grp., Inc*., 529 U.S. 803, 813 (2000).  A content-neutral regulation, on the other hand, is subject to intermediate scrutiny and will survive a First Amendment challenge "if it advances

important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner II, 5*20 U.S. at 189.

> As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based. By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral.

*Turner I*, 512 U.S. at 643 (citations omitted); *see also Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."). Facially content-neutral laws "will be considered content-based regulations of speech" if they "cannot be 'justified without reference to the content of the regulated speech,' or were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed*, 135 S. Ct. at 2227 (quoting *Ward*, 491 U.S. at 791).

In *Turner I*, the Supreme Court held that the must-carry provisions were content neutral, and, for all the same reasons, so to is Chapter 308. The Court began by recognizing that the must-carry provisions "impose burdens and confer benefits without reference to the content of speech. Although the provisions interfere with cable operators' editorial discretion by compelling them to offer carriage to a certain minimum number of broadcast stations, the extent of the interference does not depend upon the content of the cable operators' programming." 512 U.S. at 643-44. The Court held that the fact that the must-carry provisions singled out certain categories of speakers did not make them subject to strict scrutiny:

> It is true that the must-carry provisions distinguish between speakers in the television programming market. But they do so based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages

> they carry: Broadcasters, which transmit over the airwaves, are favored, while cable programmers, which do not, are disfavored. Cable operators, too, are burdened by the carriage obligations, but only because they control access to the cable conduit. So long as they are not a subtle means of exercising a content preference, speaker distinctions of this nature are not presumed invalid under the First Amendment.

*Id.*, at 645.[11]  The Court stated that "speaker-partial laws" are subject to strict scrutiny "when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Id.*, at 658.  The Court held that that the must-carry provisions did not reflect a preference for the content of broadcast stations' programming content, so "the fact that the provisions benefit broadcasters and not cable programmers does not call for strict scrutiny under our precedents." *Id.*, at 659.

The Court rejected the argument that strict scrutiny applied because the must-carry provisions applied only to cable operators and not to "analogous video delivery systems, such as multichannel multipoint distribution (MMDS) systems and satellite master antenna television (SMATV) systems." *Id.*, at 659.  The Court stated that "[i]t would be error to conclude . . . that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others." *Id.*, at 660.  Rather, laws that "single[] out a certain medium" are "'constitutionally suspect only in certain circumstances.'" *Id.*, at 660 (quoting *Leathers v. Medlock*, 499 U.S. 439, 444 (1991)).  Those circumstances are when the singling out of speakers raises the suspicion that the objective is "the suppression of certain ideas." *Id; see also Leathers*, 499 U.S. at 447 ("These cases demonstrate that differential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints."); *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 159 (2d Cir.

---

[11] The Court recognized that a facially content-neutral regulation may be content based if "its manifest purpose is to regulate speech because of the message it conveys," but it held that the purpose of the must-carry provisions was unrelated to the content of expression.  *Id.*, at 645-47.

2013) (holding that regulation preferring certain speakers over others was subject to intermediate scrutiny because preference was not based on content of speakers).

When the differential treatment is justified by some other "special characteristic," heightened scrutiny is unwarranted. *Id.*, at 660-61. The Court found that the must-carry provisions were justified by the "bottleneck monopoly" exercised by cable operators. *Id.*, at 661. The Court further found that the must-carry provisions were "broad based" because they applied to almost all cable systems and did not pose "the same dangers of suppression and manipulation that were posed by the more narrowly targeted regulations" at issue in other cases. *Id.* The Court concluded that "the must-carry provisions do not pose such inherent dangers to free expression, or present such potential for censorship or manipulation, as to justify application of the most exacting level of First Amendment scrutiny" and that the "appropriate standard by which to evaluate the constitutionality of must-carry is the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech." *Id.*, at 661-62.[12]

If a law forcing cable operators to carry stations they do not want to carry is subject to intermediate scrutiny, it is impossible to see how Chapter 308, which simply requires cable operators to offer individually those stations and programs they choose to carry, is not also subject to intermediate scrutiny (if it is subject to First Amendment scrutiny at all). When it comes to content, Chapter 308 is indifferent. It does not, for example, declare that cable operators must offer only news programs individually. Chapter 308 fully preserves the "editorial discretion" of cable operators to pick and choose the channels and programs they carry. Only

---

[12] The Court found that because there were genuine issues of fact, it could not determine whether the must-carry provisions satisfied intermediate scrutiny, and it remanded the case for further proceedings. *Id.*, at 668. After further factfinding, the Court held that the must-carry provisions satisfied intermediate scrutiny because they were narrowly tailored to further important governmental interests. *Turner II*, 520 U.S. at 185.

after an operator has chosen to carry a particular channel or program must it then make it available individually.  The fact that Chapter 308 applies only to cable operators and not, for example, to satellite television providers, does not make it content-based.  First, there is nothing to suggest that Maine is somehow favoring what satellite operators "say" over what cable operators "say."  In fact, it is likely that they "say" the exact same things – presumably, the channels and programs carried by satellite operators are substantially the same as those provided by their cable counterparts.  But even if there are some differences, there is nothing to suggest that those differences were a motivation for Chapter 308.[13]  Maine's Legislature identified a problem with cable operators – they were forcing consumers to buy a host of channels they did not want just to get the few they did want.  Chapter 308 does not reflect any preference with respect to programming content on cable television versus the content on satellite television.[14]

"Speaker-based" laws are not some additional category of laws subject to strict scrutiny. Rather, as discussed above, such laws simply raise the suspicion that the government is attempting to suppress (or promote) certain messages.  In other words, that a law targets certain speakers raises the suspicion that the law, while seemingly facially neutral, it is, in fact, content based.  Here, though, there is no reason for such a suspicion.  As discussed above, it is inconceivable how a law directed at cable operators is somehow intended to promote or suppress certain content.  In sum, if the First Amendment even applies to Chapter 308, it is subject to intermediate scrutiny.

Chapter 308 passes this test.  First, it advances the important State interest of ensuring that consumers have meaningful access to cable television.  As the legislative history set forth

---

[13] For example, there is no evidence that Chapter 308 applies only to cable operators because cable operators tend to show channels and shows of a particular political "bent" with which Maine disagrees.
[14] If what the plaintiffs are arguing is that there is no rational basis for treating satellite and cable companies differently, that is an Equal Protection issue.  But, plaintiffs make no Equal Protection challenge to Chapter 308.

above makes clear, Chapter 308 furthers Maine's interest in protecting consumers by preventing cable operators from forcing them to purchase expensive packages containing dozens of channels simply to obtain the few channels they want to watch. *See Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) ("the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States"); *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 460 (1978) (state interests in "protecting consumers and regulating commercial transactions" are "particularly strong"); *Communications Telesystems Int'l v. California Pub. Util. Comm'n*, 196 F.3d 1011, 1017 (9th Cir. 1999) (the "protection of consumers from unfair business practices" is an important state interest). Indeed, in the 1984 Cable Act itself, Congress recognized the importance of the States' interest in protecting consumers from cable operators by expressly preserving the States' authority to enact and enforce consumer protection laws, to the extent not preempted by the Act. 47 U.S.C. § 552(d)(1).

While plaintiffs claim that "numerous studies" show that an à la carte requirement would likely result in higher prices, PI Motion, at 14, they cite to just <u>one</u> report.[15]   And even that one – a report from the General Accounting Office, stated only that "it is possible that cable rates could actually increase for some consumers" and that it is "difficult to ascertain how many consumers would be better off and how many would be made worse off under an à la carte approach.")

---

[15] In testifying before a legislative committee in opposition to Chapter 308, a Charter Communications representative stated: "There have been many academic and government studies over the past few years which concluded that an à la carte model . . . would result in higher costs and less diversity in programming for consumers." *See* Testimony of Melinda Kinney, attached hereto as Exhibit I. A legislator asked the representative to provide citations to these studies, and the representative indicated that she would, but it appears that no such citations were ever provided to the committee. *See* http://legislature.maine.gov/Audio/#211?event=77611& startDate=2019-03-05T13:00:00-05:00 (recording of Committee Hearing, at timestamp 2:47 pm.); Committee File on LD 832, available at Maine State Law and Legislative Reference Library.

*See* GAO Report No. 04-8 (2003), available at  https://www.gao.gov/new.items/d048.pdf, at 30, 34.[16]

Plaintiffs argue that Chapter 308 is overinclusive because it "mandate[s] à la carte options for <u>every</u> channel and individual program offered by a cable operator."  PI Motion, at 14-15 (emphasis in original).  Of course, as discussed above, one of the reasons that the law is not content-based is that it does <u>not</u> target specific channels or programs.  Moreover, the problem the Legislature identified is that consumers cannot purchase just those channels and programs they want to watch.  It is impossible to see how the Legislature could have solved the problem by dictating the channels and programs that consumers can purchase individually.

.       Plaintiffs argue that Chapter 308 is underinclusive because it does not apply to other video providers, such as satellite companies and entities like Sling TV and Hulu+.  With respect to those providers, though, there is nothing in the record suggesting that Maine consumers have complained about being forced to purchase large packages of channels to watch the few they want.

## II.  *Plaintiffs' Claims of Irreparable Harm Are Questionable.*

Because there has not yet been discovery, it is difficult to assess the plaintiffs' claim that they will suffer irreparable harm if forced to offer channels and programs individually.  A few points warrant comment, though.  First, while plaintiffs claim that complying with Chapter 308

---

[16] The GAO Report also stated:

> The manner in which cable networks are currently packaged has raised concern among policy makers and consumer advocates about the lack of consumer choice in selecting the programming they receive. Under the current approach, it is likely that many subscribers are receiving cable networks that they do not watch. In fact, a 2000 Nielsen Media Research Report indicated that households receiving more than 70 networks only watch, on average, about 17 of these networks.

*Id*, at 31.

would result in violations of agreements between cable operators and programmers, PI Motion, at 16, the agreements themselves are not in the record. So, for example, it is not known whether the agreements permit deviation when necessary to comply with state law. Moreover, it is not clear why the reputation of cable operators would be damaged or why they would face "costly litigation" if, as a result of a state law, they were involuntarily required to unbundle content. Second, it is hard to see how giving customers the <u>option</u> of purchasing individual programming would "frustrat[e] consumer expectations and lead[] to potential customer defections." PI Motion, at 17. If subscribers find that the à la carte option is too expensive or confusing, they do not have to select it. It is doubtful, though, they would be upset at cable operators just for offering it.

Third, while plaintiffs claim that it would be extremely difficult and costly to implement an à la carte system, PI Motion, at 17-19, it should be noted that Comcast already offers a significant amount of content on an à la carte basis. Subscribers to Comcast have available to them, through their televisions, a system ("Xfinity On Demand") by which they can select and view individual programs from 96 different networks. *See* Exhibit F. For just one network – ABC – 37 different programs are available (in both Standard Definition and High Definition format). *See* Exhibit G. In some cases, multiple seasons of a program are available – for example, eleven seasons of "Duck Dynasty" are available. *See* Exhibit H.[17] Finally, while plaintiffs claim that they will lose advertising revenues, PI Motion, at 18-19, the FCC's Further Report found that under à la carte, there "is little reason to suspect that consumers would watch less video programming than they do today," and that "[a]bsent a change in audience levels,

---

[17] Plaintiffs suggest that customers would incur increased costs and be inconvenienced by having to obtain "addressable" set-top boxes. PI Motion, at 18. That, though, is a decision for consumers – some consumers may decide the cost and inconvenience is worth being able to purchase individual content, while others may not.

significant decreases in advertising revenue or increases in licensing fees are unlikely."  Further Report, at 5.

### III. The Balance of Equities and the Public Interest Militate Against an Injunction

Chapter 308 was enacted by Maine's Legislature to protect consumers from being forced to purchase content they do not want.  The 1984 Cable Act expressly authorizes States to enact consumer protection measures unless expressly preempted and, as discussed above, the Act does not preempt Chapter 308.  Plaintiffs already make significant content available on an à la carte basis, and their claim of irreparable harm if forced to provide all content à la carte is, at best, questionable.  The Court should not preliminarily enjoin Chapter 308.

Dated:  October 7, 2019                                   AARON M. FREY

Attorney General

/s/ Christopher C. Taub
Christopher C. Taub, Asst. Atty. Gen.
Christopher.C.Taub@maine.gov
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 7th day of October, 2019, I electronically filed the above

document with the Clerk of Court using the CM/ECF system which will send notification of such

filing to the following:

AMY K. TCHAO
atchao@dwmlaw.com

DAVID P. MURRAY
dmurray@willkie.com

EBEN M. ALBERT
ealbert@bernsteinshur.com

ERIN LORRAINE DOZIER
edozier@nab.org

JAMES S. BLACKBURN
james.blackburn@arnoldporter.com

JEFFREY T. PIAMPIANO
jpiampiano@dwmlaw.com

JESSICA L. MAHER
jmaher@mb-law.com

JESSICA L. SABA
jessica.saba@lw.com

JOHN C. ULIN
john.ulin@arnoldporter.com

JOHN W. CONWAY
jconway@lcwlaw.com

RICHARD H. GRIFFIN
richard.griffin@lw.com

SALLY J. DAGGETT
sdaggett@jbgh.com

JOSHUA A. RANDLETT
jrandlett@rudmanwinchell.com

JOSHUA A. TARDY
jtardy@rudmanwinchell.com

KRISTIN M. COLLINS
kcollins@preti.com

MATTHEW A. BRILL
matthew.brill@lw.com

MATTHEW T. MURCHISON
matthew.murchison@lw.com

MELANIE A. MEDINA
mamedina@willkie.com

MICHAEL D. HURWITZ
mhurwitz@willkie.com

MICHAEL H. HERMAN
michael.herman@lw.com

OSCAR RAMALLO
oscar.ramallo@arnoldporter.com

PHILIP R. SAUCIER
psaucier@bernsteinshur.com

ROGER R. THERRIAULT
rtherriault@tlawmaine.com

STEPHEN BLAKE KINNAIRD
stephenkinnaird@paulhastings.com

STEPHEN E. F. LANGSDORF
 slangsdorf@preti.com

WILLIAM KENNEDY
 wkennedy@ddlaw.com

TIMOTHY C. WOODCOCK
 twoodcock@eatonpeabody.com

/s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Assistant Attorney General
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800