## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

<table>
<tr>
<td>

COMCAST OF MAINE/NEW HAMPSHIRE, INC., *et al.*,

       Plaintiffs,

  v.

JANET MILLS, in her official capacity as the Governor of Maine, *et al.*,

       Defendants.

</td>
<td>

Case No. 1:19-cv-00410-NT

**INJUNCTIVE RELIEF SOUGHT**

</td>
</tr>
</table>

## REPLY MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The State's opposition ("Opp.") only confirms that L.D. 832 cannot stand.  Indeed, the State's preemption defense is premised on rewriting the text of L.D. 832 and the Communications Act, and its First Amendment defense just ignores the obvious constitutional defects while glossing over the problem that Maine's Legislature apparently never even considered them.  The State also mischaracterizes L.D. 832's effects, suggesting it "only" requires cable operators to offer video programming on an à la carte basis after they have already chosen to carry such programming.  But L.D. 832 strikes at the heart of cable operators' and programmers' editorial discretion to determine the manner in which video content is presented to consumers, and it would cause some programming services to be withdrawn altogether.  In short, there is a reason no other state has enacted a law like L.D. 832.  It plainly violates both the Communications Act and the First Amendment, and it just as plainly would inflict irreparable harm.

## ARGUMENT

### I.  L.D. 832 IS PREEMPTED BY FEDERAL LAW

#### A.  L.D. 832 Is Expressly Preempted by Section 624(f)(1) of the Act.

Section 624(f) prohibits the State from imposing any "requirements regarding the provision or content of cable services, except as expressly provided in [Title VI]."  47 U.S.C. § 544(f)(1).  The State does not argue that Title VI "expressly provide[s]" it with the authority to impose an à la carte requirement, nor could it.  Instead, the State asserts that Section 624(f) "applies only to regulations of the <u>content</u> of programming," and in turn that L.D. 832 is not such a regulation.  Opp. at 8.  Even setting aside that L.D. 832 *does* regulate cable content, *infra* at 5-6, the State's claim fails for the more fundamental reason that it ignores the plain language of Section 624(f), which *also* prohibits requirements regarding the "provision" of cable services beyond those enumerated in Title VI.  The State's attempt to rewrite Section 624(f) to excise this

1

prohibition violates the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted).

Courts confronted with analogous requirements that affect the provision of cable services have found them preempted. For example, the *MediaOne* case cited in the Complaint separately analyzed whether a county ordinance imposed requirements regarding the "provision" and "content" of cable services, holding that it impermissibly did both. *MediaOne Grp., Inc. v. Cty. of Henrico*, 97 F. Supp. 2d 712, 716 (E.D. Va. 2000), *aff'd*, 257 F.3d 356 (4th Cir. 2001). Similarly, the *Cablevision* case held that "franchising authorities are precluded from enforcing franchise requirements that usurp the cable operator's power to determine the details and particulars of the provision of cable service," irrespective of whether such requirements are "content-based." *Cablevision Sys. Corp. v. Town of E. Hampton*, 862 F. Supp. 875, 886 (E.D.N.Y. 1994), *aff'd*, 57 F.3d 1062 (2d Cir. 1995).[1] And the magistrate judge's opinion in *Lafortune v. City of Biddeford*, which this Court adopted and the First Circuit affirmed, determined that a city violated Section 624(f) by requiring a written release from all individuals mentioned during broadcasts—a requirement that is broader than the State's proposed limitation to "content-based" measures. No. 01-250-P-H, 2002 WL 823678, at *8 (D. Me. Apr. 30, 2002);

---

[1] Contrary to the State's claim that *Cablevision* has no bearing here because it focused primarily on Sections 624(a) and (b), the operative portion of the court's analysis discussed "Section 544" (i.e., 47 U.S.C. § 544) as a whole, and, in any event, the scope of preemption under subsections (a) and (b)—which prohibit franchising authorities from regulating cable "services" and from establishing "requirements for video programming"—is closely comparable to the preemption of state "requirements regarding the provision or content of cable services" under subsection (f).

*see also* 222 F.R.D. 218 (D. Me. 2004) (district court opinion adopting magistrate's

recommendations), *aff'd*, 142 F. App'x 471 (1st Cir. 2005).

Applying the plain language of the statute and the relevant case law, there can be no

doubt that L.D. 832 impermissibly imposes "requirements regarding the . . . provision of cable

services."  Forcing cable programmers and operators to abandon their longstanding and federally

authorized[2] practices of offering most programming only as part of a curated tier, and instead to

offer all channels and all programs à la carte, plainly dictates the manner in which cable services

are *provided*.  Indeed, the State does not dispute that L.D. 832 is a requirement regarding the

"provision" of cable services; it just reads that language out of the statute altogether.

In support of its contention that Section 624(f) applies *only* to "content-based"

requirements, the State primarily relies on *United Video, Inc. v. FCC*, 890 F.2d 1173 (D.C. Cir.

1989).  But that case—which dealt with the reasonableness of federal agency decisionmaking

---

[2] The State suggests the FCC is "not so sure" that L.D. 832 is preempted by federal law.  Opp. at 5.  That is a blatant mischaracterization.  When asked whether L.D. 832 would be preempted by federal law, an FCC staff member merely reported that the agency had not had occasion to address the question.  FCC Letter, Opp. Ex. E.  That is hardly surprising, because the question whether the plain language of the *statute* (as opposed to the FCC's own rules) expressly preempts state law does not turn on the agency's views.  Moreover, that the FCC staff did not offer an advisory opinion reflects the established principle that staff cannot bind the agency.  *See, e.g.*, *Vernal Enters., Inc. v. FCC*, 355 F.3d 650, 660 (D.C. Cir. 2004).  In any event, proponents of an à la carte mandate have recognized that it would require federal legislation to amend Title VI of the Communications Act.  *See* Television Consumer Freedom Act of 2013, S. 912, 113th Cong. (proposing such an amendment in a bill Congress declined to enact).  And two prior FCC Chairs have likewise acknowledged that the Communications Act does not authorize the agency to impose such a mandate.  *See Fin. Serv. & Gen. Gov't Appropriations for 2009: Hearing Before the Subcomm. on Fin. Servs. & Gen. Gov't Appropriations of the H. Comm. on Appropriations*, 110th Cong. 401 (Apr. 9, 2008) (testimony of FCC Chairman Kevin J. Martin) ("I actually don't think the Commission has any authority to require a la carte on the retail side."); Letter from Acting Chairwoman Mignon L. Clyburn to Sen. John McCain (July 24, 2013) (transmitting staff letter stating that "the Commission does not have explicit authority to require MVPDs to provide service on an *a la carte* basis"), https://bit.ly/32b5Ljm.  The fact that the FCC concededly lacks such authority undermines the State's claim that *it* nevertheless is free to override cable operators' and programmers' editorial judgments.

and did not address preemption of state action—is inapposite.  The D.C. Circuit considered

various challenges to the FCC's "syndicated exclusivity" or "syndex" rule, which allowed "the

supplier of a syndicated program to agree with a broadcast television station that the station shall

be the exclusive presenter of the program in its local broadcast area."  *Id.* at 1176.  After

concluding that the agency decision was not arbitrary and capricious, the court considered

whether Section 624(f) precluded such action.  Applying *Chevron*, and relying almost

exclusively on a single piece of legislative history, the court upheld as reasonable the FCC's

determination that Section 624(f) was inapplicable, because the "basis on which syndex forbids

carriage of certain programs is not their content, but ownership of the right to present them."  *Id.*

at 1189.[3]  This conclusion was unremarkable, given that the regulation of broadcast stations'

agreements with programming suppliers had only an indirect and incidental effect on cable

operators.  And the court did not reach the question whether Section 624(f) would bar

requirements that directly address the manner in which cable services are provided—i.e., the

"provision" of cable services—as L.D. 832 does.

   The other cases cited by the State are distinguishable for similar reasons.  *Storer Cable*

followed *United Video*'s "analysis of the legislative history" in holding that an "anti-trust

provision" was not preempted because it did not compel or forbid carriage of particular

programming based on its content.  *Storer Cable Commc'ns v. City of Montgomery*, 806 F. Supp.

1518, 1526, 1545 (M.D. Ala. 1992).  But that holding cannot be squared with the plain language

---

[3] The State asserts it is "impossible to see how this analysis would differ" in considering
preemption of state law, Opp. at 10 n.5, but *United Video* involved national communications
policy adopted by the FCC, subject to *Chevron* deference, not federal preemption questions
based on a state's attempt to regulate the provision and content of cable service.  And, unlike
here, the court found that the syndex rules would not "prevent a cable company from acquiring
the right to present, and presenting, any program" otherwise available in the marketplace.
*United Video*, 890 F.2d at 1189.

of Section 624(f), and in any event, L.D. 832 is content-based, as discussed below. *Morrison* is even farther afield; that case did not involve a state or local government's imposition of requirements on cable operators, but rather was a civil action under a state unfair trade practices statute that prohibited tying. *Morrison v. Viacom, Inc.*, 52 Cal. App. 4th 1514 (1997). The court's conclusion that the tying claims were not preempted hinged on its findings that "any effect on the cable operator's tiering decisions is only incidental to the enforcement of state antitrust law" and that the state statute at issue did "not regulate the manner in which cable services are packaged." *Id.* at 1532.

Here, by contrast, L.D. 832 directly regulates cable tiering practices and profoundly alters the manner in which cable services may be provided. The statute's express purpose is to prohibit cable operators and programmers from presenting channels in the manner they choose, i.e., typically through curated tiers, and presenting individual programs only as part of a bundle of programming on a channel, thereby usurping their editorial discretion. The State argues that cable operators are subject to the à la carte mandate only *after* they "elect[] to provide a particular channel or program," and that they therefore retain such discretion. Opp. at 11. But a cable operator's decisions regarding the provision of cable services are not limited to a binary choice of whether or not to carry a channel (or program); they also concern *how* such programming will be provided to consumers, including in particular whether the programming will be offered as part of a tier. *See* Rioboli Decl. ¶¶ 4-7; Plaehn Decl. ¶¶ 5-8. Eliminating such tiering requirements necessarily affects the manner in which cable service is "provided" in violation of Section 624(f), and no case holds otherwise.

Even if the State were correct that Section 624(f) preempts only content-based regulations—and it is not—L.D. 832 still would be invalid. L.D. 832 is content-based because it

singles out *cable* programming, exempting all other types of video programming.  And, contrary

to the State's assertion that cable operators will remain "free to provide (or not provide) any

programs they choose," Opp. at 11, Plaintiffs have shown that L.D. 832 would prevent cable

operators from offering particular channels and programs.  For example, professional sports

leagues such as Major League Baseball will not license their content to programmers, and

programmers in turn will not authorize distribution over cable systems, without an agreement to

meet prescribed tiering and penetration requirements.  *See* Plaehn Decl. ¶¶ 11-12.  L.D. 832

therefore threatens to prevent Plaintiffs from offering particular content.[4]

**B.      L.D. 832 Is Preempted Because It Impermissibly Conflicts with Federal Law.**

The State argues that L.D. 832 does not conflict with the FCC's requirement to provide

must-carry stations as part of a basic tier because the statute preserves that mandatory tier.  But

there is no textual basis for effectively carving broadcast channels out of the à la carte mandate.

L.D. 832 requires cable operators to offer *all* "channels" individually, without exempting

"channels" that include content also transmitted over the air.  *Cf.* 47 U.S.C. § 522(4) (defining

"cable channel" in a manner that includes broadcast stations).  Nor does the legislative history (to

the extent that is relevant) provide any support for such an exemption; to the contrary, L.D. 832's

sponsor made clear that his goal was to eliminate any obligation to pay for an entire tier when a

subscriber would prefer to select only "a few favorite channels."  *See* Testimony of Rep. J.

Evangelos, Opp. Ex. A at 2.  The State's *post hoc* suggestion that the term "subscribers" is code

for "subscribers to the basic tier" has no textual basis and would flout the sponsor's intention to

---

[4] The State is wrong that Sections 624(a) and (b) do not have any preemptive effect here and that
Plaintiffs waived their arguments under those provisions by including an abbreviated argument
in the PI Motion.  But the State ultimately concedes that those provisions *could* prevent
"franchising authorities . . . from enforcing [L.D. 832]," Opp. at 14 n.8, and the fact that L.D.
832 authorizes such unlawful enforcement thus provides a further basis to find it preempted.

outlaw mandatory tiers.  *See id.* at 1 (objecting to mandatory "cable TV packages" without any suggestion that requiring purchase of the basic tier would be permissible).  And exempting channels that include broadcast but not cable content would make the statute even more obviously content-based, which the State concedes would trigger preemption under Section 624(f).

## II.     L.D. 832 VIOLATES THE FIRST AMENDMENT

The State's constitutional defense fares no better, as the State ultimately concedes that "cable operators . . . engage in First Amendment conduct by deciding, through their selection of channels and programs, what speech they will present to their customers," and that "[r]egulations that limit the ability of cable operators to make such decisions thus implicate the First Amendment."  Opp. at 16-17 (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) ("*Turner I*")).[5]  But the State nevertheless asserts that L.D. 832 presents no First Amendment problem because it is subject only to intermediate scrutiny (not strict scrutiny) and that it satisfies that still-exacting standard.  It is wrong on both counts.

*Strict Scrutiny*.  The State contends that strict scrutiny does not apply because L.D. 832 covers every cable channel and program without regard to content or viewpoint.  *See* Opp. at 18-19.  Not so.  L.D. 832 targets *only* the speech of cable operators, without infringing on the "selection of channels and programs" by other video providers.  *Id.* at 21.  The Supreme Court has applied strict scrutiny to similar laws that targeted a small number of speakers, irrespective of animus.  *E.g.*, *Ark. Writer's Proj., Inc. v. Ragland*, 481 U.S. 221, 228-29 (1987); *Minneapolis*

---

[5] *Turner I*'s holding that cable operators and programmers engage in protected speech in selecting channels and programs to present to customers belies the State's assertion that the First Amendment does not extend to the "bundling" of programming.  Opp. at 17.

*Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582-83 (1983); *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2229-30 (2015).[6]  Nothing justifies a different result here.

Nor can the State rely on *Turner I*'s determination that cable operators may be singled out for unique speech burdens without satisfying strict scrutiny due to their "bottleneck monopoly power" a quarter-century ago.  *See* Opp. at 20.  As the court in *United States v. AT&T Inc.* held, "competition in the [video] industry is more intense today than ever before," and "[c]onsumers have an increasing array of virtual MVPD services from which to choose— services that operate nationwide over the internet."  310 F. Supp. 3d 161, 174-75 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).  The Maine Legislature made no attempt to justify disparate treatment of cable operators when "bottleneck monopoly power" no longer exists.  L.D. 832 therefore fails under strict scrutiny.

***Intermediate Scrutiny***.  In any event, L.D. 832 cannot survive intermediate scrutiny, which requires the State to prove, with substantial evidence, "that the harms [the state] recites are real and that its restriction will in fact alleviate them to a material degree," and that they are not the product of "speculation or conjecture."  *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993).  There is no evidence in L.D. 832's scant legislative record that comes close to satisfying this burden:  no study or expert testimony suggesting a current lack of consumer options for preferred programming; no assessment of à la carte reports or studies; no consideration of how the law would affect cable licensing practices, how cable operators and programmers generate revenues, or the availability of new or diverse content; and no consideration of how à la carte choices would even be priced.  The law instead is based on mere *conjecture* that it would expand options

---

[6] The State characterizes L.D. 832's speaker-based distinctions as an "Equal Protection" issue that Plaintiffs have waived, *see* Opp. at 21 n.14, but the Supreme Court has routinely invalidated speaker-based laws under the First Amendment on these exact same grounds.

or lower costs for consumers' preferred programming.[7]  Such speculative objectives "are

insufficient to establish a legitimate state interest" for First Amendment purposes.  *Asociación de*

*Educación Privada de P.R., Inc. v. García-Padilla*, 490 F.3d 1, 17-18 (1st Cir. 2007) (striking

down law under intermediate scrutiny that "was promulgated without any investigation,

hearings, consultation with . . . experts, evidence, findings, or any other foundation which

demonstrated" the claimed harms).[8]  The State attempts to shift the burden to Plaintiffs to show

that the à la carte mandate will cause harm, Opp. at 22, but it is the *State* that must affirmatively

justify the need for L.D. 832's speech restrictions, and it has not done so.

By singling out programming offered by cable operators, L.D. 832 is also fatally

underinclusive.  The State effectively concedes that the Legislature failed to consider the

comparable tiering practices of other video providers, including satellite providers DIRECTV

and DISH Network and online providers Sling TV and Hulu+ Live TV.  *See* Opp. at 23 (simply

asserting *post hoc* that "there is nothing in the record suggesting that Maine consumers have

complained about" other providers).  This leaves an indefensible gap between L.D. 832's stated

purpose and its actual scope.  *See March v. Mills*, 867 F.3d 46, 65 (1st Cir. 2017) (finding that

when a law permits other speech that presents "the very harm that the state claims it is trying to

address, there may be reason to doubt the seriousness of that harm . . . and 'whether the

government is in fact pursuing the interests it invokes'") (citation omitted).

---

[7] The arguments in the State's Opposition about Rep. Evangelos's conclusory assertions in
support of L.D. 832 are not "evidence," and the "Further Report" from the FCC he mentioned
was not even placed in the legislative record.  *See* Opp. at 4 & n.2; *see also* Compl. ¶ 81.

[8] In contrast, the Supreme Court credited the "years of testimony" and "volumes of documentary
evidence" supporting Congress's decision, based on marketplace factors two decades ago, to
establish the must-carry regime.  *Turner Broad. Sys., Inc. v. FCC.*, 520 U.S. 180, 199 (1997).

### III.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM

Finally, the State fails to rebut Plaintiffs' showing of irreparable harm.  The State does not dispute that infringing on Plaintiffs' First Amendment rights would constitute irreparable injury; instead, it half-heartedly questions Plaintiffs' other assertions of harm.  But Comcast's declaration confirms that its existing network infrastructure and end-user equipment cannot support offering every channel and individual program à la carte and that it would have to make massive, unrecoverable investments to overhaul its ordering, provisioning, billing, and customer care systems.  *See* Rioboli Decl. ¶¶ 10-17.  NESN's declaration demonstrates that L.D. 832's à la carte mandate is at odds with NESN's affiliation agreements and the mandate of professional sports teams to ensure broad distribution through tiering requirements.  Plaehn Decl. ¶¶ 11-12. The State speculates that some contracts might excuse breach where the cause is a state law, Opp. at 24, but that misses the point that critical programming would be withdrawn from cable operators and subscribers.  And the State's observation that Comcast already offers programming individually on its video-on-demand ("VOD") platform, *id.*, overlooks that while it is relatively easy to offer subscribers to a particular tier access to the same VOD programming at no additional charge, *id.*, it would be vastly more difficult and costly to modify operating systems to enable *each* subscriber's unique à la carte selection of individually priced channels and shows (e.g., *Duck Dynasty* episodes).  Rioboli Decl. ¶¶ 11-16.

### CONCLUSION

For these reasons, and for the reasons set forth in Plaintiffs' PI Motion, the Court should grant injunctive relief and declare L.D. 832 invalid.

Respectfully submitted,


/s/ Joshua A. Tardy
Joshua A. Tardy
Joshua A. Randlett
RUDMAN WINCHELL
84 Harlow Street
P.O. Box 1401
Bangor, ME 04401
jrandlett@rudmanwinchell.com
jtardy@rudmanwinchell.com

Matthew A. Brill (*pro hac vice*)
Matthew T. Murchison (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
matthew.brill@lw.com
matthew.murchison@lw.com

*Attorneys for All Plaintiffs*

David P. Murray (*pro hac vice*)
Michael D. Hurwitz (*pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006-1238
mhurwitz@willkie.com
dmurray@willkie.com

*Attorneys for Plaintiffs Comcast of*
*Maine/New Hampshire, Inc. and*
*NBCUniversal Media, LLC*

Dated: October 15, 2019

11

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants on October 15, 2019.

/s/ *Joshua A. Randlett*
Joshua A. Randlett, Esq.