## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| COMCAST OF MAINE/NEW HAMPSHIRE, INC., et al. | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 1:19-cv-410-NT |
| | ) | |
| JANET MILLS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

This year, Maine enacted LD 832, which requires cable operators to allow cable subscribers to purchase cable channels and programs individually. Maine is the first state in the nation to enact such an à la carte mandate. Plaintiff Comcast of Maine/New Hampshire ("**Comcast**") currently bundles most of its channels, requiring subscribers who wish to view specific programming to receive more channels and programs than they may need or want. Comcast and a number of video programmers (collectively, the "**Plaintiffs**") claim LD 832 is facially unconstitutional because it is preempted by federal law and because it violates the First Amendment. Before me is the Plaintiffs' motion for a preliminary injunction. For the reasons that follow, I **GRANT** the Plaintiffs' motion.

## LEGAL STANDARD

In determining whether to grant a preliminary injunction, I must consider:

(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the

parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest.

*Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013).

The Plaintiffs bear the burden of establishing that these factors weigh in their favor. *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). "[T]he burdens at the preliminary injunction stage track the burdens at trial." *Reilly v. City of Harrisburg*, 858 F.3d 173, 180 (3d Cir. 2017), *as amended* (June 26, 2017) (internal quotation marks omitted). In the context of a First Amendment claim, the Plaintiffs have the burden to show that the state law infringes on their First Amendment rights. *Id.* at 180 n.5 (citing *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 438 (7th Cir. 2005)). If the Plaintiffs make this showing, then the State must justify its restriction on speech under the appropriate constitutional standard. *Id.* (citing *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011)).

## DISCUSSION

## I. Likelihood of Success

A party seeking a preliminary injunction must establish that it is likely to succeed on the merits of its claims. The likelihood of success on the merits prong has been described as the *sine qua non* of the four factors for establishing a preliminary injunction. *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.")

The Plaintiffs argue that the à la carte mandate is preempted by the federal Cable Act, 47 U.S.C. §§ 521 *et seq.*,[1] and that the law violates their rights under the First Amendment. I discuss each argument in turn.

## A.        Preemption

Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art VI, cl. 2. It has long been recognized that "state law that conflicts with federal law is without effect." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (internal quotation marks omitted). The Supreme Court has made clear that:

> because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases . . . we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Congress may preempt state law either directly—through an express preemption provision in a federal statute—or implicitly. *Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 15 (1st Cir. 2000). The Plaintiffs maintain that the federal Cable Act does both.

---

[1]        Congress enacted the Cable Act in 1984. Cable Communications Policy Act of 1984, Pub. L. 98-549, 98 Stat. 2779 ("**1984 Cable Act**"), codified at 47 U.S.C. §§ 521 *et seq.* Congress amended the law in 1992, Cable Television Consumer Protection and Competition Act of 1992, Pub. L. 102-385, 106 Stat. 1460 ("**1992 Cable Act**"), and in 1996, Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat 56 ("**1996 Cable Act**").

### 1. Express Preemption

"Congressional intent is the touchstone of any effort to map the boundaries of an express preemption provision." *Tobin v. Fed. Express Corp.,* 775 F.3d 448, 452 (1st Cir. 2014) (citations omitted). Because there exists a "presumption against the preemption of state police power regulations," the Supreme Court has instructed lower courts to narrowly interpret express preemption provisions. *Medtronic*, 518 U.S. at 485 (quoting *Cipollone*, 505 U.S. at 518).

The Plaintiffs contend that provisions of the Cable Act—47 U.S.C. § 544(f) and 47 U.S.C. § 544(a) and (b)—expressly preempt LD 832. Accordingly, I consider whether Congress intended to expressly preempt states from imposing à la carte mandates on cable operators under those sections.

### a. Section 544(f)

Section 544(f) prohibits states from imposing "requirements regarding the provision or content of cable services," unless expressly allowed by the Cable Act. 47 U.S.C. § 544(f)(1). The Plaintiffs argue that the à la carte mandate is a "requirement[] regarding the provision or content of cable services," preempted by the plain meaning of § 544(f). Pls.' Mot. for Preliminary Injunction ("**Mot.**") 7 (ECF No. 14). The State urges me to adopt a narrower definition of the term "provision" in § 544(f), relying on the structure of the Cable Act, its legislative history, and cases that have interpreted the provision. State's Opp'n to Mot. ("**Opp'n**") 6–13 (ECF No. 69).

### i. Interpreting § 544(f)

#### *(I).* The Plain Meaning of § 544(f)

Section 544(f) provides:

> [a]ny Federal agency, State, or franchising authority may not impose requirements regarding the provision or content of cable services, except as expressly provided in [the Cable Act].

47 U.S.C. § 544(f)(1). In enacting LD 832, the State has attempted to impose requirements regarding how cable operators must provide programming. If § 544(f) is considered in isolation, then by its plain meaning, LD 832 would be preempted.

The Supreme Court has recently explained the relevant rules of statutory construction:

> If the statutory language is plain, we must enforce it according to its terms. *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010). But oftentimes the "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." [*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).] So when deciding whether the language is plain, we must read the words "in their context and with a view to their place in the overall statutory scheme." *Id.* at 133 (internal quotation marks omitted). Our duty, after all, is "to construe statutes, not isolated provisions." *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (internal quotation marks omitted).

*King v. Burwell,* 135 S. Ct. 2480, 2489 (2015) (parallel citations omitted).

### *(II).*  Section 544(f) in Context

"Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Taking into account the context of § 544(f), at least one other section of the Cable Act suggests that Congress did not intend the phrase "provision . . . of cable services" to be read broadly. Section 544(e), which was also enacted as part of the 1984 Cable Act, provides that "[n]o State or franchising authority may prohibit, condition, or restrict a cable system's use of any type of subscriber

equipment or any transmission technology." 47 U.S.C. § 544(e). A restriction on transmission technology or subscriber equipment would fall within the plain meaning of a "requirement[] regarding the provision . . . of cable services," rendering § 544(e) unnecessary if "provision" is read broadly. *See McDonnell v. United States*, 136 S. Ct. 2355, 2369 (2016) (rejecting interpretation that would render other parts of the statute unnecessary).

Additionally, as the State points out, § 552(d) provides that the Cable Act should not "be construed to prohibit any State or any franchising authority from enacting or enforcing any consumer protection law, to the extent not specifically preempted by this subchapter." 47 U.S.C. § 552(d). If "provision" is interpreted broadly, it would appear to specifically preempt the State from enacting *any* consumer protection law involving the cable industry,[2] since such laws would all be "requirements regarding the provision . . . of cable services." 47 U.S.C. § 544(f). If all consumer protections laws were preempted by § 544(f), there would be no point to having § 552(d).[3] In sum, § 544(e) and § 552(d) strongly suggest that Congress did not intend "provision" in 544(f) to have a broad meaning.

---

[2]     The State of Maine, for example, has a number of consumer protection laws that set forth various requirements for cable operators. *See, e.g.*, 30-A M.R.S. § 3010(1) (requiring cable operators to provide "[c]redits and refunds for interruption of cable television service"); 30-A M.R.S. § 3010(6-A) (prohibiting cable operators from "using any equipment . . . to monitor the viewing habits of the subscriber without express, prior written consent of the subscriber"); 30-A M.R.S. § 3010(6-B) ("A cable system operator may not charge a late fee . . . that exceeds 1.5% per month of the amount due in the bill.").

[3]     Plaintiffs attempt to limit the scope of § 552(d) by saying that it applies only to "improper billing requirements or failure to disclose issues" and not to "programming-related measures." Tr. Oral Argument 9–10 (ECF No. 87). But by its terms, § 552(d) is not limited to laws involving customer service protections.

### *(III).* **Legislative History**

Plain meaning " 'sometimes must yield if its application would bring about results that are antithetical to Congress's discernible intent.' " *United States v. Gordon*, 875 F.3d 26, 34 (1st Cir. 2017) (quoting *In re Hill*, 562 F.3d 29, 32 (1st Cir. 2009)). Because the term "provision or content of cable services," considered in the broader context of the Cable Act, is ambiguous, it is appropriate to look to the legislative history to attempt to understand Congress's intent. *Miner v. Dep't. of Navy*, 562 U.S. 562, 572 (2011) ("[C]lear evidence of congressional intent may illuminate ambiguous text.").

In the 1984 Cable Act, Congress sought to establish a national policy that clarified the then-existing system of local, state, and federal regulation of cable television. H.R. Rep. No. 98-934, *reprinted in* 1984 U.S. Code Cong. & Admin. News ("**House Report**" or "**H. Rep.**") 4655, 4656. Congress recognized the fundamental importance of developing a "robust marketplace of ideas" containing a "wide variety of perspectives from many different types of program providers." *Id.* To accomplish these goals, it required cable companies to make space for public access channels and third-party commercial access. *See* 47 U.S.C. §§ 531–532.

The House Report shows that Congress was concerned about the First Amendment rights of cable operators to control the content of their programming. The House Report repeatedly emphasizes the need to ensure that government officials not be able to "dictate the specific programming to be provided over a cable system." H. Rep. at 4663, 4695; *see also id.* at 4656, 4668–69, 4671, 4673–74, 4706, 4716 (discussing impact of Cable Act on various First Amendment interests). To that

end, Congress set limits on the regulatory powers of the Federal Communications Commission ("**FCC**"), franchising authorities, and states. 47 U.S.C. § 544. It allowed franchising authorities to set requirements for facilities and equipment but limited their rights to "establish requirements for video programming or other information services." 47 U.S.C. § 544(b). Similarly, in § 544(f), it prohibited federal agencies, states, and franchising authorities from imposing "requirements regarding the provision or content of cable services." 47 U.S.C. § 544(f). The legislative history suggests that the Cable Act as a whole—and § 544(f) specifically—was concerned with preventing government officials from controlling the content of cable programming.

### *(IV).* Cases Interpreting § 544(f)

The cases that have addressed the meaning of § 544(f) have nearly unanimously adopted a limited interpretation of the section. In 1989, the Court of Appeals for the District of Columbia Circuit addressed a challenge by cable operators to the FCC's "syndicated exclusivity" or "syndex" rules. *United Video, Inc. v. FCC*, 890 F.2d 1173 (D.C. Cir. 1989). The rules permitted local broadcast stations to enforce their exclusive licenses with syndicated television program providers against cable operators that received the programs from an out-of-market signal and transmitted the programs back into the local broadcast station's market. *Id.* at 377. The D.C. Circuit determined that the syndex rules did not run afoul of § 544(f), because that provision only prohibited requirements that were content-based. *Id.* at 1189. In reaching this conclusion, the D.C. Circuit considered the plain meaning of § 544(f) to be ambiguous and looked to the legislative history. It wrote:

This historical context supports the Commission's belief that when Congress forbade "requirements regarding the provision or content of cable services," its concern was with rules requiring cable companies to carry particular programming.

*Id*. at 1188. The examples provided in the House Report "suggest that the key is whether a regulation is content-based or content-neutral." *Id*. at 1189.

The House report suggests that Congress thought a cable company's owners, not government officials, should decide what sorts of programming the company would provide. But it does not suggest a concern with regulations of cable that are not based on the content of cable programming, and do not require that particular programs or types of programs be provided. Such regulations are not requirements "regarding the provision or content" of cable services.

Syndex is clearly different from a requirement or prohibition of the carriage of a particular program or channel. Although it will certainly affect the content of cable programming, it is content-neutral. The basis on which syndex forbids carriage of certain programs is not their content, but ownership of the right to present them. Syndex itself does not require carriage of any particular program or type of program, nor does it prevent a cable company from acquiring the right to present, and presenting, any program.

*Id.*

The Plaintiffs argue that *United Video* is distinguishable and urge me to reject it. They contend that *United Video* involved the reasonableness of an agency's action and not a state preemption claim. It is true that the syndex rules were a requirement imposed by the FCC and that the D.C. Circuit was required to uphold the rules unless they were arbitrary or capricious. The Plaintiffs write: "Applying *Chevron*, and relying almost exclusively on a single piece of legislative history, the court upheld as reasonable the FCC's determination that [47 U.S.C. 544(f) was inapplicable."[4] Reply

---

[4]     The Plaintiffs criticize *United Video* for resting its conclusions on a single piece of legislative history, but they offer no additional material from the legislative record that would suggest that the

4 (ECF No. 85). But the D.C. Circuit in *United Video* went beyond a holding that the FCC's interpretation was reasonable. Because the FCC had reached its conclusion that § 544(f) did not prohibit syndex rules for a different reason than the court, the D.C. Circuit was required to determine whether "the agency has come to a conclusion to which it was bound to come as a matter of law, albeit for the wrong reason." *United Video*, 890 F.2d at 1190 (discussing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)). Thus, the D.C. Circuit held as a matter of law that the FCC was "*bound* to say that syndex rules are sufficiently different from the sorts of rules with which Congress was concerned that the statutory phrase 'requirements regarding the provision or content of cable services' does not embrace them." *Id.* at 1189 (emphasis added).

The Plaintiffs also claim that the D.C. Circuit, in dealing with the syndex rules, did not "directly address the manner in which cable services are provided." Reply 4. Although the syndex rules involved the relationship between the supplier of a syndicated program and a broadcast television station, the rules permitted broadcast stations with exclusive rights to a syndicated program to "forbid any cable television station from importing the program into its local broadcast area from a distant station." *United Video*, 890 F.2d at 1176. In other words, the rules had a very direct

---

legislative history is ambiguous or that the House Report is not indicative of Congress's intent. Further, Congress amended the Cable Act twice since *United Video* was decided—through the 1992 Cable Act and the 1996 Cable Act. Congress is presumed to act with awareness of a judicial interpretation of a statute. *Santoro v. Accenture Fed. Servs., LLC,* 748 F.3d 217, 224 (4th Cir. 2014). If Congress believed that the D.C. Circuit's interpretation of § 544(f) was erroneous, it could have amended the statute.

effect on the provision of cable programming, specifically prohibiting cable operators from transmitting an exclusively syndicated program from a distant signal.

Subsequent cases have followed *United Video*. In *Storer Cable Communications v. City of Montgomery*, a district court found that § 544(f) did not preempt a municipal ordinance aimed at increasing competition in cable services supply. 806 F. Supp. 1518, 1546 (M.D. Ala. 1992).[5] The court agreed with *United Video*'s conclusion that § 544(f) was concerned with content-based requirements. Because the district court found that the Montgomery ordinance did not intrude into the area of content, the court found that the ordinance did not run afoul of § 544(f). *Id.*

In *Morrison v. Viacom, Inc.*, the California Court of Appeal agreed with both *United Video* and *Storer* that § 544(f) prohibits only content-based requirements. 52 Cal. App. 4th 1514 (1997), *as modified on denial of reh'g* (Mar. 21, 1997). In *Morrison*, plaintiffs alleged that a cable operator illegally restrained trade "by making the purchase of broadcast channels a prerequisite for the purchase of satellite cable channels and by making the purchase of both broadcast channels and satellite cable channels a prerequisite for the purchase of premium channels." *Id.* at 1518. The state law at issue in *Morrison*, the Cartwright Act, includes a provision that "expressly prohibits illegal tying arrangements." *Id.* at 1524 (citing Cal. Bus. & Prof. Code § 16727). "Tying arrangements" are defined by case law as "an agreement by a party

---

[5] In relevant part, the Montgomery statute had the effect of preventing cable operators and programmers from entering into various exclusive distribution agreements. *See Storer Cable Commc'ns v. City of Montgomery, Ala.*, 806 F. Supp. 1518, 1526–27, 1546 (M.D. Ala. 1992).

to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Id.* at 1524 (quoting *Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842, 856 (1971)). The court held that § 544(f) did not preempt the Cartwright Act because the state law did not regulate the content of cable services.[6] *Id.* at 1532.

The authorities cited by the Plaintiffs do not convince me that I should reject *United Video* or adopt a broader interpretation of § 544(f). In *Cablevision Systems Corp. v. Town of East Hampton*, a local franchising authority claimed that a cable operator violated the terms of its franchise agreement by eliminating a "tier" of service that it had previously offered to consumers. 862 F. Supp. 875, 878–79 (E.D.N.Y. 1994). The court found that requiring a cable operator to provide a particular tier of programming was preempted by § 544(a) and (b), which provides that franchising authorities may only enforce "requirements contained within the franchise . . . for broad categories of video programming." § 544(b)(2)(B). The court found that requiring a specific tier was not a requirement for a broad category of cable services but rather an effort to regulate the particular programming offered by the cable operator. *East Hampton*, 862 F. Supp. at 886. The *East Hampton* court never addressed preemption under § 544(f). But even if it had, the franchising authority's requirement in *East Hampton* would likely have been considered content-based since

---

[6]     The California Court of Appeal found that the anti-tying provisions of the Cartwright Act were partially preempted by 47 U.S.C. § 543(b)(7)(A), which provides "[e]ach cable operator of a cable system shall provide its subscribers a separately available basic service tier to which subscription is required for access to any other tier of service." *Morrison v. Viacom, Inc.*, 52 Cal. App. 4th 1514, 1520–22 (1997).

the franchising authority was attempting to dictate the provision of particular programming.

Two other cases cited by the Plaintiffs also involved requirements regarding the content—rather than the provision—of cable services. The district court in *Time Warner Cable of New York City v. City of New York*, held that New York City's effort to place Fox News on one of its public access channels violated § 544(f). 943 F. Supp. 1357, 1391 (S.D.N.Y. 1996), *aff'd*, 118 F.3d 917 (2d Cir. 1997). The City attempted to require Time Warner Cable to carry Fox News even though Time Warner Cable had decided not to carry the channel. *Id.* The court found that the City's action amounted to a content-based regulation. *Id.* at 1400.

Likewise, in *Lafortune v. City of Biddeford*, the plaintiff challenged a requirement that producers of programs shown on a public access station had to obtain a written release from any person mentioned in a program who was not a public official. No. 01-250-P-H, 2002 WL 823678, at *8 (D. Me. Apr. 30, 2002), *report and recommendation adopted*, 222 F.R.D. 218 (D. Me. 2004), *aff'd*, 142 F. App'x 471 (1st Cir. 2005). The ordinance would have effectively shut down a local, live call-in program.[7] The court stated:

> A franchising authority which endows [individuals mentioned on the show] with such a veto power has "impose[d] requirements regarding the . . . content of cable services" in violation of 47 U.S.C. § 544(f)(1). It has also imposed an unconstitutional prior restraint on the plaintiff's

---

[7] Although, on its face, the release requirement appeared content-neutral, it was clear that officials of the Town of Biddeford were hoping to suppress a particular program that had transmitted views critical of certain elected officials. *Lafortune v. City of Biddeford*, No. 01-250-P-H, 2002 WL 823678, at *8 (D. Me. Apr. 30, 2002), *report and recommendation adopted*, 222 F.R.D. 218 (D. Me. 2004), *aff'd*, 142 F. App'x 471 (1st Cir. 2005). Against this factual backdrop, the ordinance was viewed as an attempt to censor speech. *Id.*

freedom of speech, by giving private individuals the effective power of censorship.

*Id.* at *8 (ellipsis in original). Biddeford's ordinance ran afoul of § 544(f) because it targeted the content of specific programming. *See id.*

The only case cited by the Plaintiffs that found a regulation to be preempted as a "requirement[] regarding the *provision . . .* of cable services" is *MediaOne Group, Inc. v. County of Henrico*, 97 F. Supp. 2d 712, 716 (E.D. Va. 2000). There, a county ordinance conditioned approval of a merger between MediaOne and AT&T on a requirement that MediaOne provide access to its cable modem platform, at favorable rates, to any internet service provider that requested it. The MediaOne merger in 1999 was part of AT&T's "major effort to establish a foothold in broadband markets around the country" when internet access through cable modems was emerging as a faster alternative than dial-up modems. *See MediaOne Grp., Inc. v. Cty. of Henrico*, 257 F.3d 356, 359 (4th Cir. 2001). MediaOne provided both traditional cable television services and a cable modem platform through a company called "Road Runner." *Id.* The district court in *MediaOne* concluded that § 544(f) applied to the county ordinance because the cable modem platform was a "cable service" under the Cable Act. *MediaOne*, 97 F. Supp. 2d at 716.[8] The district court struck down the ordinance for various reasons, one of which was that it was preempted by § 544(f). The district

---

[8]     The Court of Appeals for the Fourth Circuit did not affirm the District Court on this basis, noting that the proper regulatory classification of cable modem services was under review by the FCC. *MediaOne*, 257 F.3d at 365. The FCC later reached the conclusion "that cable modem service . . . is an interstate information service, not a cable service." *In Re Inquiry Concerning High-Speed Access to Internet over Cable & Other Facilities*, 17 FCC Rcd. 4798, 4819 (2002).

court determined that the ordinance was a requirement regarding the content of cable services, but it went on to state, without analysis, that the ordinance was also a requirement regarding the provision of cable services because MediaOne's "'provision' of the MediaOne Road Runner cable service is what triggers the Ordinance's forced access requirements." *Id.* This reading of "provision" would seem to prohibit any regulation of cable services "providers" by the FCC, franchising authorities, and states. As discussed above, this extremely broad interpretation is unsupported by the Cable Act's content, structure, and legislative history.

### *(V).* Is "Provision" Superfluous?

The Plaintiffs argue that the word "provision" becomes superfluous if § 544(f) is interpreted to prohibit only requirements regarding the content of cable services. The Plaintiffs suggest that provision must at least cover "programming-related" decisions of cable operators, and they argue that à la carte availability is a "programming-related" decision. Tr. Oral Argument 8–9, 13, 17 (ECF No. 87). I agree that "provision" could extend to programming-related decisions, but, given my analysis of the Cable Act, I would extend § 544(f) to cover requirements regarding programming-related decisions only if they had the effect of either prohibiting a cable operator from providing particular programming or requiring a cable operator to provide particular programming. The release requirement in *Lafortune* provides an example. *See* 2002 WL 823678, at *8. On its face the requirement was content-neutral, and the city justified it as a way to limit liability for any slanderous statements made by talk show hosts. But as the court recognized, the release

requirement was more than that. It was actually a programming-related requirement that targeted a particular talk show.

### ii.     Analysis

Having determined that § 544(f) prohibits government officials from imposing content-based requirements or mandates that have the effect of restricting or requiring particular content, I consider whether it preempts LD 832. The Plaintiffs argue that LD 832 is content-based because it would affect video programming content and because it singles out cable providers over other types of video programming providers, such as satellite or on-line television. The State contends that the à la carte mandate is a content-neutral requirement that cable operators must offer access to cable channels and programs individually. I address each of these arguments.

I agree with the State that LD 832 is content-neutral. LD 832 requires cable operators to offer access to cable channels and programs individually. It does not require or prohibit cable operators from carrying any particular channel or program. Nor does anything in the limited legislative history behind LD 832 suggest that the Maine legislature was at all concerned with the content of particular programming. The sponsor of LD 832 was focused on rising prices for cable services and on the fact that consumers were "forced to purchase cable TV packages which include dozens of channels the consumer has no interest in watching." *Testimony in support of LD 832* (ECF No. 69-1). In that respect, LD 832 is similar to California's anti-tying requirement upheld in *Morrison*. *See* 52 Cal. App. 4th at 1532. Neither LD 832 nor the anti-tying provision dictates the content that cable operators or programmers

16

must carry. *See id.* Additionally, LD 832 does not prohibit cable operators from continuing to offer bundles in any combination they choose. It simply provides that, in addition to the bundles, there must be an à la carte option.

The Plaintiffs contend that the practical effect of LD 832 will be a reduction in the content available to consumers, because cable programmers will prevent cable operators from acquiring the right to present certain programming. At the outset, I note that the D.C. Circuit rejected the argument that an effect on content necessarily makes a provision content-based and subject to preemption under § 544(f). *United Video,* 890 F.2d at 1189 (acknowledging that the syndex rules "will certainly affect the content of cable programming" but are content-neutral and not preempted under § 544(f). But, I can envision a content-neutral regulation, perhaps like the release requirement in *Lafortune*, that has such a profound effect on the availability of video programming that it would be preempted by § 544(f). *See Lafortune*, 2002 WL 823678, at *8. The Plaintiffs have not presented evidence to allow me to conclude that the impact of the à la carte mandate will have a major impact on content. They offer two affidavits that suggest that current contracts may prevent them from offering programming on an à la carte basis. *See* Declaration of Rick Rioboli (ECF No. 14-1); Declaration of Peter Plaehn (ECF No. 14-2). But the Plaintiffs have not offered the actual contracts into evidence, claiming that they are highly confidential.[9] Because I do not have the contracts in evidence, I cannot tell whether there are severability

---

[9]     The Plaintiffs did not attempt to obtain an order allowing these contracts to be admitted under seal, as is allowed under Local Rule 7A.

clauses. Nor is there any evidence before me that establishes the procedures regarding renegotiation of agreements that violate state law.

Moreover, there are two contradictory reports from the FCC on the topic of à la carte mandates, and they reach different conclusions about the impact on content. In their Complaint, the Plaintiffs cite the 2004 Report, which concluded that an à la carte mandate would lead to the failure of many programming networks, thus diminishing program diversity. FCC, REPORT ON THE PACKAGING AND SALE OF VIDEO PROGRAMMING SERVICES TO THE PUBLIC ("**2004 Report**") (Nov. 18, 2004) (available at https://docs.fcc.gov/public/attachments/DOC-254432A1.pdf) (last visited Dec. 20, 2019). But a report released in 2006 criticized the 2004 Report, questioned the data upon which it was based, and suggested that programming diversity would improve under an à la carte scheme. FCC, FURTHER REPORT ON THE PACKAGING AND SALE OF VIDEO PROGRAMMING SERVICES TO THE PUBLIC 4–5 ("**Further Report**") (Feb. 9, 2006) (available at https://docs.fcc.gov/public/attachments/DOC-263740A1.pdf) (last visited Dec. 20, 2019).[10]

While the cable operators have established that they are not interested in the à la carte model and compliance with it will be costly, they have not convinced me that implementation of LD 832 will likely result in a reduction in content. A speculative, indirect effect on content is an insufficient reason to conclude that LD 832 is preempted. *See United Video,* 890 F.2d at 1189; *see also English v. Gen. Elec.*

---

[10]     At oral argument, counsel for the Plaintiffs indicated that a United States House of Representative investigation subsequently discredited the Further Report. Tr. Oral Argument 39. Plaintiffs' counsel offered to provide a cite but failed to do so.

*Co.*, 496 U.S. 72, 90 (1990) (rejecting a "speculative . . . basis on which to rest a finding of pre-emption," because "pre-emption is ordinarily not to be implied absent an 'actual conflict' ").

Finally, the Plaintiffs contend that LD 832 imposes requirements regarding the content of cable services because the law imposes a burden on cable operators but not other multichannel video programming distributors ("**MVPDs**"), such as satellite operators and online television streaming providers (*e.g.*, SlingTV). But a law that singles out cable operators, though speaker-based, is not necessarily based on content. *Turner Broad. Sys., Inc. v. FCC* ("*Turner I*"), 512 U.S. 622, 658–59 (1994) (finding no evidence that Congress preferred broadcasters over cable programmers based on content of their programming and applying intermediate scrutiny). The Plaintiffs have made no showing that LD 832 applies only to cable operators *based on the content* of their programming. *See id.*

I recognize that LD 832 is a first-in-the-nation law that would significantly change how cable operators do business in Maine. But just because the law is novel does not mean it is preempted. *See Whalen v. Roe*, 429 U.S. 589, 597 n.20 (1977) ("Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.") (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)).

I must presume that the State acted within its authority when it enacted LD 832, unless it was the "clear and manifest purpose of Congress" in enacting § 544(f), to prevent states from enacting such a provision. *Medtronic*, 518 U.S. at 485. Further, I am required to interpret § 544(f) narrowly. *Id.* (presumption against the preemption supports interpreting express preemption clause narrowly). I decline to upset the consensus that has emerged among the courts that § 544(f) is appropriately limited to content-based requirements. I conclude that § 544(f) was not intended to prohibit states from enacting content-neutral laws designed to lower prices and allow consumers to purchase only the programming they wish to view. Accordingly, I find that LD 832 is likely not preempted by § 544(f) of the Cable Act.

### b.      Sections 544(a) and (b)

The Plaintiffs contend that LD 832 is preempted by § 544(a) and (b). Section 544(a) provides that "[a]ny franchising authority may not regulate the services, facilities, and equipment provided by a cable operator except to the extent consistent with this subchapter." 47 U.S.C. § 544(a). Section 544(b)(1) provides that, for franchises granted after the effective date of the Cable Act, the franchising authorities "may establish requirements for facilities and equipment, but may not . . . establish requirements for video programming or other information services." 47 U.S.C. § 544(b). Section 544(b)(2) allows a franchising authority to enforce requirements contained in the franchise—"(A) for facilities and equipment; and (B) for broad categories of video programming or other services." 47 U.S.C. § 544(b)(2).

The Plaintiffs do not develop their argument that § 544(a) and (b) preempt LD 832, perhaps because these provisions apply only to franchising authorities and not

to states. Congress clearly knew how to restrict the regulatory authority of states, as it did so in § 544(f). Even if I found that the Plaintiffs had not waived this argument as undeveloped, I would likely not find that these provisions restrain state regulatory authority. I also would likely interpret § 544(a) and (b) as provisions designed to keep franchising authorities from requiring specific programming. H. Rep. 4705–06 (§ 544(a) and (b) ensure that franchising authorities can enforce commitments made in franchise agreements, "yet also protect[] the cable operator from being forced to provide specific programming"). I have already found that LD 832 does not prohibit cable operators from carrying or require them to carry any particular programming. LD 832 is not preempted under § 544(a) and (b).

### 2. Conflict Preemption

"[C]onflict pre-emption exists where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quotation marks omitted). "[A] court should not find pre-emption too readily in the absence of clear evidence of a conflict." *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000). The Plaintiffs argue that both types of conflict preemption—impossibility and obstacle—are present.

### a. Impossibility

The Plaintiffs argued in their opening brief that they would be unable to comply with the à la carte mandate and comply with the federal requirement that cable operators include all stations that elect must-carry status on the basic tier. Mot. 9–10. In response, the State indicated that it does not interpret LD 832 "as allowing

consumers to purchase à la carte channels and programs without first subscribing to the mandatory basic tier." Opp'n 14. The State bases its interpretation on the use of the term "subscribers" in LD 832, and it argues that one must first become a "subscriber" by purchasing the basic tier in order to then be able to purchase additional programming on an à la carte basis. Opp'n 15. I am required to consider the narrowing construction offered by the State. *Nat'l Org. for Marriage v. McKee,* 649 F.3d 34, 66 (1st Cir. 2011) (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982)) ("In evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered."). Under the State's limiting construction, I find that LD 832 does not make compliance with the Cable Act's must-carry and basic tier requirements impossible.

### b.    Obstacle

The Plaintiffs also argue that LD 832 stands as an obstacle to the accomplishment of the Cable Act's purposes and objectives and frustrates the effectiveness of federal law. Mot. 10–11. The Plaintiffs posit that "Congress made clear that its goals for regulating cable service were to establish and maintain 'a national policy concerning cable communications' that 'minimize[s] unnecessary regulation that would impose an undue economic burden on cable systems.' " Mot. 10 (quoting 47 U.S.C. § 521(1), 521(6)). I agree that these were among Congress's goals. But so too were "assur[ing] that cable systems are responsive to the needs and interests of the local community" and allowing states to "enact[] or enforce[e] any consumer protection law" unless specifically preempted. 47 U.S.C. §§ 521(2), 552(d).

Because there are competing federal purposes and objectives in the Cable Act, and because LD 832 embodies one of those objectives, I do not find "clear evidence" of a conflict. *See Geier*, 529 U.S. at 885.

Because I find that no provision of the Cable Act expressly preempts LD 832 and because the Plaintiffs have not established conflict preemption, I go on to address the Plaintiffs' First Amendment claims.

### B.    First Amendment

The Plaintiffs argue that LD 832 violates their First Amendment rights and should be subject to strict scrutiny. They contend that the State has failed to meet its burden of showing that LD 832 can withstand either strict or intermediate scrutiny because the State has not provided evidence that LD 832 will further an important State interest. Mot. 11–15. The State responds that the Plaintiffs do not have a First Amendment right to bundle content in the first place. Alternatively, the State argues that if First Amendment interests are at stake, then intermediate rather than strict scrutiny would apply and LD 832 would survive intermediate scrutiny. Opp'n 16, 21.

### 1.    Plaintiffs' Constitutional Rights

As a threshold matter, the Plaintiffs are required to demonstrate that LD 832 infringes on their First Amendment rights. They make arguments that touch upon two different doctrines of First Amendment law. First, citing *Turner I*, 512 U.S. at 636, they contend that a decision "exercising editorial discretion" over how to provide programming is protected speech. Mot. 11. Second, they contend that because LD 832 singles out cable operators for disfavored treatment but leaves other multichannel video programming distributors unregulated, it violates the First Amendment's

prohibition on speaker-based regulations as discussed in *Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983), and *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 227 (1987). Reply 7–8. I address each argument in turn.

### a. Editorial Discretion under *Turner I*

In *Turner I,* the Supreme Court addressed whether the must-carry provisions of the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. 102-385, 106 Stat. 1460, which required cable operators to carry the signals of certain local broadcast television stations, violated the First Amendment rights of cable operators and programmers. 512 U.S. at 636–37. The Supreme Court wrote that "there can be no disagreement" that:

> Cable programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment. Through original programming or by exercising editorial discretion over which stations or programs to include in its repertoire, cable programmers and operators seek to communicate messages on a wide variety of topics and in a wide variety of formats.

*Id.* at 636 (quotation marks, citations, and alterations omitted). The Court determined that the must-carry provisions "regulate cable speech in two respects: The rules reduce the number of channels over which cable operators exercise unfettered control, and they render it more difficult for cable programmers to compete for carriage on the limited channels remaining." *Id.* at 637. Ultimately, the Court applied intermediate scrutiny to the must-carry provisions, and after remand for further development of the factual record, the Court upheld the must-carry requirements. *Turner Broad. Sys., Inc. v. FCC* ("*Turner II*"), 520 U.S. 180 (1997).

24

The Plaintiffs argue that, like the cable operators and programmers in *Turner I*, they enjoy First Amendment protection for their decisions regarding how to package and sell their video programming. They consider their bundling decisions to fall within their "editorial discretion." The State counters that, unlike the must-carry provisions at issue in *Turner I*, LD 832 does not infringe on the cable operators' rights to decide what programs and channels to show. The cable operators and programmers are free, according to the State, to choose whatever content they wish to provide and bundle it in whatever packages they see fit. They simply must, in addition, offer that same programming to consumers on an à la carte basis. The State points out that the Plaintiffs cite no case supporting the notion that they have a First Amendment right to bundle channels and programs. Opp'n 2. The State contends that *Turner I* does not control if there is no impingement on the right to choose programming, and it argues that the Plaintiffs have failed to meet their initial burden of demonstrating that LD 832 infringes on their First Amendment rights.

There is no question that *Turner I* is distinguishable from the instant case. In *Turner I*, the Government's must-carry provisions forced cable operators to carry particular channels and impinged on programmers by increasing the competition for the remaining channels. Here, LD 832 requires no such addition of content, and it does not shrink the space remaining for programmers. Nor does LD 832 prohibit the Plaintiffs from packaging programming in bundles; it merely requires them to also provide channels and programming individually.

The Plaintiffs simply do not address these distinctions. They rely exclusively on the broad language in *Turner I*, and they do not explain why cable operators' editorial discretion to choose what channels or programs to offer, which is protected by the First Amendment, should extend to cable operators' discretion in *how* to sell that programming.[11] Nor do the Plaintiffs make any attempt to distinguish the cable operators' rights from the video programmers' rights under the First Amendment. I find that the Plaintiffs have failed to carry their burden at the preliminary junction stage that they are likely to succeed on the merits of their claim that they have First Amendment rights to require consumers to purchase bundles of programming.

### b.    Speaker-based Laws

In addition to concluding that cable operators had First Amendment rights in exercising editorial discretion when choosing particular programming, the Court in *Turner I* considered whether the must-carry provisions transgressed cable operators' First Amendment rights because they placed special burdens on members of the press. *See Turner I*, 512 U.S. at 640–41. Application of the First Amendment protections of the press to cable operators is not, by any stretch, a new concept. In *City of Los Angeles v. Preferred Communications, Inc.,* the Supreme Court held that a cable operator seeking to open a second franchise in Los Angeles had First Amendment rights akin to the press. 476 U.S. 488, 494–95 (1986). The Court wrote:

---

[11]     The Plaintiffs are not alone in reading *Turner I* broadly. *See U.S. Telecom Ass'n v. FCC,* 855 F.3d 381, 430 (D.C. Cir. 2017) (Kavanaugh J., dissenting from denial of rehearing en banc) ("[T]he Supreme Court's *Turner Broadcasting* decisions mean that Internet service providers possess a First Amendment right to exercise their editorial discretion over what content to carry and how to carry it."). *But cf.* Susan Crawford, *First Amendment Common Sense*, 127 HARV. L. REV. 2343 (2014) (warning against extending *Turner*'s editorial discretion to internet service providers).

"[c]able television partakes of some of the aspects of speech and the communication of ideas as do the traditional enterprises of newspaper and book publishers, public speakers, and pamphleteers. [The cable operator's] proposed activities would seem to implicate First Amendment interests." *Id.* at 494. In *Leathers v. Medlock*, the Supreme Court reiterated the idea that "[c]able television provides to its subscribers news, information, and entertainment. It is engaged in 'speech' under the First Amendment, and is, in much of its operation, part of the 'press.'" 499 U.S. 439, 444 (1991) (citing *Preferred Commc'ns.*, 476 U.S. at 494).

In addressing the cable operators' speaker-based argument in *Turner I*, the Court cited *Minneapolis Star* and *Arkansas Writers' Project*, two cases relied on by the Plaintiffs. In *Minneapolis Star,* the Supreme Court considered the constitutionality of a Minnesota law aimed at publishers that imposed a use tax on paper and ink. 460 U.S. at 578. In *Arkansas Writers' Project*, the Supreme Court considered a general interest magazine's challenge to Arkansas's sales tax, which exempted religious, professional, trade, and sports magazines. 481 U.S. at 224–25, 227. In both of those cases, the Court found that because the laws singled out the press, or a component of the press, they were unconstitutional under the First Amendment. *Id.* at 229.

The fact that the Supreme Court has historically viewed cable operators as part of the press and that it found in *Turner I* that cable operators' rights fall within the ambit of cases like *Minneapolis Star* and *Arkansas Writers' Project*, suggests to me that the Plaintiffs do have First Amendment interests at stake. LD 832 clearly

singles out cable operators for differential treatment. Under *Turner I*, this means some level of heightened scrutiny applies. 512 U.S. at 640–41. Because I find that the Plaintiffs have met their burden of establishing that the law implicates their First Amendment rights, I address which level of scrutiny applies, and whether it is likely that the State can meet its burden of showing that LD 832 withstands that scrutiny.

### 2.    Level of Scrutiny

#### a.    Strict Scrutiny

The Plaintiffs contend that strict scrutiny should apply citing *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226, 2230–31 (2015) and *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 828 (1995). Mot. 12. In *Reed*, the Court struck down a municipality's signage regulations because they were content-based and failed to withstand strict scrutiny. 135 S. Ct. at 2231–32. In *Rosenberger*, the Court held that a University of Virginia regulation restricting student activity funds from being used to support a student group endeavoring to publish a Christian magazine violated the group's free speech rights. 515 U.S. at 837. The Plaintiffs offer no analysis of how LD 832 bears any resemblance to either the ordinance in *Reed* or the regulation in *Rosenberger*. The State rejoins that if intermediate scrutiny applied to the must-carry provisions in *Turner I*, "it is impossible to see" how LD 832 would be subject to strict scrutiny. Opp'n at 18–20.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional" and are subject to strict scrutiny. *Reed*, 135 S. Ct. at 2226 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992)).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. Because I have concluded that LD 832's à la carte mandate is not content-based, strict scrutiny does not apply on this basis.

"[S]peaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Turner I*, 512 U.S. at 658 (citations omitted). As the Court in *Turner I* framed it: "The question here is whether Congress preferred broadcasters over cable programmers based on the content of programming each group offers. The answer . . . is no." *Id.* 658–59. The Plaintiffs make no attempt to explain how the Maine legislature is singling out cable operators as opposed to other MVPDs *based on the content of the programming*.

Strict scrutiny "is unwarranted when the differential treatment is 'justified by some special characteristic of' the particular medium being regulated." *Id.* at 660–61 (*quoting Minn. Star*, 460 U.S. at 585). In *Turner I*, the Court found that the "special characteristics of the cable medium: the bottleneck monopoly power exercised by cable operators and the dangers this power poses to the viability of broadcast television" justified the must-carry provisions and made strict scrutiny unwarranted. *Id.* at 661. The Plaintiffs contend in their reply brief that the finding of a "bottleneck monopoly" that justified singling out the cable operators in *Turner I* no longer exists and cannot be used to justify treating cable operators differently from other multichannel video programming distributors. Reply 8. The Plaintiffs cite an FCC

report that suggests cable subscribers only totaled 55.2% of subscriptions to MVPDS in 2017. *See In re Commc'ns Marketplace Report*, FCC 18-181, 2018 WL 6839365 (Dec. 26, 2018) ("**Communications Marketplace Report**"). Because the special circumstances that justified the must-carry provisions are absent here, the Plaintiffs contend that strict scrutiny should apply.

It is true, as the Plaintiffs point out, that much has changed since the *Turner* cases were decided and that the justifications for the must-carry provisions do not necessarily apply to the à la carte mandate. But the Plaintiffs only develop this argument in their reply brief. Neither party has addressed whether the cable industry's market share of multichannel video programming in Maine is different from that of the nation as a whole. Further, the sponsor of LD 832 was concerned about cable pricing and ensuring that Maine citizens have access to affordable cable programming. The evidentiary record is weak at this point, but the record does contain evidence that cable pricing has greatly exceeded the pace of inflation over many years.[12] This may provide a separate special characteristic that would support differential treatment of cable operators. Because I ultimately conclude that the State

---

[12]    *See In re Commc'ns Marketplace Report*, FCC 18-181, 2018 WL 6839365 (Dec. 26, 2018) ("**Communications Marketplace Report**") ¶ 71 ("Over the five years ending January 1, 2017 the price of expanded basic service rose, on average, by 4.1% annually. . . . For comparison, the rate of general inflation measured by the Consumer Price Index (all items) rose . . . at an average annual rate of 1.4% over the last five years."); 2004 Report at 20 ("[C]able prices have increased by an average of 4.6% per year . . . [and] in excess of 7%, for the expanded basic program tier over the past five years."); *id.* at 5 ("Some commenters allege that as cable rates have increased at nearly three times the rate of inflation, the industry's practice of making most networks available as part of a bundle or tier has contributed to the rise in retail rates.").

has not met its burden of showing that it is likely to succeed under intermediate scrutiny, I do not need to decide this issue at this time.

### b.    Intermediate Scrutiny

Under intermediate scrutiny, LD 832 "will be sustained if 'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' " *Turner I*, 512 U.S. at 662 (citing *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).

The Plaintiffs do not dispute that Maine has an important interest in making sure that its citizens have access to cable television services at affordable rates. Rather, they contend that the State has shown no evidence that there is an absence of consumer choice, excessive pricing, or a lack of à la carte options in the marketplace. They also argue that the State has failed to establish that the à la carte mandate will solve any of the problems that the State recites because it has not shown that LD 832 will actually lead to lower costs or greater consumer choice. The Plaintiffs are correct that the State bears the burden of showing that the problems LD 832 seeks to remedy "are real, not merely conjectural, and that [LD 832] will in fact alleviate these harms in a direct and material way." *Asociación de Educación Privada de P.R., Inc. v. García-Padilla,* 490 F.3d 1, 18 (1st Cir. 2007).

To establish that there is an absence of consumer choice and excessive pricing caused by bundled programming, the State points to a comment made by the Office of the Public Advocate that cable consumers have expressed frustration with bundled

channels. Tr. Oral Argument at 56; *see* Testimony of the Office of the Public Advocate (ECF No. 69-3) ("[A] great deal of consumers experience a high level of frustration with their cable providers. They feel that they lack choices and being able to select the channels they want and not have to pay for channels they do not watch and do not want would be highly favorable."). This evidence of consumer complaints in Maine is buttressed by the 2004 Report, which stated it is "undeniable that many Americans are frustrated with year over year increases in their pay-television bills." 2004 Report at 3. The record also demonstrates that increases in rates for cable television services, which have significantly out-paced inflation, continued from 2013 through 2017. *See* Communications Marketplace Report ¶ 71. This may be sufficient to conclude that the State is likely to be able to show that containing cable costs in Maine is a real concern, but the State stumbles when it comes to demonstrating a likelihood of success on whether LD 832 will solve the problem of rising cable prices.

The State references the Further Report, which concluded "that à la carte could be in consumers' best interests." Further Report 3. But the Further Report's purpose is really to tear down the conclusions of the 2004 Report by pointing out what it claims is flawed analysis and industry bias. The Further Report speaks in terms of what "could" happen, not what will happen, if à la carte programming is mandated, and it recommends further consideration of à la carte and other alternatives to bundling. The report even acknowledges that prices for some consumers could rise by up to 4% under an à la carte scheme. *Id.* at 4. Further, the report seems to focus on an à la carte *channel* scheme and does not address the à la carte *programming* scheme that

LD 832 mandates.[13] The Legislature did not undertake any further investigation, hear from expert witnesses, or commission a Maine-specific study to determine what impact LD 832 would actually have on access to cable services. The State has not accounted for the significant transactional costs resulting from upending the cable market in Maine or the likelihood that these costs will be passed onto consumers. Decl. of Rick Rioboli 4–5. Finally, there is no mechanism in the law that would stop cable operators from pricing individual channels at the same price as an entire tier. The only constraint on cable operators' pricing would be market forces and consumer good will.

At this initial stage, I cannot conclude that the State has carried its burden of showing that LD 832 will, in fact, be likely to reduce prices and increase affordable access to cable. The State candidly conceded at oral argument that "there may well not be enough in the . . . factual record at this point for us to have met our burden."[14] Tr. Oral Argument at 56. Because I agree that there is not sufficient evidence to show that the State will likely be able to demonstrate that LD 832 will remedy the problems

---

[13]     LD 832 requires that cable operators offer consumers the ability to purchase both individual channels, such as ESPN or the Food Network, and individual programs, such as one Monday Night Football game or one episode of Chopped. The Further Report appears to only forecast the possible effects of an à la carte *channel* scheme.

[14]     Because I reach the conclusion I do, I sidestep the question of whether the legislature itself must create a record showing that a problem actually exists and that the law is likely to solve that problem. Reply 8 (ECF No. 85). The issue of how well-developed the legislative record needs to be and how much deference should be accorded to the legislature if a law infringes on First Amendment freedoms is complex. *See* Michael J. Burstein, Note, *Towards A New Standard for First Amendment Review of Structural Media Regulation*, 79 N.Y.U. L. REV. 1030 (2004); Note, *Deference to Legislative Fact Determinations in First Amendment Cases After* Turner Broadcasting, 111 HARV. L. REV. 2312 (1998). This is an issue that will need to be decided, but it makes little sense to offer a prediction on this issue without comprehensive briefing.

associated with rising cable prices, I conclude that the Plaintiffs are likely to succeed on their First Amendment claim. I note that a likelihood of success determination on a motion for preliminary injunction should "be understood only as [a] probable outcome" based on "the present state of the record." *Maine Educ. Ass'n Benefits Trust v. Cioppa*, 695 F.3d 145, 158 (1st Cir. 2012).

## II. Remaining Factors

"Likelihood of success is the main bearing wall of the four-factor framework" for preliminary injunctions. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). Nonetheless, the remaining factors for a preliminary injunction—whether the Plaintiffs will suffer irreparable harm, the balance of hardships, and the public interest—also weigh in the Plaintiffs' favor. *See Harnett*, 731 F.3d at 9. A plaintiff who has shown a likelihood of success on the merits of a First Amendment claim has satisfied the irreparable injury component of the preliminary injunction analysis as well, given the loss of First Amendment freedoms. *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The balance of hardships and public interest also weigh in favor of the Plaintiffs. The affidavit of Comcast Chief Information Officer Rick Rioboli suggest that it will take significant resources for Comcast to implement an à la carte ordering system and that implementation costs will be passed on to consumers. Decl. or Rick Rioboli 4–5. Because the State has not established that LD 832 is likely to improve access to cable services or lower costs, I cannot conclude that granting the preliminary injunction will create a countervailing hardship on the State. The public interest is

served by protecting First Amendment rights from likely unconstitutional infringement. *See Yes for Life Political Action Comm. v. Webster*, 74 F. Supp. 2d 37, 43 (D. Me. 1999).

## CONCLUSION

For the reasons stated above, I **DENY** the Plaintiffs' motion for preliminary injunction (ECF No. 14) on their preemption claim (Count I). I **GRANT** Plaintiffs' motion for a preliminary injunction on their First Amendment claim (Count II). Although I had anticipated consolidating the preliminary injunction hearing with the trial on the merits, pursuant to Fed. R. Civ. P. 65, the evidentiary record is not sufficiently developed to allow me to make a final determination on the Plaintiffs' claims for declaratory and permanent injunctive relief. I direct the Clerk of Court to enter a scheduling order.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 20th day of December, 2019.