# United States Court of Appeals
## For the First Circuit

No. 20-1104

COMCAST OF MAINE/NEW HAMPSHIRE, INC.; A&E TELEVISION NETWORKS,
LLC; C-SPAN; CBS CORP.; DISCOVERY, INC.; DISNEY ENTERPRISES,
INC.; FOX CABLE NETWORK SERVICES, LLC; NBCUNIVERSAL MEDIA, LLC;
NEW ENGLAND SPORTS NETWORK, LP; VIACOM, INC.,

Plaintiffs, Appellees,

v.

JANET MILLS, in her official capacity as the Governor of Maine;
AARON FREY, in his official capacity as the Attorney General of
Maine,

Defendants, Appellants,

CITY OF BATH, MAINE; TOWN OF BERWICK, MAINE; TOWN OF BOWDOIN,
MAINE; TOWN OF BOWDOINHAM, MAINE; TOWN OF BRUNSWICK, MAINE; TOWN
OF DURHAM, MAINE; TOWN OF ELIOT, MAINE; TOWN OF FREEPORT, MAINE;
TOWN OF HARPSWELL, MAINE; TOWN OF KITTERY, MAINE; TOWN OF
PHIPPSBURG, MAINE; TOWN OF SOUTH BERWICK, MAINE; TOWN OF
TOPSHAM, MAINE; TOWN OF WEST BATH, MAINE; TOWN OF WOOLWICH,
MAINE,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. Nancy Torresen, U.S. District Judge]

---

Before
Lynch and Lipez, Circuit Judges.[*]

---

[*] Judge Torruella heard oral argument in this matter and
participated in the semble, but he did not participate in the
issuance of the panel's opinion in this case. The remaining two
panelists therefore issued the opinion pursuant to 28 U.S.C.
§ 46(d).

---

       Christopher C. Taub, Deputy Attorney General of the State of Maine, with whom Aaron M. Frey, Attorney General of the State of Maine, was on brief, for appellants.

       Matthew A. Brill, with whom Melissa Arbus Sherry was on brief, for appellees.

       Kelly M. Klaus, Donald B. Verrilli, Jr., and Elaine J. Goldenberg on brief for WarnerMedia, LLC, amicus curiae.

       Corbin K. Barthold and Cory L. Andrews on brief for Washington Legal Foundation, amicus curiae.

       John Ulin, James S. Blackburn, and Oscar Ramallo on brief for Motion Picture Association, Inc., amicus curiae.

---

February 24, 2021

---

LIPEZ, **Circuit Judge**. Maine passed a law in 2019 requiring cable operators to offer their subscribers the option of buying access to cable programs and channels individually, rather than bundled together in a channel or package of channels. A group of cable operators and programmers sued and sought a preliminary injunction against enforcement of the law, arguing that it violated the First Amendment and was preempted by provisions of the federal Communications Act. The district court granted the preliminary injunction on First Amendment grounds, and Maine appealed.

For the reasons discussed below, we agree with the district court that the law implicates the First Amendment and therefore triggers some form of heightened -- either intermediate or strict -- judicial scrutiny. We also accept Maine's concession that, at this point in the litigation, it has not offered enough evidence in support of the law to survive such scrutiny. We therefore affirm.

I.

The law at issue is called "An Act to Expand Options for Consumers of Cable Television in Purchasing Individual Channels and Programs." 2019 Me. Laws 129th Leg., ch. 308 (codified at Me. Stat. tit. 30-A, § 3008(3)(F) (2019)) ("Chapter 308" or "the Act"). The sole operative provision of the Act imposed an "à la carte" requirement on cable operators: "Notwithstanding any provision in a franchise, a cable system operator shall offer subscribers the

option of purchasing access to cable channels, or programs on cable channels, individually."  Id.  As far as the record on appeal indicates, the accompanying legislative record was sparse.  The district court noted that the Maine Legislature did not hear from expert witnesses or commission a Maine-specific study to determine what impact the Act would have on access to cable services.

However, one of the Act's sponsors testified before the Energy, Utilities, and Technology Committee that he had "submitted th[e] bill on behalf of Maine's hundreds of thousands of cable television subscribers," who "[f]or far too long . . . have been forced to purchase cable TV packages which include dozens of channels the consumer has no interest in watching."  Citing a Federal Communications Commission ("FCC") survey, the sponsor reported that the price of an expanded basic cable package had risen faster than inflation, and, relying on a 2006 FCC report, suggested that the average cable bill would be thirteen percent lower if consumers could subscribe to only their preferred channels.  Barry Hobbins, Maine's Public Advocate, also offered testimony, suggesting that many consumers were frustrated with their cable providers and would prefer a regime in which they only paid for the channels they actually watched.  Although the Public Advocate did not formally endorse the Act, he opined that the law "would go a long way in an attempt to remedy the lack of consumer choice in the cable marketplace in Maine."

Before the Act went into effect, a cable operator (Comcast of Maine/New Hampshire, Inc.) and various cable programmers (together, "plaintiffs" or "the cable companies")[1] sued the Governor and the Attorney General of Maine ("the state defendants" or simply "Maine" or "the state")[2] in federal district court, claiming that Chapter 308 violated the First Amendment and was preempted by various provisions of the federal Communications Act of 1934, as amended. A few days later, the plaintiffs moved for a preliminary injunction against enforcement of the Act. The district court consolidated the trial on the merits with a hearing on the preliminary injunction motion. See Fed. R. Civ. P. 65(a)(2).

During the district court proceedings, the state explained in more detail how the Act would be interpreted and enforced. See Sorrell v. IMS Health Inc., 564 U.S. 552, 563 (2011)

---

[1] In general, cable operators own the physical cable infrastructure that delivers a signal to viewers; cable programmers produce television content and sell or license it to cable operators. See Turner Broadcasting System, Inc. v. FCC ("Turner I"), 512 U.S. 622, 628 (1994). The programmers challenging the law here are: A&E Television Networks, LLC; C-SPAN; CBS Corp.; Discovery, Inc.; Disney Enterprises, Inc.; Fox Cable Network Services, LLC; NBCUniversal Media, LLC; New England Sports Network, LP; and Viacom, Inc. When the distinction between the programmers and operators is unimportant, we occasionally refer to the combined plaintiffs as just "the cable companies."

[2] The plaintiffs also named various Maine municipalities as defendants. They were dismissed by a joint stipulation below and are not parties to the present appeal.

(noting that lower courts are "entitled to rely on the [s]tate's plausible interpretation of the law it is charged with enforcing"). The state pointed out that there is a familiar model for subscribing to cable TV. Cable programmers (like Disney) compile individual television programs into linear streams[3] of content called channels (like ESPN). Cable operators (like Comcast) bundle those channels into various tiers (like Comcast's "Sports & Entertainment" or "Kids & Family" packages), which customers can purchase. As written, the Act requires cable operators to provide subscribers with the option to purchase every cable channel and television program individually (or "à la carte").[4] Hence, a

---

[3] A "linear stream," in this context, signifies a continuous series of prescheduled programs; it differs from an "on demand" arrangement, which allows viewers to watch a program whenever they choose. See Implementation of Section 304 of the Telecommunications Act of 1996, Fourth Further Notice of Proposed Rulemaking, 25 FCC Rcd. 4303, 4308, ¶ 14 n.43 (Apr. 21, 2010) ("The term 'linear programming' is generally understood to refer to video programming that is prescheduled by the programming provider. Cf. 47 U.S.C. § 522(12) (defining 'interactive on-demand services' to exclude 'services providing video programming prescheduled by the programming provider').").

[4] In fact, the Act is written in the disjunctive, requiring "the option of purchasing access to cable channels, or programs on cable channels." Me. Stat. tit. 30-A, § 3008(3)(F) (emphasis added)). But the parties and the district court treated the Act as requiring both options. See, e.g., Appellants' Br. at 10 (explaining that Chapter 308 "requires the unbundling of channels and programs" (emphasis added)); Comcast of Me./N.H., Inc. v. Mills, 435 F. Supp. 3d 228, 249 n.13 (D. Me. 2019) (explaining that Chapter 308 "requires that cable operators offer consumers the ability to purchase both individual channels, such as ESPN or the Food Network, and individual programs, such as one Monday Night Football game or one episode of Chopped" (emphasis added)). We

customer, instead of having to buy the full "Sports &
Entertainment" package, could pay only for the ESPN channel.
Further, under the law, instead of paying for the entire EPSN
channel, a customer could pay to view a single Red Sox game.

The state also clarified in its briefing that the "à la
carte" option would only be available to customers who already
subscribe to (at least) a basic cable tier or package, in order to
avoid any potential conflict with federal law regulating the basic
tier.  See 47 U.S.C. § 543(b)(7).  Separately, the state also
acknowledged to the court at the hearing that nothing in the Act
requires a cable operator to charge any particular price for an
individual channel or program.  As a result, cable operators could
continue to steer subscribers to bundled tiers by offering
attractive discounts (or, equivalently, by charging high prices
for à la carte options).

After considering the parties' arguments, the district
court granted the motion for a preliminary injunction.  See Comcast
of Me./N.H., Inc. v. Mills, 435 F. Supp. 3d 228, 233 (D. Me. 2019).
The court first determined that the Act was not expressly or
impliedly preempted by federal law.  Id. at 244.  However, the
court found that the Act likely burdened the plaintiffs' First

_____

simply follow suit, as neither party has raised this issue on
appeal.

Amendment rights because, even though it did not impinge on the plaintiffs' editorial discretion, it nonetheless singled them out for disfavored treatment. Id. at 245-46. Additionally, the court concluded that the state had not shown -- at least "[a]t this initial stage" -- that the Act was likely to achieve its primary goal: reducing prices and increasing affordable access to cable. Id. at 249. The court then concluded that the remaining requirements for a preliminary injunction were satisfied. Id. at 249-50. As part of its determination, the court also reconsidered the desirability of combining the preliminary injunction hearing with the merits trial. Because the court was now convinced that the evidentiary record was not "sufficiently developed" for "a final determination" on the underlying claims for declaratory and permanent injunctive relief, it declined to enter final judgment. Id. at 250. The defendants timely appealed the entry of the preliminary injunction, and the parties agreed to stay further proceedings in the district court pending the outcome of the appeal.

## II.

We will uphold a decision to grant a preliminary injunction unless it constitutes an abuse of discretion. Doe v. Trs. of Bos. Coll., 942 F.3d 527, 532 (1st Cir. 2019). We review the district court's findings of fact for clear error and its conclusions of law de novo. Id.

In assessing the plaintiffs' request for a preliminary injunction, the district court found that all four of the relevant factors (that is, "(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest") weighed in favor of granting the request. Shurtleff v. City of Bos., 928 F.3d 166, 171 (1st Cir. 2019). On appeal, the state has not challenged the district court's assessment of the latter three factors or suggested that any of the district court's factual findings amounted to clear error. Instead, it takes issue with the district court's conclusion that the plaintiffs were likely to succeed on the merits of their First Amendment claim. The state argues that the First Amendment is not implicated at all. Hence, the standard of review is mere rational basis, and not some heightened standard of review.

As appellees, the cable companies defend the entry of the preliminary injunction on both First Amendment and federal preemption grounds. We can affirm the entry of the preliminary injunction on any ground supported by the record. See Jennings v. Stephens, 574 U.S. 271, 276 (2015) (noting that an appellee, without taking a cross-appeal, can argue for affirmance on any ground supported by the record, even if it involves an attack on the reasoning of the lower court). We choose to address the more thoroughly briefed First Amendment issue, reviewing de novo the

legal conclusions underpinning the district court's analysis.  We
do not reach any preemption issues.

Thus framed, our task is narrow.  The state candidly
conceded at oral argument that, if the Act triggers the First
Amendment at all, the existing record is insufficient to justify
the law and the state cannot prevail on this appeal.  The central
question, then, is whether Chapter 308 likely implicates the First
Amendment rights of cable operators or programmers.  If we find
that it does, the action will return to the district court for
consideration of which level of constitutional scrutiny applies,
whether additional, post-enactment evidence can be offered in
support of the law, and potentially even whether, on a more fulsome
record, the state law is preempted.[5]

Because this is an appeal of a preliminary injunction,
we assess only whether the district court abused its discretion in
finding a likelihood of success on the First Amendment argument.
At the same time, given the fullness of the record on the First

---

[5] The district court explicitly reserved the first two of
these questions.  See Comcast of Me./N.H., Inc., 435 F. Supp. 3d
at 249 n.14 ("Because I reach the conclusion I do, I sidestep the
question of whether the legislature itself must create a record
showing that a problem actually exists and that the law is likely
to solve that problem."); id. at 248 ("Because I ultimately
conclude that the State has not met its burden of showing that it
is likely to succeed under intermediate scrutiny, I do not need to
decide this issue [i.e., whether strict scrutiny applies] at this
time.").

Amendment issue, our legal conclusion -- whether the First Amendment is implicated at all -- will be binding, barring any unforeseen developments in the factual record below.  Under the law of the case doctrine, a panel decision on a preliminary injunction motion constitutes binding precedent, at least when the record before the panel was "sufficiently developed and the facts necessary to shape the proper legal matrix we[re] sufficiently clear."  Naser Jewelers, Inc. v. City of Concord, 538 F.3d 17, 20 (1st Cir. 2008) (quoting Cohen v. Brown Univ., 101 F.3d 155, 169 (1st Cir. 1996)); see also 18B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4478.5 (2d ed. 2020) ("A fully considered appellate ruling on an issue of law made on a preliminary injunction appeal . . . does become the law of the case for further proceedings in the trial court on remand and in any subsequent appeal.").  For that reason, and for brevity, we will not refer to "likelihoods" and "probabilities" on the First Amendment issue.

### III.

In Turner Broadcasting System, Inc. v. FCC ("Turner I"), 512 U.S. 622 (1994), the Supreme Court explained the applicability of the First Amendment to the commercial medium of cable television: "Cable programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment."  Id. at 636

(citing <u>Leathers</u> v. <u>Medlock</u>, 499 U.S. 439, 444 (1991)). This is so, the Court reasoned, because whether "[t]hrough 'original programming or by exercising editorial discretion over which stations or programs to include in its repertoire,' cable programmers and operators 'see[k] to communicate messages on a wide variety of topics and in a wide variety of formats.'" <u>Id.</u> (quoting <u>City of Los Angeles</u> v. <u>Preferred Commc'ns, Inc.</u>, 476 U.S. 488, 494 (1986)).

However, this observation -- that a cable operator or programmer can, just like any private citizen or member of the press, invoke the speech protections of the First Amendment -- is just an "initial premise." <u>Id.</u> As other circuits have subsequently observed, a cable company alleging a violation of its First Amendment rights must still "show that the challenged government action actually regulates protected speech," <u>Cablevision Sys. Corp.</u> v. <u>FCC</u>, 570 F.3d 83, 96 (2d Cir. 2009), or "interferes with [its] speech rights," <u>Time Warner Entm't Co.</u> v. <u>FCC</u>, 240 F.3d 1126, 1129 (D.C. Cir. 2001). After all, "without a plausible allegation that the offensive conduct interferes with First Amendment rights," a reviewing court "has neither a reason nor the ability to subject the conduct of the governmental actor to heightened scrutiny." <u>Cablevision Sys. Corp.</u>, 570 F.3d at 96.

Even then, incidental burdens imposed by a law on a speaker's First Amendment activities are not necessarily enough to

trigger heightened scrutiny under the First Amendment.  See Turner I, 512 U.S. at 640 (noting that "the enforcement of a generally applicable law may or may not be subject to heightened scrutiny under the First Amendment").  It is "beyond dispute," for example, that the government "can subject newspapers to generally applicable economic regulations without creating constitutional problems," Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue, 460 U.S. 575, 581 (1983), even if their "enforcement against the press has incidental effects on its ability to gather and report the news," Cohen v. Cowles Media Co., 501 U.S. 663, 669 (1991).  Indeed, whole categories of law -- copyright, tax, antitrust, and labor, just as examples -- impose burdens on the press without necessarily raising First Amendment hackles.  See id. at 669-70; see also Arcara v. Cloud Books, Inc., 478 U.S. 697, 706 (1986) ("One liable for a civil damages award has less money to spend on paid political announcements or to contribute to political causes, yet no one would suggest that such liability gives rise to a valid First Amendment claim.").

Turner I and its follow-on case, Turner Broadcasting System, Inc. v. FCC ("Turner II"), 520 U.S. 180 (1997), illustrate how these principles apply.  At issue in both cases were the "must-carry" provisions of the Cable Television Consumer Protection and Competition Act of 1992 ("1992 Cable Act" or "Cable Act"), which requires cable operators to dedicate some of their channel capacity

to carrying local broadcast stations.  Turner I, 512 U.S. at 630.
Each case developed a different part of the analysis.  Turner I
analyzed which level of heightened First Amendment scrutiny (if
any) applied and concluded that intermediate scrutiny governed.
512 U.S. at 636-62.  Turner II, on a more factually developed
record, evaluated the burdens and benefits of the provisions under
intermediate scrutiny.  520 U.S. at 185.

Across the two cases, the Court explained that the "must-
carry" requirements interfered with protected speech because:

> First, the provisions restrain cable
> operators' editorial discretion in creating
> programming packages by "reduc[ing] the number
> of channels over which [they] exercise
> unfettered control."  Second, the rules
> "render it more difficult for cable
> programmers to compete for carriage on the
> limited channels remaining."

Turner II, 520 U.S. at 214 (quoting Turner I, 512 U.S. at 637).
The Court also rejected the argument that the "must-carry"
provisions were "nothing more than industry-specific antitrust
legislation" that would only "warrant rational-basis scrutiny."
Turner I, 512 U.S. at 640.  That was because "laws that single out
the press, or certain elements thereof, for special treatment 'pose
a particular danger of abuse by the State,' and so are always
subject to at least some degree of heightened First Amendment
scrutiny."  Id. at 640-41 (quoting Ark. Writers' Project, Inc. v.
Ragland, 481 U.S. 221, 228 (1987)) (citing City of Los Angeles,

476 U.S. at 496). Given that "the must-carry provisions impose
special obligations upon cable operators and special burdens upon
cable programmers," the Court concluded that "some measure of
heightened First Amendment scrutiny is demanded." Id. at 641
(citing Minneapolis Star & Trib. Co., 460 U.S. at 583).

## IV.

Building on Turner I and II, the cable companies identify
two ways in which Chapter 308 allegedly burdens their First
Amendment rights. First, they argue that it constitutes a speaker-
based regulation that "singles out" cable operators' speech for
special, disfavored treatment. Second, they claim it infringes on
cable operators' and programmers' "editorial discretion." Because
we find merit in the "singling out" argument, we need not, and
therefore do not, reach the district court's determination that
the cable companies failed to provide adequate support for their
contention that Chapter 308 also triggers heightened scrutiny
because it impinges on their "editorial discretion."

There is no question that the á la carte requirement
"singles out" in some sense. Chapter 308 applies only to "cable
system operator[s]," and says nothing about direct competitors
like satellite-based operators (e.g., DirectTV and DISH Network)
and internet-based operators (e.g., YouTube TV and Hulu+ Live TV).
Me. Stat. tit. 30-A, § 3008(3)(F). The question is whether Chapter
308's targeted obligation triggers heightened First Amendment

scrutiny under Turner I. The cable companies argue that the obligation is significant. They point to various kinds of costs that would be imposed by the law. Some costs would be technical in nature. Comcast suggests it would need to overhaul its ordering, distribution, and billing systems. In addition, some customers have older set-top boxes that cannot deliver á la carte content. These would have to be replaced with newer digital equipment. Other potential burdens are legal in nature. Comcast maintains that many of its existing agreements with programmers (so-called "affiliation agreements") prohibit á la carte transmission and would therefore have to be renegotiated.

Against this background, we begin with Turner I's explanation of when heightened scrutiny applies. The Court's language is broad and unqualified: "[L]aws that single out the press, or certain elements thereof, for special treatment . . . are always subject to at least some degree of heightened First Amendment scrutiny." 512 U.S. at 640-41 (emphasis added) (citing City of Los Angeles, 476 U.S. at 496). Later in the opinion, when deciding whether strict scrutiny (rather than intermediate scrutiny) applied under a "singling out" theory, the Court also explained that "the fact that a law singles out a certain medium, or even the press as a whole, 'is insufficient by itself to raise First Amendment concerns.'" Turner I, 512 U.S. at 660 (quoting Leathers, 499 U.S. at 452). This later statement, however, must

be read in context.  By this point in the opinion, the Court had
already determined that heightened scrutiny applied; it was now
considering whether "singling out" mandated strict scrutiny.
Indeed, the Court began the paragraph in which this statement
appears by explaining that "[i]t would be error to conclude
. . . that the First Amendment mandates strict scrutiny for any
speech regulation that applies to one medium (or a subset thereof)
but not others."  Id. (emphasis added).  We thus read this latter
reference to "rais[ing] First Amendment concerns" consistently
with the opinion's earlier discussion, as addressing the
applicable level of heightened scrutiny and not whether heightened
scrutiny applies at all.

Even if Turner I's very broad statement (i.e., that laws
that single out the media are always subject to heightened
scrutiny) is not true in all instances, the state's reasons for
withholding heightened scrutiny in this case are unpersuasive,
given that Chapter 308 targets cable operators but leaves similarly
situated internet- and satellite-based operators untouched.  Maine
first argues that Turner I's "singling out" holding is inapplicable
to consumer protection laws like the one at issue here.  It points
out that many consumer protection laws apply only to cable
operators.  For example, Maine requires that cable operators issue
credits for service interruptions, provide toll-free telephone
numbers for receiving customer complaints, and refrain from

- 17 -

charging excessive late payment fees. See Me. Stat. tit. 30-A, § 3010(1), (6-B). The state rejects the suggestion that such consumer protection measures will trigger First Amendment scrutiny simply because they "single out" cable operators. Turner I makes clear, however, that state consumer protection laws may still be subject to heightened scrutiny on the basis that they "single out." Indeed, the "must-carry" provisions at issue in the Turner cases could themselves be fairly characterized as consumer protection measures, insofar as they were intended to ensure the "continued availability of free local broadcast television" to viewers unable to afford paid options. Turner I, 512 U.S. at 646. Hence, Turner I itself suggests that a beneficent consumer protection purpose does not insulate a law from the possible application of the First Amendment.

In rejecting the state's argument, we do not dismiss its concerns about applying the heightened scrutiny required under the First Amendment to laws that arguably may impose no more than de minimis costs on a segment of the media. Those concerns, however, can be addressed through the appropriate application of the heightened standard of review. Heightened scrutiny will not prevent Maine from enforcing cable-specific laws that serve important state interests. Indeed, if intermediate scrutiny applies, Maine will still enjoy "latitude in designing a regulatory solution." Turner II, 520 U.S. at 213.

Trying another tack, the state suggests that "singling out" concerns are generally restricted to laws that impose special taxes on the press. To be sure, <u>Turner I</u>'s discussion did rely heavily on cases involving selective and discriminatory taxes. The opinion itself, however, applied the "singling out" analysis to a non-tax law, i.e., the "must-carry" provisions. <u>See</u> 512 U.S. at 641. Moreover, the Supreme Court has recognized that different "forms of financial burden" can "operate as disincentives to speak." <u>Simon & Schuster, Inc.</u> v. <u>Members of N.Y. State Crime Victims Bd.</u>, 502 U.S. 105, 108 (1991). Taxing the media may be the most obvious way to impose a burden, but it is not the only way. <u>See</u> <u>id.</u> at 108-09 (discussing a "Son of Sam" law that escrowed the speaker's speech-derived income for at least five years); <u>see also</u> <u>Pitt News</u> v. <u>Pappert</u>, 379 F.3d 96, 110, 111-12 (3d Cir. 2004) (reasoning that the "[g]overnment can . . . seek to control, weaken, or destroy a disfavored segment of the media by targeting that segment" and that "whether those burdens take the form of taxes or some other form is unimportant").

In a third attempt to insulate Chapter 308 from heightened scrutiny despite its targeting of cable operators, the state contends that a law singling out part of the media for disfavored treatment raises First Amendment concerns only if the law "directly" or "independently" implicates the First Amendment's free speech protections. We are again unconvinced. If a law

implicates the First Amendment for some other, independent reason,
it is hard to see what additional force a "singling out" analysis
brings to the table.  Contrary to the state's suggestion, First
Amendment law is often concerned with laws that do not "directly"
implicate the First Amendment.  As the Court has explained,
heightened First Amendment scrutiny can apply, for example, to
"statutes which, although directed at activity with no expressive
component, impose a disproportionate burden upon those engaged in
protected First Amendment activities" or have "the inevitable
effect of singling out those engaged in expressive activity."
Arcara, 478 U.S. at 704, 707.

Our conclusion that the First Amendment is triggered by
Chapter 308's targeting of cable companies aligns with the views
of other circuits that have similarly applied Turner I's "singling
out" rationale to  cable- or satellite-specific regulations based
solely on the laws' narrow focus.  For example, in DISH Network
Corp. v. FCC, the Ninth Circuit considered a preliminary injunction
against a law requiring that satellite operators begin carrying
certain channels in high definition by a specific date.  653 F.3d
771, 777 (9th Cir. 2011).  As the court explained, the law did not
affect an operator's "ability to offer programs."  Id.  But it
required the satellite provider to change the order in which it
converted channels to HD, both prioritizing certain channels and
preventing the satellite provider from offering other programs in

HD.  Id.  On that basis, the court concluded that the law implicated the First Amendment, reasoning that, under Turner I, "any law that singles out an element of the press is subject to some form of heightened First Amendment scrutiny."  Id.  Hence, even though the requirement imposed only "minimal and nuanced" obligations on satellite carriers, it nonetheless "likely implicated" the First Amendment.  Id.[6]

Similarly, in Time Warner Entertainment Co. v. FCC, the D.C. Circuit evaluated the constitutionality of cable rate regulations issued by the FCC under the authority of the 1992 Cable Act.  56 F.3d 151, 179 (D.C. Cir. 1995).  That court also viewed Turner I as holding that "laws of less than general application aimed at the press or elements of it" trigger First Amendment scrutiny.  Id. at 181 (citing Turner I, 512 U.S. at 640).  Accordingly, the court concluded, "we know from [Turner I] that rational basis cannot be the test" for evaluating the cable-specific rate regulations at issue.  Id.

Finally, in Time Warner Cable, Inc. v. Hudson, the Fifth Circuit reviewed a law that allowed some cable operators to opt out of their existing municipal franchise agreements (and obtain a new, more convenient state-wide franchise), but denied the same privilege to larger, established operators.  667 F.3d 630, 634

---

[6] DISH Network Corp. also concluded that the provision was likely to survive intermediate scrutiny.  See 653 F.3d at 782.

(5th Cir. 2012).  The court concluded that the law was "not a law
of general applicability as it excludes statewide franchises from
certain incumbents and singles out elements of the press for
special treatment."  Id. at 638.  As a result, the First Amendment
was implicated; it remained only to "determine which form of
heightened scrutiny to apply."  Id. (citing Turner I, 512 U.S. at
641).

        Overall, we detect no basis here for departing from the
Supreme Court's explicit statement in Turner I that laws singling
out one segment of the press for "special treatment . . . are
always subject to at least some degree of heightened First
Amendment scrutiny." 512 U.S. at 640-41 (emphasis added).  Chapter
308 expressly treats cable operators differently from some of their
direct competitors (like satellite-based Dish TV and DirectTV).
Cable operators alone must adopt an á la carte system, while their
competitors remain free to offer content in traditional tiers and
packages.  That unique treatment amounts to singling out under
Turner I and triggers heightened scrutiny under the First
Amendment.

        In so deciding, we leave open the question of whether
Chapter 308 would trigger "singling out" concerns if it applied
across the board to all pay TV systems, including satellite- and
internet-based ones.  Turner I is fairly read to suggest that the
broader the scope of a regulation, the less likely it is to raise

First Amendment concerns.  See 512 U.S. at 661 (suggesting that "more narrowly targeted regulations" pose greater "dangers of suppression and manipulation").  But because Chapter 308 singles out cable from similarly situated rivals in the pay TV market, we need not address that question.

**V.**

In sum, we conclude that the district court correctly determined that Chapter 308 triggers heightened First Amendment scrutiny because it "singles out" cable operators.  The state has acknowledged that it cannot meet any heightened level of scrutiny on this record.  Accordingly, we agree that the district court correctly entered a preliminary injunction delaying the enforcement of Chapter 308.  We do not decide, however, what level of constitutional scrutiny is appropriate.  The district court should decide that issue in the first instance, as well as determine whether the state is permitted to adduce post-enactment evidence to satisfy that level of scrutiny.  Additionally, the parties and the court are free to revisit the question of preemption on a more fully developed record, if they choose to do so.

Affirmed.